1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
     DAVID DAVIES d/b/a DAVIES    )
 4   HOME SERVICES, individually  )
     and as the representative    )
 5   of a class of similarly      )
     situated persons,            )
 6                                )
                  Plaintiff,      )  No. 13-CV-3546
 7                                )
           vs.                    )
 8                                )
     W.W. GRAINGER, INC., and     )
 9   JOHN DOES 1-12,              )
                                  )
10                Defendants.     )

11

12          The deposition of ROBERT J. FINN taken

13   before Teresa Resendez, Certified Shorthand Reporter,

14   taken pursuant to the provisions of the Illinois Code

15   of Civil Procedure and the Rules of the Supreme Court

16   thereof pertaining to the taking of depositions for the

17   purpose of discovery at 134 North LaSalle Street,

18   Suite 1000, Chicago, Illinois, commencing at

19   10:00 a.m., on October 15, 2013.

20

21

22

23

24
```

2

```
 1   APPEARANCES:

 2        BOCK & HATCH, LLC
          MR. JAMES M. SMITH
 3        MR. JONATHAN B. PIPER
          134 North LaSalle Street
 4        Suite 1000
          Chicago, Illinois  60602
 5        Phone:  (312) 658-5500
          E-mail:  jon@bockhatchllc.om
 6
 7             On behalf of the Plaintiff;

 8        WINSTON & STRAWN, LLP
          MR. NORMAN K. BECK
 9        35 West Wacker Drive
          Chicago, Illinois  60601
10        Phone:  (312) 558-7422
          E-mail:  nbeck@winston.com
11
               On behalf of the Defendants;
12
13        W.W. GRAINGER, INC.
          MS. AIMEE M. NOLAN
14        100 Grainger Parkway
          Lake Forest, Illinois 60045
15        Phone:  (847) 535-1047
          E-mail:  aimee.nolan@grainger.com
16
17             On behalf of the Defendant
               W.W. Grainger, Inc.
18
19             *    *    *    *    *    *

20

21

22

23

24
```

3

```
 1                    I N D E X

 2   WITNESS                                    PAGE

 3   ROBERT J. FINN

 4        Examination by Mr. Smith .............    4

 5

 6                  E X H I B I T S

 7   FINN DEPOSITION EXHIBIT

 8        No. 1 ...............................   21

 9        No. 2 ...............................   28

10        No. 3 ...............................   64

11        No. 4 ...............................   70

12        No. 5 ...............................   71

13

14

15

16

17

18

19

20

21

22

23

24
```

4

```
 1   WHEREUPON:

 2                    ROBERT J. FINN,

 3   called as a witness herein, having been first duly

 4   sworn, was examined and testified as follows:

 5                    EXAMINATION

 6   BY MR. SMITH:

 7        Q.   Good morning, sir.  Can you please state your

 8   full name for the record.

 9        A.   Robert J. Finn.

10        Q.   And spell your last name, please.

11        A.   F, like in Frank, I-N-N.

12        Q.   Okay.  And my name is Jim Smith.  I'm one of

13   the plaintiff's attorneys who represents David Davies,

14   doing business as, Davies Home Services.  And we're

15   here today to take your deposition.  Have you ever

16   given a deposition before?

17        A.   No.

18        Q.   Okay.  As you can see -- And I'm sure you had

19   discussions with your counsel about how this day was

20   going to go -- or morning, hopefully.  But as you can

21   see, there's a court reporter here.  She's going to

22   take down everything that we say.  So it's important

23   that, when we leave here today, the court reporter has

24   the opportunity to transcribe a clear record.  So to
```

5

1    that end, I'm going to do my best not to talk over you
2    and interrupt you when you're answering a question, and
3    I'm going ask that you do the same for me when I'm
4    asking a question.  Does that make sense?
5         A.   Yes.
6         Q.   Okay.  And to the extent this is different
7    than having just a normal conversation, oftentimes, I
8    can nod my head or say, you know, words like "uh-huh"
9    or "mm-hmm," and we understand what's going on; but the
10   court reporter might not be able to take that down.  So
11   to the extent you can give "yes" or "no" answers
12   or something clear that the court reporter can
13   understand, that's important.  Do you understand that?
14        A.   Yes.
15        Q.   Another point of clarification is, if I ask a
16   question and you don't quite understand it, please ask
17   me for clarification.  Okay?
18        A.   Okay.
19        Q.   And that's important because if I think I'm
20   asking a clear question and you don't understand it,
21   but you answer it anyway, it's going to be
22   understood -- or assumed that you did understand it.
23   Does that make sense to you?
24        A.   Yes.

6

1         Q.   Okay.  If you want to go back at any time
2    during the deposition to clarify an answer you gave, we
3    can stop and go back and revisit that.  Okay?
4         A.   Okay.
5         Q.   Are you on any medications today that would
6    affect your ability to answer or understand my
7    questions?
8         A.   No.
9         Q.   Do you have any impairments or disability
10   that would affect your ability to answer or understand
11   my questions?
12        A.   No.
13        Q.   Did you do anything to prepare for this
14   deposition?
15        A.   Yes.
16        Q.   And what did you do?
17        A.   I talked to our attorneys.
18        Q.   Anything else?
19        A.   And I talked to people within Grainger who
20   were familiar with the project.
21        Q.   And when you say "project," what do you mean
22   by that?
23        A.   The fax campaign.
24        Q.   And who at Grainger did you speak with to

7

1    prepare for today's deposition?
2         A.   Do you want specific names?
3         Q.   Yes, please.
4         A.   Kathy Kasok.
5         Q.   Is that with a K or a C?
6         A.   K.
7         Q.   And do you know how to spell her last name?
8         A.   K-A-S-O-K, I believe, maybe A-K.
9         Q.   Okay.  Anybody else?
10        A.   Tom Carlson.
11        Q.   Do you know how to spell Carlson?
12        A.   C-A-R-L-S-O-N.
13        Q.   Anybody else?
14        A.   Brett Macalpine.
15        Q.   Do you know how to spell his last name?
16        A.   Yeah.  M-A-C-A-L-P-I-N-E.
17        Q.   Anybody else?
18        A.   Patti Lang, P-A-T-T-I, L-A-N-G; Amy Woolerly,
19   W-O-O-L-E-R-Y; Dan Nicholas, N-I-C-O-L-A-S.  Peggy in
20   Pricing, I don't know her last name.
21        Q.   Is that it?
22        A.   That's as far as I ...
23        Q.   Did you do anything else to prepare for
24   today's deposition?

8

1         A.   I reviewed the fax campaign myself.
2         Q.   When you say the "fax campaign" -- Strike
3    that.
4              When you say "reviewed the fax campaign," is
5    that documents that you were reviewing?
6         A.   Yes.
7         Q.   And what type of documents would that be?
8         A.   That's the fax that we sent.
9         Q.   Anything beyond the fax?
10        A.   Yes.
11        Q.   And what types of documents would those be?
12        A.   Contracts.
13        Q.   Anything else?
14        A.   That's pretty much it.  That's pretty much
15   it.
16        Q.   And who would those contracts be with?
17        A.   InfoUSA.
18        Q.   Anybody else other than InfoUSA?
19        A.   Optima Direct.
20        Q.   Is it O-P-T-I-M-A, Optima --
21        A.   Yes.
22        Q.   -- and then a new word, "direct"?
23        A.   Yes.
24        Q.   Any other contracts?

9

```
1        MR. SMITH:  Off the record.
2                         (Enter Mr. Piper.)
3                         (Discussion off the record.)
4   BY MR. SMITH:
5        Q.   Any contracts that you reviewed other than
6   with InfoUSA and Optima Direct?
7        A.   No.
8        Q.   Okay.  I'll circle back and talk a little bit
9   about the folks who you spoke with to prepare for the
10  deposition.
11            For now, I'm going to talk a little bit about
12  what you do for Grainger and a little bit about what
13  Grainger does.  Okay?
14       A.   Okay.
15       Q.   And I know that the formal name of Grainger
16  is W.W. Grainger, Inc.; is that right?
17       A.   Yes.
18       Q.   Is it okay for the purpose of this deposition
19  that we just refer to that entity as Grainger, and
20  everybody will know what I'm talking about -- or what
21  we're talking about?
22       A.   Yes.
23       Q.   Okay.  And you work for Grainger; is that
24  right?
```

10

```
1        A.   Yes.
2        Q.   And how long have you worked for Grainger?
3        A.   Almost nine years.
4        Q.   And what's your current title?
5        A.   Senior director of marketing communications.
6        Q.   Okay.  And what is Grainger?
7        A.   Grainger is an industrial distribution
8   company that sells millions of products to all
9   different types of businesses.
10       Q.   Are they limited to the United States, or do
11  they sell nationwide -- or worldwide?
12       A.   Yeah.  We have locations -- We sell
13  worldwide.
14       Q.   And within the nation, is it all 50 states?
15       A.   Yes.
16       Q.   And as I understand correctly, Grainger is a
17  Fortune 500 company; is that right?
18       A.   Yes.
19       Q.   And if you had to estimate -- or could you
20  estimate, I should say, how many customers that
21  Grainger has nationwide?
22       MR. BECK:  This is just a little bit off the
23  notice, but go ahead.  If you have an answer, you can
24  answer that.
```

11

```
1   BY THE WITNESS:
2        A.   We have 1.8 million customers.
3        Q.   And is that nationwide or worldwide, that
4   figure?
5        A.   I believe it's nationwide.
6        Q.   And how long have you been the senior
7   director of marketing communications?
8        A.   About seven years.
9        Q.   And what were you -- or did you have a title
10  before that?
11       A.   Yes.
12       Q.   And what was it?
13       A.   Director of direct marketing.
14       Q.   And how long were you the director of direct
15  marketing for Grainger?
16       A.   About two years.
17       Q.   Does that bring you to when you started with
18  Grainger?
19       A.   Yeah.
20       Q.   And what were your job responsibilities while
21  you were the director of direct marketing?
22       A.   To create direct mail.
23       Q.   Anything else?
24       A.   No.
```

12

```
1        Q.   And can you further elaborate what you mean
2   by "create direct mail"?
3        A.   Yes.  To put graphics and copy on direct mail
4   and to execute it and send out to our customers.
5        Q.   And when you say your customers, were they
6   existing customers at the time?
7        A.   Back in --
8        Q.   In the two-year time period when you were
9   director of direct marketing.
10       A.   Yes.
11       Q.   So did you have a customer list?
12       A.   Yes.
13       Q.   And you would -- Walk me through that
14  process.  How would you actually send out the direct
15  mail marketing?
16       A.   We have a customer list on our database, and
17  we would target those customers, specific customers,
18  and send direct mail out to that database of existing
19  customers.
20       Q.   And what's the name of that database that
21  you're referring to?
22       A.   Are you referring -- Are you referring back
23  to the 2004?
24       Q.   Well, you referred to a database that
```

13

```
1   Grainger had.
2       A.   Yeah, our ERP system.
3       Q.   ERP?
4       A.   Yeah.  SAP.
5       Q.   Do you know what those two acronyms mean, ERP
6   and SAP?
7       A.   Yes.
8       Q.   What do they mean?
9       A.   ERP is a common term, Enterprise --
10  something -- platform.  I don't remember what the R
11  means.
12      Q.   Okay.
13      A.   SAP is a company.  SAP -- Currently we have
14  SAP as our ERP system.
15      Q.   And that -- Currently, today, Grainger has
16  that same company, SAP?
17      A.   Yes.
18      Q.   Okay.  And how would Grainger input the --
19  Strike that.
20           Was this database limited to existing
21  customers only?
22      A.   Back then, I don't remember.
23      Q.   Okay.  Has it changed today, the database,
24  with respect to being limited to customers or including
```

14

```
1   folks in there that aren't customers?
2       A.   I don't know.
3       Q.   Okay.  So when you changed your position to
4   senior director of marketing communications, what were
5   your job responsibilities?  Or how did your job
6   responsibilities change?
7       A.   It broadened the scope from -- In addition to
8   direct mail, I'm responsible for executing -- my team
9   is responsible for executing the advertising for
10  Grainger.
11      Q.   Is that limited by geography in any way?
12      A.   Predominantly, the United States.
13      Q.   And when you say "executing the advertising,"
14  is that all forms of advertising for Grainger?
15      A.   Yes.
16      Q.   And would it be possible for you to list the
17  various forms of advertising that Grainger has done
18  over the last five years?
19      A.   Sure.  Direct mail, catalogs, radio and print
20  advertising, seller collateral, digital media, trade
21  show banners, and fax.
22      Q.   Anything else?
23      A.   That's it.
24      Q.   What does seller collateral mean?
```

15

```
1       A.   We have sellers in -- calling on customers,
2   and they have one-pager sheets that talk about products
3   or services that Grainger offers in which the seller
4   can talk to the customer.
5       Q.   So -- And I might not be understanding you
6   correctly.  Does Grainger have, like, a phone center
7   where you're calling -- where their job description is
8   to, like, telemarket or call on existing customers?
9       A.   We have a call center.  Customers can call
10  into the call center to place orders and whatnot.  We
11  have call center folks that call our existing customers
12  from time to time.
13      Q.   And with respect to executing these forms of
14  advertising that you just listed, what is your role?
15      A.   I'm sorry.  Could you repeat the question?
16      Q.   Sure.  As the senior director of marketing
17  communications over the last nine years, you had
18  testified that it was -- you were to execute
19  advertising for Grainger?
20      A.   Mm-hmm.
21      Q.   My question is, what was your specific role
22  in executing these forms of advertisement?
23      A.   Oversee teams that create the advertising,
24  work with our business partners to understand what
```

16

```
1   their goals are, and then create the advertising that
2   meets those goals.
3       Q.   Okay.  And was there a team that you oversaw
4   with respect to the fax advertising?
5       A.   The team that I oversaw had to do with
6   creating the fax itself.
7       Q.   Anything else?
8       A.   No.
9       Q.   And how many members of the team in -- We'll
10  start with today.  Is there still a team today for
11  Grainger that handles fax advertising?
12      A.   No.
13      Q.   Okay.  When did that team to cease to exist
14  or cease to handle fax advertising?
15      A.   We stopped doing fax advertising in 2009.
16      Q.   And when did you start?
17      A.   December 2008.
18      Q.   So during the time period from December 2008
19  to 2009, are you able to list the various team members
20  that were on that team, the fax advertising team?
21      A.   Yes.
22      Q.   Can you do that for me?
23      A.   Sure.  On my team, it was really Brenda
24  Gelfond.  She created the fax.
```

17

1    Q.   She created the fax?
2    A.   Yes.
3    Q.   And can you spell her last name?  Gelfond?
4    A.   G-E-L-F-O-N-D.
5         So she was on my team and created the fax.
6    Q.   Anybody else on the team?
7    A.   There were other people on other teams.
8    Q.   I see.
9         There were multiple facets of the fax
10   advertising -- Were there multiple teams, I guess?
11   A.   Yes.
12   Q.   Limited to fax advertising?
13   A.   Yes.
14   Q.   Okay.  How many other teams were there?
15   A.   One other team.
16   Q.   And who oversaw that team?
17   A.   I don't know who oversaw it.  I don't know
18   who really oversaw that.
19   Q.   Okay.  Does that team -- Did the two teams
20   have names?  Did you refer to them in any way?
21   A.   Yes.
22   Q.   And what were their names?
23   A.   Small business team.
24   Q.   And what was the name of the other team?

18

1    A.   The other team was my team that created
2    the -- So Brenda created the fax for the small business
3    team.
4    Q.   Okay.  And you're not sure who oversaw the
5    small business team between the 2008 and 2009 time
6    frame?
7    A.   I can give you the name -- I can give you
8    names.  I don't remember exactly who oversaw exactly at
9    what point in time.
10   Q.   Okay.  And if you could, between the
11   December 2008 to 2009 time frame, who was on the small
12   business team?
13   A.   John Gartner; Rohan -- R O H A N --
14   Thromballi.  Do you want me to spell it?
15   Q.   Yeah.
16   A.   I might be messing up the pronunciation, but
17   T-H-R-O-M-B-A-L-L-I.
18        Dan Nicholas.
19   Q.   That same --
20   A.   Yes.
21   Q.   One of the people you spoke with to prepare
22   for today's deposition?
23   A.   Yes.
24        Laura Weiss and Tom Carlson, I believe.

19

1    Q.   And you spoke with Tom Carlson to prepare for
2    today's dep?
3    A.   Yeah, yes.
4    Q.   Anybody else you can think of?
5    A.   It's such a long time ago.  I think that
6    those are, as far as I know, the main players in the
7    small business --
8    Q.   Okay.
9    A.   -- who helped construct the small business --
10   part of the small business team.
11   Q.   Okay.  And the small business team, just
12   judging by what you're calling it, they did more than
13   just fax advertising, correct?
14   A.   Yes.
15   Q.   And so during this December 2008 to 2009 time
16   period, was one of the things they decided to do was to
17   market small businesses through fax advertising?
18   A.   Yes.
19   Q.   And your team, with the help of Brenda
20   Gelfond, helped create the fax advertising?
21   A.   Yes.
22   Q.   Did you do anything else with respect to the
23   fax advertising during that December 2008 to 2009 time
24   frame?

20

1    A.   There may have been direct mail.  That's what
2    I remember.
3    Q.   But just limited to the fax advertising, did
4    you have any other -- did you or Brenda Gelfond have
5    any other role in the fax advertising from December
6    2008 to 2009?
7    A.   No.
8    Q.   Okay.  And does John Gartner still work for
9    Grainger?
10   A.   No.
11   Q.   What about Rohan?
12   A.   No.
13   Q.   Dan Nichols?
14   A.   Nicholas?  Yes.
15   Q.   Nicholas.
16        Laura Weiss?
17   A.   No.
18   Q.   And Tom Carlson?
19   A.   No.
20   MR. BECK:  Could you read that last question back?
21   I'm sorry.
22        (Record read as requested.)
23   BY MR. SMITH:
24   Q.   Does Tom Carlson still work for Grainger?

21

1    A.   Yes.
2    Q.   The folks who you identified as people you
3 spoke to that work for Grainger for you to prepare for
4 today's deposition, do all those folks still work for
5 Grainger?
6    A.   Yes.
7    Q.   Did you speak with any former employees to
8 prepare for today's deposition?
9    A.   No.
10    MR. SMITH:  Okay.  I would like to mark the first
11 exhibit.
12              (Finn Deposition Exhibit No. 1
13               marked as requested.)
14 BY MR. SMITH:
15    Q.   Sir, I'm going to hand to you what's been
16 marked as Finn No. 1.  Take some time and look that
17 over for me.  Do you recognize what's been marked as
18 Exhibit No. 1?
19    A.   Yes.
20    Q.   And what do you recognize it to be, or what
21 is it?
22    A.   It's a notice of deposition that -- It's the
23 notice of deposition.
24    Q.   For you to appear here today or somebody from

22

1 Grainger to appear here today?
2    A.   Yes.
3    Q.   I would like to call your attention to the
4 second page.  It starts with "Deposition Rider."  Are
5 you Grainger's designated representative to discuss
6 these topics today?
7    MR. BECK:  Just for the record, he is, subject to
8 discussions that you and I have had about the scope of
9 the notice with respect to the judge's order.  But
10 subject to that ...
11    MR. SMITH:  Okay.  So -- I don't know if we have
12 to get involved on the record here, but our
13 conversation sort of stopped once Judge Mason clarified
14 the scope.  So I guess we can, if necessary, tackle it
15 if I go beyond the scope.  If you think I do, we can,
16 you know, cross that bridge if we get there.
17    MR. BECK:  Fair enough.
18 BY MR. SMITH:
19    Q.   Okay.  Sir, I would like to walk through this
20 deposition rider with you.  Hopefully it's not too
21 painful.
22         Paragraph No. 1 states, "Circumstances
23 surrounding how Grainger obtained David Davies doing
24 business as, Davies Home Services' fax number on or

23

1 before December 2nd, 2009."  Are you knowledgeable of
2 this topic?
3    A.   Yes.
4    Q.   Are you the most knowledgeable person at
5 Grainger regarding this topic?
6    A.   Yes.
7    Q.   Are there any former employees at Grainger
8 who would be more knowledgeable than you regarding this
9 topic?
10    MR. BECK:  Objection: form, calls for
11 speculation.
12         You can answer.
13 BY THE WITNESS:
14    A.   Could be.  I don't know.  I think I am,
15 though.  Could be.
16    Q.   And when you say "could be," are you thinking
17 of any particular person or persons in mind?
18    A.   Yes.
19    Q.   And who is that?
20    A.   John Gartner.
21    Q.   Thinking about anybody else?
22    A.   Rohan Thromballi.
23    Q.   Anybody else?
24    A.   No.

24

1    Q.   Now, number 2, for the record, reads,
2 "Circumstances surrounding how Grainger developed a
3 list of recipients who were to receive the" -- in
4 quotes -- "advertising circulars" -- end quotes -- "as
5 referenced by Grainger in its initial disclosures
6 pursuant Rule 26(a)(1) via facsimile from April 5,
7 2009, to the current date."
8         Are you the most knowledgeable person at
9 Grainger regarding this topic?
10    MR. BECK:  For the record, that was one topic that
11 we identified a being beyond the scope of the judge's
12 order.  And so Mr. Finn is not being presented here on
13 that topic.
14 BY MR. SMITH:
15    Q.   I'll move to the third paragraph, sir.  And
16 for the record, it reads, "Circumstances surrounding
17 how Grainger sent or attempted to send the fax attached
18 to plaintiff's complaint to plaintiff and any other
19 recipients."
20         Are you the most knowledgeable person at
21 Grainger regarding this topic?
22    MR. BECK:  Again, that is a topic that we
23 identified as being beyond the scope of the current
24 order.  Mr. Finn is not being presented in that

25

1  capacity.  Although he may have knowledge as to that
2  topic, he's not being presented as a 30(b)(6) witness
3  on that.
4        MR. SMITH:  So for any questions that I ask that
5  you deem to fall within these categories, are you going
6  to prevent Mr. Finn from answering?
7        MR. BECK:  I don't know.  I don't anticipate doing
8  that, but it will depend on the question.
9        MR. SMITH:  I guess to make these a little easier
10  or smoother, what other categories or paragraphs are
11  you objecting to?
12       MR. BECK:  Two, 3, and 4, to the extent they don't
13  involve Mr. Davies; 5 and 6, to the extent -- We're not
14  objecting to 5 and 6.
15       MR. SMITH:  You're not?
16       MR. BECK:  Subject to the judge's -- I mean, the
17  judge's order specifically addressed your ability to
18  ask as to other ...
19  BY MR. SMITH:
20       Q.   Well, maybe this is a more appropriate way to
21  do it:  Mr. Finn, are you prepared to testify with
22  respect to topics discussed in Paragraph No. 2?
23       A.   No.
24       Q.   And why not?

26

1        A.   Because I believe I was here to talk about
2  paragraphs 1, 5, and 6.
3        Q.   And what's your belief based on?
4        A.   My conversations with the attorneys.
5        Q.   Now, with respect to Paragraph No. 5, are you
6  the most knowledgeable person at Grainger regarding
7  this topic?
8        A.   Yes.
9        Q.   Are there any former Grainger employees who
10  are as knowledgeable or more knowledgeable than you on
11  this topic?
12       A.   No.
13       Q.   With respect to Paragraph No. 6, are you the
14  most knowledgeable person at Grainger on this topic?
15       A.   Yes.
16       Q.   And are there any former Grainger employees
17  who are as knowledgeable or more knowledgeable than you
18  on this topic?
19       A.   No.
20       Q.   Now, I understand that you're not prepared to
21  discuss today the topics in paragraphs 2, 3, 4, 7, and
22  8, but I want to call your attention to paragraph 2 in
23  the event that the Court straightens out the scope
24  issue and somebody's going to have to come back and

27

1  talk about these topics.  Are you the person that's
2  going to talk about the topics in Paragraph No. 2?
3        A.   I don't know.
4        Q.   Is there anybody at Grainger more
5  knowledgeable than you regarding the topics contained
6  in paragraph 2?
7        MR. BECK:  Object to the form, calls for
8  speculation.
9        You can answer.
10  BY THE WITNESS:
11       A.   At this point, I think I probably know a lot
12  about this.  So am I the absolute correct person?  I'm
13  not sure.
14       Q.   Same thing with respect to paragraph 3:  If
15  we've got to come back here and depose somebody
16  regarding this topic, are you the most knowledgeable
17  person at Grainger to discuss topics contained in
18  paragraph 3?
19       MR. BECK:  Same objection.
20       You can answer.
21  BY THE WITNESS:
22       A.   Yeah.
23       Q.   And what about paragraph 4?  If we have to
24  come back and depose somebody with respect to these

28

1  topics, are you the most knowledgeable person?
2        MR. BECK:  Same objection.
3        You can answer.
4  BY THE WITNESS:
5        A.   Yes.
6        Q.   I'm calling your attention down to
7  Paragraph No. 7.  If we have to come back here and
8  depose somebody -- Or when we have to come back here
9  and depose somebody regarding this topic, are you going
10  to be the most knowledgeable person at Grainger?
11       MR. BECK:  Same objection.
12       You can answer.
13  BY THE WITNESS:
14       A.   Yes.
15       Q.   And same question with respect to
16  Topic No. 8:  If we have to come back here or when we
17  come back here, will you be the person at Grainger most
18  knowledgeable of this topic?
19       MR. BECK:  Same objection.
20       You can answer.
21  BY THE WITNESS:
22       A.   Yes.
23       MR. SMITH:  We'll mark Exhibit No. 2.
24

29

```
1              (Finn Deposition Exhibit No. 2
2               marked as requested.)
3  BY MR. SMITH:
4      Q.   Sir, the court reporter handed to you what's
5  been marked as Finn Exhibit No. 2.  Can you take some
6  time and look this over.
7      A.   Okay.  I looked it over.
8      Q.   Do you recognize Exhibit No. 2?
9      A.   Yes.
10     Q.   And what is it?
11     A.   It's the action complaint.
12     Q.   The amended class action complaint?
13     A.   Yes.
14     Q.   I want to call your attention to the last
15 page, which is Exhibit A to the amended class action
16 complaint.  Do you recognize this page?
17     A.   Yes.
18     Q.   And what is that?
19     A.   It's a fax.
20     Q.   Can you be more specific?
21     A.   It's the fax that we sent to Mr. Davies.
22     Q.   And who created this -- Strike that.
23          This is one of Grainger's fax advertisements?
24     A.   Yes.
```

30

```
1      Q.   Who created this advertisement?
2      A.   My team, although it doesn't look exactly
3  like the fax that we had sent.  It looks a little more
4  compressed.
5      Q.   Other than it looking a little more
6  compressed, does the content look the same?
7      A.   Yes.
8      Q.   And I'm sorry.  You stated your team created
9  this advertisement, right?
10     A.   Yes.
11     Q.   So that's you and Brenda?
12     A.   Yes.
13     Q.   Can you walk me through that process?  If I'm
14 understanding your testimony, generally, Brenda created
15 it, and you reviewed it or oversaw her while she
16 created it?  Is that generally correct?
17     A.   We had a small business team that created the
18 idea and the message.  Brenda worked on -- In our
19 creative team, Brenda did this specifically.  We would
20 work and put the copy points, the $25 offer, as well as
21 the -- all the terms and conditions.  We would put that
22 on paper; we would create it.
23     Q.   Okay.  So that process, I would like to get a
24 little more specific.  When you say "we," is it
```

31

```
1  something that Brenda would do, and then she would show
2  you what she would think is a final product; and then
3  you would okay it?  It that how it went?
4      A.   We would -- We have people on our creative
5  team that look at this.  We would also work with our
6  legal team to make sure that the terms and conditions
7  are all appropriate.
8      Q.   Is it a legal team within Grainger, like
9  in-staff or on-staff attorneys?
10     A.   Both, yes.
11     Q.   And do you know who at Grainger's legal team
12 reviewed this fax?
13     A.   Yes.
14     Q.   And who is that?
15     A.   Aimee Nolan.
16     Q.   And that's A-I-M-E-E, Aimee?
17     A.   Yes.
18     Q.   Anybody else?
19     A.   On our Grainger legal team?
20     Q.   Right.
21     A.   Not that I'm aware of.
22     Q.   And when was this fax advertisement created,
23 the one that's attached as Exhibit A to the complaint?
24     A.   I don't know the exact date.  A month before.
```

32

```
1  I don't know.
2      Q.   When you say -- And I understand that you're
3  not sure.  But when you said "month before," a month
4  before it was sent?
5      A.   Yes, as far as I remember.
6      Q.   And I notice that on the fax itself, it says,
7  "Monthly specials" towards the top.  Do you see that?
8      A.   Yes.
9      Q.   Was there multiple variations of the fax
10 advertisement that was sent during the time period of
11 December 2008 to 2009?
12     A.   Yes.
13     Q.   And how many variations?
14     A.   Nine in the year of 2009, one in 2008.
15     Q.   And did you and Brenda work on creating all
16 ten of those fax advertisements?
17     A.   I believe Brenda took the lead on creating
18 the majority of the advertisements.
19     Q.   And for each of the ten fax advertisements,
20 would you have the legal team review each one?
21     Q.   So plaintiff alleges that he received this
22 fax on December 2nd, 2009.  Do you know -- which is
23 obviously at the very far end of 2009 -- was this one
24
```

33

1  of the last faxes that you guys sent out?
2      A.  Yes.
3      Q.  Was it the very last?
4      A.  Yes.
5      Q.  Limited to Exhibit A here that we're talking
6  about, are copies of this advertisement saved anywhere?
7      A.  Yes.
8      Q.  Where is it saved?
9      A.  In a secure site, secure file folder.
10     Q.  Electronic folder?
11     A.  Yes.
12     Q.  Do you know if there's any hard copies saved
13 as well anywhere at Grainger?
14     A.  Probably.
15     Q.  And are all 10 variations of the fax
16 advertisements that were sent -- are all of those saved
17 at the same secure location that you're referring to?
18     A.  Yes.
19     Q.  And geographically, do you know where that
20 secure location would be?  Is there like a computer
21 server that these are saved on?
22     A.  I don't know.  I don't know.  I don't know
23 where the location of the server is or what -- I don't
24 know.

34

1      Q.  Okay.  You just know that they're saved
2  somewhere?
3      A.  Yes.
4      Q.  And so because the subject fax refers to
5  monthly specials -- in over approximately a one-year
6  period, you sent about ten variations of these fax
7  advertisements -- I'm gathering that there was a plan
8  to send these out once a month, roughly; is that
9  accurate?
10     A.  Not every month.
11     Q.  It turned out to be not every month.  But was
12 there a plan of action, when the small business team
13 decided to send out these advertisements, to market
14 small businesses by fax once a month?
15     A.  Yes.
16     Q.  And was there a meeting that took place to
17 discuss that fax advertisement plan?
18     A.  Probably.  I don't know of any specific
19 meeting that was set up.
20     Q.  Go ahead.  I'm sorry.
21     A.  No, I don't know of any specific meeting.
22     Q.  If there was a meeting, you weren't involved
23 with it or in it?
24     A.  Correct.

35

1      Q.  If there was a meeting, would members of the
2  small business team -- would they have been a part of
3  that meeting if there even was one?
4      MR. BECK:  Object to foundation.
5          Go ahead.  You can answer.
6  BY THE WITNESS:
7      A.  Yes.  Yes, there were meetings.
8      Q.  Now, were there E-mails exchanged regarding a
9  plan to send out fax advertisements to the small
10 businesses, you know, on a monthly basis?
11     A.  I don't know.
12     Q.  So if there were E-mails exchanged, you
13 didn't receive any of them; is that right?
14     A.  Correct.
15     Q.  I want to call your attention to the small
16 print at the bottom of Exhibit A.  Looks like there's,
17 generally, two paragraphs down there.  So I want to
18 call your attention to the first paragraph.  It starts,
19 "Offer valid for the intended recipient."  Do you see
20 that?
21     A.  Yes, but -- Yes.  But it's not that small.  I
22 can read it.
23     Q.  Would you agree it's smaller than all the
24 other typed font on this exhibit?

36

1      A.  Yes.
2      Q.  Do you know who drafted this language limited
3  to that first paragraph?
4      A.  Could you restate that question?
5      Q.  Sure.  I'm focusing your attention on the
6  paragraph, "Offer valid for the intended recipient."
7  Do you know who drafted that language?
8      A.  Yes.  Our team.
9      Q.  So you and Brenda?
10     A.  Brenda did.
11     Q.  Brenda did.
12         Was that language then reviewed by the legal
13 team?
14     A.  Yes, it was.
15     Q.  And do you know if the language changed at
16 all after the legal team reviewed it?
17     A.  It wasn't changed.
18     Q.  For the other nine variations of the fax
19 advertisement that was sent, did the content of this
20 paragraph change?  And I understand it refers to
21 specific dates.  So those dates would -- Assume they
22 would change, but the content -- Strike that.
23         For the other nine variations of the faxes
24 that were sent, did this "offer valid" paragraph -- was

37

```
1    this included on all those other nine variations?
2        A.   Yes.
3        Q.   And was the content of those other nine
4    variations the same?
5        A.   Yes.
6        Q.   I want to call your attention to the bottom
7    paragraph, the one that begins, "If you do not wish to
8    receive faxes."  Do you see that?
9        A.   Yes, sir.
10       Q.   And who drafted that language?
11       A.   We did, with the assistance of our legal
12   team.
13       Q.   When you say "we," do you mean Brenda again?
14       A.   Yes.
15       Q.   And then what do you mean by with the
16   assistance of your legal team?
17       MR. BECK:  He is not going to testify as to advice
18   of counsel that was given by legal other than that they
19   reviewed it.  Do you want to restate the question?
20       MR. SMITH:  Sure.  I wasn't interested in that
21   kind of response.
22       MR. BECK:  I'm not suggesting you were.  I just
23   want to make sure that Mr. Finn understands that.
24
```

38

```
1    BY MR. SMITH:
2        Q.   Did Brenda or you or both of you send this
3    bottom paragraph to a legal team to review?
4        A.   Yes.
5        Q.   And did the legal team change the language in
6    any way?
7        A.   The language on this fax is what the legal
8    team approved.
9        Q.   Okay.  Was this the same version that Brenda
10   sent to the legal team?
11       A.   I don't -- I don't remember.  I don't know.
12       Q.   If there were variations of the language, so
13   I guess, drafts of this fax advertisement, would those
14   drafts be saved at Grainger anywhere?
15       A.   Possibly.  I don't know.
16       Q.   Who would know the answer to that question?
17       A.   Probably Brenda.
18       Q.   I don't know if I asked this:  Does Brenda
19   still work at Grainger?
20       A.   Yes.
21       Q.   And the other nine variations of this fax
22   advertisement that Grainger sent between December 2008
23   and 2009, did this bottom paragraph change in any way?
24       A.   For 2009, it didn't change.
```

39

```
1        Q.   So that's telling --
2        A.   In 2008, there was a few little word changes
3    on 2008 that were slightly different.
4        Q.   And there was only one fax sent in 2008,
5    right?
6        A.   Yes.
7        Q.   So that one fax was slightly different than
8    the fax that's attached to the complaint; is that
9    right?
10       A.   Yes.
11       Q.   And do you recall what that difference was?
12       A.   Not exactly.  Not exactly.
13       Q.   Okay.  But that 2008 fax advertisement is
14   saved somewhere at Grainger, right?
15       A.   Yes.
16       Q.   And did the location of that bottom
17   paragraph, with respect to it being on the bottom of
18   the fax, for all ten variations, did the location
19   change in any way?
20       A.   No.
21       Q.   Did the size of the print change in any way?
22       A.   No.
23       Q.   And was it always underneath the "offer
24   valid" paragraph that's included on this exhibit?
```

40

```
1        A.   That there was a space and an indent.
2        Q.   There is a space and an indent where?
3        A.   A space between the first paragraph and the
4    second paragraph and then an indent.
5        Q.   The first paragraph is indented?
6        A.   Yes.  Well -- Yes.
7        Q.   That's what it looks like on this --
8        A.   Yes.
9        Q.   -- fax, right?
10            So is that set up the same for all ten
11   variations of the fax advertisement?
12       A.   Yes.
13       Q.   I want to change gears a little bit towards
14   the plaintiff and move way a little bit from the fax
15   advertisement and talk a little bit about the
16   plaintiff.  How did Grainger find plaintiff's fax
17   number?
18       A.   We used InfoUSA.
19       Q.   And what do you mean by that?  You used
20   InfoUSA?
21       A.   We had a contractual agreement with InfoUSA
22   to get fax numbers of existing customers.
23       Q.   So it was limited to existing customers only?
24       A.   Yes.
```

41

```
1       Q.   And do you know -- And I know you said you
2  reviewed some of these contracts to prepare for today's
3  deposition.  Do you know when Grainger entered into
4  this contract with InfoUSA?
5       A.   I don't remember when the contract for
6  InfoUSA for Grainger was done, but we did a statement
7  of work specifically for this work.
8       Q.   Statement of work?
9       A.   Yes.
10      Q.   I don't know what that means.  Can you
11 explain it to me?
12      A.   It's a contract that gives InfoUSA direction
13 on what to do.
14      Q.   Okay.  So if I'm understanding correctly,
15 Grainger already had an existing relationship with
16 InfoUSA, and you entered into sort of a separate or
17 ancillary agreement with InfoUSA regarding the fax
18 advertisement plan --
19      A.   Yes.
20      Q.   -- of December 2008 and 2009?
21      A.   Could you restate that question again?  I'm
22 sorry.
23      Q.   Sure.  I understand that Grainger and InfoUSA
24 had a contractual relationship before December of 2008,
```

42

```
1  correct?
2       A.   I believe so.
3       Q.   And sometime around December of 2008,
4  Grainger and InfoUSA entered in a -- sort of a separate
5  agreement that you're calling a statement of work to
6  help Grainger with this fax advertising campaign; is
7  that right?
8       A.   No.
9       Q.   Okay.
10      A.   We constructed a statement of work with
11 InfoUSA, I believe, early to mid 2009 for the purposes
12 of getting fax numbers for our existing customers.
13      Q.   We'll talk about that process in a minute.
14 But I first want to talk about, what did Grainger do
15 with respect to the fax recipients before early to mid
16 2009?
17      A.   Our existing customers gave us their fax
18 number.
19      Q.   So let's talk about that process.  Can you
20 explain in the -- Strike that.
21           Is there more than one way that an existing
22 customer would give Grainger their fax number?
23      A.   Yeah.
24      Q.   Can you give me the various ways that an
```

43

```
1  existing customer could do that?
2       A.   They could give their fax number to their
3  seller, their salesperson.  We may get it when they set
4  up an account.  When a customer applies for credit,
5  sometimes that is asked.  They may go into a branch --
6  one of our branches and give it to the counter
7  associate.
8       Q.   Any other ways you can think of?
9       A.   No.
10      Q.   Through any of these ways in which Grainger
11 would obtain a customer's fax number, did Grainger
12 inform the customer that they would use it to send them
13 fax advertisements?
14      A.   Not specifically, no.
15      Q.   So through these various ways that you
16 described in which a customer could give Grainger a fax
17 number, it was to -- Strike that.
18           I want to talk a little bit about early/mid
19 2009 in which you worked with InfoUSA to get fax
20 numbers.
21      A.   Okay.
22      Q.   Can you walk me through that process?  And
23 here's how I'm understanding it:  that InfoUSA has a
24 giant database of customers, and somehow they can
```

44

```
1  cross-check it with your existing customers in some
2  way.  Was that what was going on?
3       A.   To a degree.  We gave InfoUSA existing
4  customers of ours in which we didn't have a fax number.
5       Q.   Okay.
6       A.   InfoUSA found fax numbers in
7  publicly-available sources to give us fax numbers of
8  our existing customers.
9       Q.   Okay.  And when you say "publicly-available
10 sources," what do you mean by that?
11      A.   Yellow Pages, places that -- places where the
12 customer gives their fax number that is publicly
13 available.
14      Q.   And I -- And how do you know that's what
15 InfoUSA did to get their list of fax numbers?
16      A.   Could you ask that question again?
17      Q.   Sure.  You had testified as to what InfoUSA
18 would do.  And I know you don't work there, and so
19 you're making an assumption that that's what they're
20 doing, at least from my position.  So I would like to
21 know what your basis is for testifying that InfoUSA
22 would pull fax numbers off of publicly-available
23 sources.
24      A.   I guess it's two things:  One, in the
```

45

```
1   contract, they went with -- they weren't going to take
2   any faxes that were against this Junk Fax Protection
3   law.  So that's number 1.  Number 2, is when we were
4   investigating this particular thing, we asked them and
5   they told us that it was from the Yellow Pages.
6        Q.   Okay.  Is that in writing anywhere?  Is there
7   a record of that, to your knowledge?
8        A.   In the contract?
9        Q.   Anywhere.
10       MR. BECK:  Object to the form as vague.  I'm not
11  sure he knows what you're asking about.
12  BY MR. SMITH:
13       Q.   Well, you said that there's two ways, and the
14  second way was they told you that -- or you asked them
15  that.  In any of the -- You're indicating that there
16  was a communication -- direct communication between
17  somebody at Grainger and InfoUSA that they were going
18  to pull -- that InfoUSA was going to pull these fax
19  numbers from a publicly-available source.  All I'm
20  asking, is there a record of that communication?
21       A.   I don't know.
22       Q.   Do you know who at Grainger would be able to
23  answer that question?
24       A.   The question being -- Could you --
```

46

```
1        Q.   You had indicated, I think -- and correct me
2   if I'm wrong -- that there was some sort of
3   communication between Grainger and InfoUSA in which
4   InfoUSA informed Grainger that they're pulling these
5   fax numbers from publicly-available sources; is that
6   right?
7        A.   That's what I believe to be true, yes.
8        Q.   Okay.  And so my question is, is there any
9   record, any E-mail, correspondence, anything of that
10  sort, a written-down record of that communication?
11       A.   I don't know.
12       Q.   And then the follow-up question was, do you
13  know who at Grainger would -- if such a communication
14  exists, who would know more than you?
15       MR. BECK:  Object to the form, calls for
16  speculation.
17       You can answer if you can.
18  BY THE WITNESS:
19       A.   I don't know.
20       Q.   In follow-up to that, if you're not sure if
21  there is a record, what's the basis for your belief
22  that there was a communication between InfoUSA and
23  Grainger that they were going to pull fax numbers from
24  a publicly-available source?
```

47

```
1        MR. BECK:  Object to the form.  It's vague.  I
2   don't understand.
3        If you understand it, you can answer.
4   BY THE WITNESS:
5        A.   Can you say the question differently?
6        Q.   Sure.  Did you have direct communication with
7   InfoUSA to learn that InfoUSA would pull fax numbers
8   from publicly-available sources?
9        A.   No.
10       Q.   So what's your belief that that's what
11  happened?
12       A.   Because my belief is based on the fact that
13  they adhere to the Junk Fax Protection Act and that we
14  had conversations and learned about this, that that's
15  what's been stated by InfoUSA.
16       Q.   Okay.  I guess I'm still unclear on how you
17  learned that.  Was this through talking with somebody
18  while preparing for today's deposition, or is that your
19  belief that existed, you know, back in 2009 when this
20  was happening?
21       A.   When we were preparing for this deposition
22  and we were talking about this, we talked to InfoUSA.
23  And we asked them, "Where did you get the fax number
24  for Mr. Davies?"  They told us that it came from Yellow
```

48

```
1   Pages, publicly-available sources.
2        Q.   And who did you speak with at InfoUSA?
3        A.   I don't remember the name.
4        Q.   And did you E-mail anybody at InfoUSA to set
5   up that conference or that telephone call?
6        A.   That was handled by our legal team.
7        Q.   And when did that conversation take place?
8        A.   I don't know the exact date.  Maybe April or
9   May.
10       Q.   So it wasn't in preparation for this
11  deposition?  It sounds like it happened sometime after
12  the complaint was filed and before you received the
13  deposition notice.
14       A.   I don't remember exactly when the timing was.
15       Q.   And so in the context of that conversation,
16  you were talking about Mr. Davies specifically; is that
17  right?
18       A.   Yes.
19       Q.   And somebody from InfoUSA told you, "We
20  pulled his number from the Yellow Pages"?
21       A.   Yes.
22       Q.   Did they go beyond Mr. Davies in particular
23  and talk about their practice?
24       A.   They may have, yeah.  I don't remember the
```

49

1  exact specifics of the -- that, but they may have.
2      Q.   And was it a call that took place in April or
3  May of 2013?
4      A.   That I was involved in, yes.
5      Q.   And who else was on that call?
6      A.   Oh, boy, I don't remember.  Somebody from our
7  legal team.  I don't remember all the -- I don't
8  remember the person from Info.
9      Q.   Was Brenda on the call?
10      A.   No.
11      Q.   So there's you, one person from Grainger's
12  legal team?
13      A.   Yes.
14      Q.   And somebody from --
15      A.   Info.
16      Q.   -- InfoUSA?
17      A.   Yeah, I think so.  I don't recall exactly who
18  was in the room.
19      Q.   It was an in-person conference?
20      A.   Oh, no, no.  InfoUSA called in.
21      MR. BECK:  Jim, we've been going about an hour.
22  Would now be a decent time to take a short break?
23      MR. SMITH:  That would be great.
24                      (Discussion off the record.)

50

1  BY MR. SMITH:
2      Q.   So I want to talk some more about how
3  Grainger and InfoUSA sort of created the list that you
4  were talking about.
5      A.   Okay.
6      Q.   You say that in early to mid 2009 is when you
7  started -- when you got the list from -- I'm calling it
8  a list; I don't know if that's the right way to do
9  it -- the list from InfoUSA of your customers with fax
10  numbers?
11      A.   Not exactly.  We have a list of our existing
12  customers which we provided to InfoUSA to give us --
13      Q.   Okay.  Let's stop there.  I want to walk
14  through that process.  You had earlier testified you
15  have about 1.8 million customers nationwide; is that
16  right?
17      A.   Correct.
18      Q.   Are all of those customers in Grainger's
19  database?
20      A.   Yes.
21      Q.   So did you give InfoUSA the entire database
22  of customers?
23      A.   No.
24      Q.   What list did you give to them?

51

1      A.   Existing customers who we define as small
2  business customers who we didn't have a fax number for.
3      Q.   Was there any other criteria?
4      A.   The criteria is based on what we define as
5  small business.
6      Q.   Okay.  So as I understand it, you sent
7  InfoUSA a list of Grainger's existing customers who
8  Grainger defined as small business and who Grainger did
9  not have a fax number; is that correct?
10      A.   Yes.
11      Q.   And how would Grainger define what is a small
12  business is for purposes of this list?
13      A.   Their MRO potential is less than $25,000 a
14  year.
15      Q.   And what is MRO potential?
16      A.   It's maintenance, repair, and operating
17  supplies.  It's the things that Grainger sells.  So
18  these are customers that spend less than $25,000 on
19  those materials in total.
20      Q.   And how does Grainger track that kind of
21  information?
22      A.   By the type of company that they are,
23  square-foot size, those types of things, we can
24  estimate how much they spend.

52

1      Q.   Okay.  And then the no fax numbers is
2  self-explanatory.  In your database -- In Grainger's
3  database, you have a list of company names, and these
4  particular customers did not have a fax number listed,
5  right?
6      A.   Correct.  It was not listed in our database.
7      Q.   And were you involved in sending that list to
8  InfoUSA?
9      A.   I was not physically -- I was not personally
10  responsible for sending that list to InfoUSA.
11      Q.   Do you know how many small businesses were on
12  that list?
13      A.   Yeah.
14      Q.   How many?
15      MR. BECK:  Hold on.  I think this is well beyond
16  the scope of the notice.  We'll stipulate that it was a
17  list that had a lot of numbers on it.
18      MR. SMITH:  So with respect to the specific
19  numbers, you're going to object and instruct the
20  witness not to answer?
21      MR. BECK:  Correct.  It's beyond the scope of the
22  notice, which is supposed to be about Davies.
23  BY MR. SMITH:
24      Q.   And in what form did Grainger send the list

53

1   to InfoUSA?  And what I mean by that, was it electronic
2   form?  Was it hard copy?  Did you E-mail it?  Mail it?
3   You know, that kind of thing.
4        A.   I don't know exactly.  Certainly,
5   electronically.  I don't know what other -- I don't
6   know if it was E-mails or if it was put to an HMTP
7   site.  I don't know.
8        Q.   Okay.  And then do you have an understanding
9   of what InfoUSA did with that list that was sent to
10  them?
11       A.   Other than what I've already explained, no, I
12  don't have any other information.
13       Q.   Okay.  And so did InfoUSA then send you back
14  a list of existing small business customers with now
15  fax numbers?
16       A.   Yes.
17       Q.   And what did you do -- What did Grainger do
18  with that list?
19       A.   We took that list and gave it to Optima
20  Direct to transact the faxes.
21       Q.   When you say "transact" --
22       A.   Transmit the faxes.
23       Q.   Before you obtained this list from InfoUSA,
24  was Optima Direct transmitting the earlier fax

54

1   advertisements that were sent out, the one in 2008 and
2   the earlier ones in 2009?
3        A.   Yes, yes.  The ones in 2009, yes.  I don't
4   know about 2008.
5        Q.   Okay.
6        A.   I assume they were.  I don't know exactly.
7        Q.   Now, InfoUSA didn't directly send their list
8   to Optima Direct, right?  It went through Grainger
9   first, and then Grainger sent the list to Optima
10  Direct?
11       A.   Yes.
12       Q.   Does Grainger save that list in any, you
13  know, unique spot outside of the regular customer
14  database?
15       A.   That, I'm not sure.
16       Q.   Did you work with Optima Direct in any way to
17  transmit the subject fax advertisements?
18       A.   No.
19       Q.   Who at Grainger did?
20       A.   I believe it was two of the gentlemen I
21  mentioned earlier:  John Gartner, Rohan Thromballi, I
22  believe.
23       Q.   And I think you mentioned that contract with
24  Optima Direct was one of the things you reviewed to

55

1   prepare for today's deposition; is that right?
2        A.   Yeah.
3        Q.   Do you remember when that contract was
4   entered?
5        A.   Not exactly.  Not exactly.  It would have to
6   have been December of 2008 or so.
7        Q.   Did you bring those contracts with you today?
8        A.   No.
9        Q.   Do you know how the -- by reviewing that
10  contract, how the Optima Direct was to be paid under
11  the terms of that agreement?
12       A.   Say that -- Ask the question again.
13       Q.   Sure.  Do you know how Optima Direct was to
14  be paid through the contract between Optima Direct and
15  Grainger regarding the faxing campaign from
16  December 2008 to 2009?
17       A.   Yeah, yes.  Some of the payment was based on
18  the volume of faxes that they transmitted.  They also
19  received payment on the opt-out support that they
20  provided.  I believe there may also have been a program
21  set up, you know, to ...
22       Q.   Any other way that they got paid?
23       A.   Not that I -- No, not that I'm aware of, no.
24       Q.   So they were not paid on successfully-sent

56

1   transmissions, for example?
2        MR. BECK:  Object to the form.  I think that
3   misstates the testimony.
4   BY MR. SMITH:
5        Q.   Let me ask it a different way.
6        A.   Okay.
7        Q.   Do you know whether Optima Direct was paid on
8   whether a fax transmission was successfully sent or
9   not?
10       A.   I don't know that specific.
11       Q.   So when you say "volume of faxes
12  transmitted," you're not exactly sure what that means?
13       A.   I'm not exactly sure if it was the
14  successfully faxed or if it was the initial sent fax.
15  I don't know.
16       Q.   Are you familiar with the opt-out support
17  that Optima Direct provided Grainger with respect to
18  how it worked?
19       A.   Yes.
20       Q.   And can you explain to me how it worked?
21       A.   Sure.  They provided a toll-free 800 number
22  for customers to call to opt out as well as a toll-free
23  fax number, should the recipient want to not receive
24  any more faxes.  And that was the support.

57

1    Q.  So if a customer who received one of these
2 faxes wanted to opt out and they got in touch with
3 Optima Direct, what would happen next; do you know?
4    A.  Yes.  Optima Direct would flag their fax
5 number that the customer indicated that they no longer
6 wanted a fax, and that would go on a suppression file
7 so we would no longer contact that customer per the
8 customer's wishes.
9    Q.  I'm sorry.  Did you say a "suppression file"?
10   A.  They would indicate that that customer no
11 longer wished to receive a fax anymore.
12   Q.  Would that be relayed to Grainger in any way?
13   A.  Yes, we would get that suppression file.
14   Q.  So then Grainger's database would be updated,
15 the SAP or the ERP?
16   MR. BECK:  And I think this is beyond the scope of
17 the notice, but you can answer if you know this.
18 BY THE WITNESS:
19   A.  The fax numbers that -- we never put it back
20 into our database, into our ERP system.
21   Q.  The fax numbers?
22   A.  Correct.
23   Q.  So the fax numbers that you got from InfoUSA
24 were never put into Grainger's ERP database?

58

1    A.  Correct.
2    Q.  So this is just a separate database?
3    A.  Correct.
4    Q.  Was that database -- Strike that.
5      Now, I understand that you sent to InfoUSA
6 just small businesses with no fax number, right?
7    A.  Correct.
8    Q.  But the first few faxes that you sent out
9 before working with InfoUSA in that regard, you had
10 those existing customer's fax numbers, correct?
11   A.  That is correct.
12   Q.  And were those faxes being targeted to just
13 small businesses at that time as well?
14   A.  Yes.
15   Q.  So if I'm understanding right, you also had a
16 list of small businesses with fax numbers before
17 working with InfoUSA; is that right?
18   A.  That is correct.
19   Q.  And did you combine that list with the list
20 that you received from InfoUSA?
21   A.  I don't understand the word "combine."
22   Q.  To create one, you know, larger list of all
23 small business customers now that you have their fax
24 numbers.

59

1   MR. BECK:  Again, this is beyond the scope, but
2 you can answer if you know this.
3 BY THE WITNESS:
4    A.  I don't know if the actual lists were
5 combined physically.  I don't know.  When we sent out
6 fax -- We had a group of customers that were our
7 existing customers who gave us their fax as well as
8 existing customers that we received faxes from InfoUSA.
9    Q.  Okay.  Now, I know we spoke about the ten
10 variations of the faxes attached to the complaint.  Did
11 Grainger, during the same time period, send out any
12 other fax advertisements?
13   A.  No.
14   Q.  If I call your attention back to
15 Exhibit No. 2, the subject fax, which is the last page
16 of Exhibit 2, on the very top in that header, do you
17 see that?
18   A.  Yes.
19   Q.  There's a toll-free number (866) 404-3933.
20 Do you see that?
21   A.  Yes.
22   Q.  Do you know whose number that is?
23   A.  No, I don't.
24   Q.  Was there any direct communication with

60

1 plaintiff in which Grainger asked him if it's okay if
2 Grainger sent him a fax advertisement?
3    A.  No.
4    Q.  Was there any direct communication with any
5 of the fax recipients in which Grainger asked the
6 recipients if it was okay if Grainger sent them a fax
7 advertisement?
8    A.  No.
9    Q.  Other than the subject fax advertisement
10 that's -- at issue here in this lawsuit, did Grainger
11 send any other faxes to plaintiff that you're aware of
12 not limited to advertisements?
13   A.  Say that -- Restate that question.
14   Q.  Other than the subject fax advertisement
15 that's attached to Exhibit No. 2, are you aware of
16 whether Grainger ever faxed anything else to plaintiff?
17   A.  Not that I'm aware of.
18   Q.  Do you know whether Grainger sent any of the
19 other nine variations of the fax to plaintiff?
20   A.  No, we did not.
21   Q.  Do you know why Mr. Davies was included on
22 this fax transmission and not any of the earlier ones?
23   A.  Mr. Davies was included in this fax because
24 he was an existing customer that had done business with

61

1   us. We do -- No, there's no, really, other reason why.
2   It's just -- We do test control with some of the
3   different messaging, and his name was selected to be in
4   December for this fax.
5       Q.   What do you mean by "test control"?
6       A.   We try to determine the success of this
7   campaign. And there are certain customers that we
8   could send the fax to that we don't.
9       Q.   And who was involved in that process?
10      A.   Our analytics team.
11      Q.   Anybody else?
12      A.   No.
13      Q.   Were there any other outside companies used
14  to work with your analytics team?
15      A.   No, not that I'm aware.
16      Q.   So if I understand you correctly, once the
17  Optima Direct would receive the list, you know -- I'm
18  going to call it the master list. If that's not the
19  right way to call it, tell me. But what I'm referring
20  to is the list from InfoUSA of the small business
21  existing customers; now they have fax numbers. Then
22  you forward that over to Optima Direct. I'm going to
23  call that the master list only because it sounds like
24  they didn't -- for every single of the fax

62

1   transmissions, they didn't target everybody on that
2   list, correct?
3       A.   That's --
4       MR. BECK:   Object to the form.
5            You can answer.
6   BY THE WITNESS:
7       A.   Yeah, that's correct. We received a list
8   back from InfoUSA; and then based on that list, our
9   analytics team would select existing customers that
10  would get the fax every month, you know, which
11  customers would get the fax each month.
12      Q.   And would you or Brenda work with the
13  analytics team to update or change the fax
14  advertisement based on where the analytics team wanted
15  to send that particular fax?
16      A.   No.
17      Q.   Do you know how Optima Direct was informed of
18  who to target for a particular fax transmission?
19      A.   We --
20      MR. BECK:   Object to the form.
21           Go ahead.
22  BY THE WITNESS:
23      A.   We gave them -- We gave them selection of the
24  master file to send out to customers.

63

1       Q.   Okay. And was that done by E-mail?
2       A.   Of sending the file over to Optima Direct?
3       Q.   Right.
4       A.   I don't know.
5       Q.   And do you know how the actual fax
6   advertisement was sent to Optima Direct?
7       A.   I don't know for certain. May have been
8   E-mailed, the advertisement itself.
9       Q.   Would John Gartner and Rohan be the people to
10  talk to about what -- the communications between Optima
11  Direct and Grainger with each particular fax
12  transmission?
13      A.   Maybe, yeah. Could be, yeah.
14      Q.   Once Optima Direct had the fax advertisement
15  to be sent and then a subset of the list of who to
16  target, was there any communication back to Grainger as
17  far as, you know, "Good news. We're done. And here's
18  how many were sent," et cetera, or "Here's how many
19  were tried. Here's how many were successful"?
20      A.   Yes. Optima provided us reports.
21      Q.   And were they detailed reports with respect
22  to each fax number?
23      A.   I never saw -- I don't know if there were
24  reports like that. I never saw those reports.

64

1       Q.   And who would be the people to talk to at
2   Grainger regarding those reports?
3       A.   The detailed reports you're referring to,
4   probably the gentlemen that you talked about earlier.
5       Q.   John and Rohan?
6       A.   And Rohan.
7       Q.   Is it Rohan?
8       A.   I believe so, yes.
9       Q.   I have chicken scratch for writing.
10           Do you know where Optima Direct is located?
11      A.   Boy, I can't say for certain that I do. I
12  don't know.
13      MR. SMITH:   We'll mark this as number 3.
14  BY MR. SMITH:
15      Q.   Sir, I'm going to hand to you what's been
16  marked as Finn Exhibit No. 3. Could you take some time
17  to look this over?
18      A.   Sure. Okay.
19      Q.   Do you recognize Exhibit 3?
20      A.   Yes.
21      Q.   What is it?
22      A.   On the first page, it looks like a screen
23  shot of Mr. Davies -- some account information, and a
24  purchase.

65

1      Q.   Okay.  So is this the big database that
2  Grainger has that you were referring to earlier in your
3  deposition?
4      A.   This is one screen shot of -- Looks like a
5  transaction in particular.
6      Q.   Okay.  And I notice his phone number is
7  listed here on page 1, but his fax number is not.
8      A.   Correct.
9      Q.   If you had Grainger's fax number from him,
10  would his fax number be listed here?
11      MR. BECK:  Object to the form.
12      Go ahead.
13  BY THE WITNESS:
14      A.   I don't know.  I don't know based on the
15  screen.  It looks like -- If we had the fax -- I don't
16  know.  It looks like -- If we had a fax number, there
17  would have been a fax and then nothing next to it.  So
18  I don't know.
19      Q.   Okay.  And, you know, I think this was, you
20  know, talked about, but I don't know if we really
21  clarified it.  For the plaintiff in this case in
22  particular, he did not give you his fax number,
23  correct?
24      A.   Correct.

66

1      Q.   He was part of the group of the small
2  business with no fax number that you sent to InfoUSA?
3      A.   That is correct.
4      Q.   And then InfoUSA found his fax number and
5  gave it to you?
6      A.   Correct.
7      Q.   So still focusing on the first page of
8  Exhibit No. 3, it looks like there's a
9  Customer No. 835800897; is that right?
10      A.   That's correct, yep.
11      Q.   And does each -- Every time -- Can you
12  explain that for me?  How does a person get a customer
13  number at Grainger?
14      A.   They became a customer of ours.  So every
15  customer gets a customer number.
16      Q.   So the first transaction -- I don't think
17  I've ever shopped at Grainger; but if I did, my first
18  time, I would be given a customer number?
19      A.   That's correct.
20      Q.   And this customer number stays with Davies
21  Home Services for the life of his future purchases?
22      A.   Yes.
23      Q.   And how did you obtain his -- the contact
24  information that's listed here on the first page?

67

1      A.   He must have provided it when he became a new
2  customer.
3      Q.   Is that a necessary component for a new
4  customer, to give Grainger their home address or their
5  business address?
6      A.   Yes.
7      Q.   Is it the same thing with their phone number;
8  it's part of the process to give Grainger their phone
9  number?
10      A.   Yes.
11      Q.   Can a customer choose not go give Grainger
12  that information?
13      A.   I would expect, sure.  I would think, yes.
14      Q.   And then underneath here, it looks like a
15  transaction from September 15th, 2008?
16      A.   Mm-hmm.
17      Q.   Is that correct?
18      A.   Yes.  This is a transaction that Mr. Davies
19  bought a dehumidifier, $221.
20      Q.   How do you know it's a dehumidifier?
21      A.   Because on the other page, it starts to
22  detail out some of those -- specific purchase.  I don't
23  know that from this.
24      Q.   You don't know it from page 1?

68

1      A.   From page 1, correct.
2      Q.   Can you identify for the record pages 2, 3,
3  and 4?
4      A.   I'm not sure what you mean "identify."  Like
5  describe?
6      Q.   Describe what it is.
7      A.   Yeah.  Okay.  So on page 2 --
8      Q.   Strike that.
9      What is it?  On page 2, 3, and 4, is this the
10  same -- is this a printout of the same database?
11      A.   This is a printout of Mr. Davies' purchase
12  history with Grainger from when he first -- His first
13  purchase is indicated on February 16th, 1994, all the
14  way to his final purchase on September 15th, 2008.
15      Q.   Okay.  And there's been no record of him
16  making any other purchases after September 15th, 2008?
17      A.   That is correct.
18      Q.   And how is this information inputted?
19      MR. BECK:  Beyond the scope, but if you know.
20  BY THE WITNESS:
21      A.   I don't know specifically.  Customer
22  purchases something, and the item that they order along
23  with the dates and the different types of information
24  is automatically put into certain --

69

1   Q.   Is this all done electronically with various
2   software --
3   A.   I believe so, yes.
4   Q.   -- and hardware and things that are beyond my
5   ability to understand?
6   A.   I believe so, yes.
7   Q.   And I still don't see "dehumidifier" on any
8   of these pages?
9   A.   No.  That would be indicated on page 3, under
10  material code.  MTRL is the second column.  And those
11  are -- Those are Grainger item numbers.
12  Q.   And you know that 1DGX4 is a dehumidifier?
13  A.   Sure do.
14  Q.   Do you know what 3WE70 is?
15  A.   It's a blanket.
16  Q.   That's impressive.
17       What about 9N999?
18  A.   That's a replacement part.
19  MR. BECK:  He's prepared.  What can I say?
20  MR. SMITH:  Pretty good.
21  BY MR. SMITH:
22  Q.   So when Mr. Davies goes to Grainger and
23  purchases these items, it doesn't matter whether he
24  pays cash or check or credit card, if you make any

70

1   purchase there, this information will be automatically
2   generated?
3   A.   Yes.
4   MR. SMITH:  Mark this as number 4.
5            (Finn Deposition Exhibit No. 4
6             marked as requested.)
7   BY MR. SMITH:
8   Q.   Sir, I'm going to show you what's been
9   previously marked as Exhibit Finn 4.  Can you take some
10  time and look this over?
11  A.   Sure.
12  Q.   Do you recognize Exhibit No. 4?
13  A.   Yes.
14  Q.   And what is it?
15  A.   It's a couple pages of Yellow Pages in which
16  lists phone numbers.
17  Q.   So the first two pages, it looks like it's
18  from a Yellow Pages book, June 2007; is that right?
19  A.   Yes.
20  Q.   For the area codes 847 and 224?
21  A.   Yes.
22  Q.   Did you review these documents in preparation
23  for today's deposition?
24  A.   Yes.

71

1   Q.   Do you know where these documents came from?
2   A.   Yes.  Our attorneys found these pages, got
3   these pages.
4   Q.   And were they obtained after this lawsuit was
5   filed?
6   A.   I believe so, yes.
7   Q.   So this isn't something that is an indication
8   that Grainger obtained Mr. Davies' fax number before
9   sending out the fax advertisement, right?
10  A.   Correct.
11  Q.   Through the Yellow Pages.
12  MR. BECK:  Object to the form.
13       You can answer.
14  BY THE WITNESS:
15  A.   That's correct.
16  MR. SMITH:  Mark this next one.
17            (Finn Deposition Exhibit No. 5
18             marked as requested.)
19  BY MR. SMITH:
20  Q.   Sir, I'm going to hand to you what's been
21  previously marked as Exhibit Finn 5.  Can you take a
22  look at this?
23  A.   Okay.
24  Q.   Do you recognize Exhibit No. 5?

72

1   A.   I don't recognize -- I don't recognize this
2   one in particular.
3   Q.   Okay.  I want to call your attention to
4   Page No. 12.  Do you recognize these -- what's called
5   here Affirmative and Other Defenses?
6   A.   I'm sorry.  Ask the question again.  Do I
7   recognize --
8   Q.   Well, do you recognize the entire Finn No. 5,
9   which was titled "Answer and Affirmative Defense."
10  It's a 15-page document.
11  A.   I'm sorry.  So I'm getting confused.  Could
12  you just state the question one other time?
13  Q.   Sure.  Finn No. 5 is a document that was
14  filed by Grainger.
15  A.   Okay.
16  Q.   It's called an Answer and Affirmative
17  Defense.  What I would like to know is if you recognize
18  it.
19  A.   I don't remember seeing this.
20  Q.   Okay.  And then I called your attention to
21  page 12.
22  A.   Okay.
23  Q.   And do you recall seeing these affirmative
24  and other defenses?

73

1    A.   I don't remember seeing this.
2    Q.   Okay.  And it could be you haven't seen it.
3    A.   Right.
4    Q.   So I want to call your attention to the first
5  defense here on page 12.  It states, "Plaintiff's claim
6  is barred to the extent that plaintiff consented to
7  receiving fax transmissions from Grainger."  Do you see
8  that there?
9    A.   Yes.
10   Q.   So I understand that it's Grainger's position
11 that plaintiff consented to receiving the fax
12 advertisement.  That is Grainger's position?
13   A.   That is correct.
14   Q.   Can you explain to me what that decision is
15 based on?
16   A.   Yes.  Mr. Davies is an existing customer, and
17 he had his phone number and fax in a --
18 publicly-available source, so that gives consent.
19   Q.   Any other reason?
20   A.   No.
21   Q.   From the other small business customers that
22 Grainger targeted with these fax advertisements, does
23 Mr. Davies -- is he in any unique position than the
24 other recipients?

74

1       MR. BECK:  Object to the form.
2       You can answer.
3  BY THE WITNESS:
4    A.   Could you explain "different"?
5    Q.   It was a bad question.
6       Limited to Grainger's position that plaintiff
7  consented to receive the fax advertisement because he's
8  an existing customer and you obtained his fax number
9  from a public source, does that put Mr. Davies in a
10 unique position than any of the other small business
11 customers that received one of Grainger's fax
12 advertisements?
13   A.   We had existing customers that gave us the
14 fax themselves.  We had other customers that were
15 existing customers in which we received the fax from
16 InfoUSA.
17   Q.   Okay.
18   A.   So I guess -- And some one case, I guess, that
19 does make him a little unique.  But this fax campaign
20 was about existing small business customers who had
21 been doing business with us previously.
22   Q.   Okay.  Other than the difference of some of
23 the existing customers gave Grainger a fax number and
24 Mr. Davies never actually gave Grainger a fax number,

75

1  are there any other differences between the --
2  Mr. Davies and the other recipients?
3       MR. BECK:  Object to the form.
4       You can answer.
5  BY THE WITNESS:
6    A.   There are a lot of different small
7  businesses.  There are contractors.  There are small --
8  other little businesses that would make Mr. Davies
9  different, but -- That would be one thing, but ...
10   Q.   And again, I think I asked a bad question
11 because I didn't clarify that that was limited to the
12 issue of consent.
13   A.   Okay.  Everyone gave consent to receiving
14 these faxes.
15   Q.   By being existing customers and provide --
16 either providing Grainger with a fax number or being
17 listed in a public source?
18   A.   Yes.
19   Q.   Is there any other way that -- either
20 plaintiff or any of the other recipients gave consent
21 to Grainger?
22   A.   Not that I'm aware of.
23   Q.   Now, you indicated that, in your mind,
24 there's a difference between -- a potential difference,

76

1  anyway, of an existing customer giving the fax number
2  to Grainger, or Mr. Davies' position in which he never
3  did that; instead, InfoUSA found it from a public
4  source?  Is that right?
5       MR. BECK:  Object to the form.
6       You can answer.
7  BY THE WITNESS:
8    A.   Say that again.
9    Q.   Sure.  You had indicated there's, in your
10 mind, a difference between Mr. Davies, who never
11 actually gave Grainger his fax number, and other
12 existing customers who did -- Is that right? -- with
13 respect to the issue of consent.
14   A.   With respect to how we received the fax
15 number, yes.
16   Q.   Well, with respect to the issue of consent.
17   A.   Okay.
18      MR. BECK:  I'm sorry.  Object to the form.
19      Is there a question?
20      MR. SMITH:  Yeah.  Let me rephrase it again.
21 BY MR. SMITH:
22   Q.   So this is limited to the issue of consent.
23 You had earlier testified, I think -- and correct me if
24 I'm wrong --

77

1    A.   Okay.
2    Q.   -- that the only difference with the issue of
3  consent between a person like Mr. Davies and other
4  recipients is that Grainger received the fax numbers
5  directly from some of these other recipients, but not
6  Mr. Davies; is that correct?
7        MR. BECK:  I'll object to the form.  I think that
8  misstates the testimony -- That is his testimony, but
9  that wasn't the question that was asked because I think
10  you weren't asking about consent in particular.
11        But you can answer that.
12 BY THE WITNESS:
13    A.   I'll try to answer this as best I can.
14  Everybody consented to getting the fax.  So there were
15  no differences --
16    Q.   Okay.
17    A.   -- as it relates to consent.
18    Q.   So it doesn't matter whether Grainger
19  obtained the fax number from InfoUSA or directly from
20  the customer; they all consented in the same way?
21    A.   Correct.
22    Q.   Now, is there a way -- And you don't have to,
23  you know, give me exact numbers here at this
24  deposition.  But is there a way to determine the -- for

78

1  all of the fax advertisements that were sent from
2  December 2008 to the end of 2009, whether those
3  recipients gave Grainger their fax number directly or
4  whether InfoUSA pulled their fax numbers from a
5  publicly-available source?
6    A.   Yes.
7    Q.   And can you -- How would that -- How would
8  that process be -- or go?
9        MR. BECK:  Object as beyond the scope.
10        You can answer.
11 BY THE WITNESS:
12    A.   We know the customers that we didn't have a
13  fax number in our -- in SAP.
14    Q.   And do you know the percentage of people that
15  you had fax numbers versus people -- or existing
16  customers in which you did not without the help of
17  InfoUSA?
18        MR. BECK:  I'll object to the form.
19        You can answer.
20 BY THE WITNESS:
21    A.   I just want to -- I'm just trying to -- I
22  just didn't understand the question exactly.
23    Q.   Do you know that -- There's the -- the group
24  like Mr. Davies, with the help of InfoUSA, you obtained

79

1  their fax number; then there's a group of existing
2  customers that you didn't need InfoUSA's help?
3    A.   Correct.
4    Q.   Do you know the percentage of those two
5  categories?
6    A.   Yeah.  I don't have it.  I don't know it off
7  the top of my head, but yes.
8    Q.   You can figure it out?
9    A.   Yes, yes.
10    Q.   And this is just to beat a dead horse, I
11  think.  But the second affirmative defense here on
12  page 12 of Exhibit No. 5 goes towards Grainger's
13  contention that plaintiff had an established business
14  relationship with Grainger.  It's Grainger's position
15  that all of the people that -- all the small businesses
16  that received these subject faxes were existing
17  customers of Grainger; is that right?
18    A.   That's correct.
19        MR. SMITH:  Let me check my notes, but I think
20  that's all I have.
21        MR. BECK:  Okay.  Go off the record for a minute?
22        MR. SMITH:  Sure.
23             (Discussion off the record.)
24 BY MR. SMITH:

80

1    Q.   Regarding the analytics team, are you able to
2  identify folks who worked on the analytics team from
3  the period of 2008 through 2009?
4    A.   Yeah.
5    Q.   And who are they?
6    A.   I mentioned some of the names earlier.  Laura
7  Weiss.
8    Q.   Okay.
9    A.   Tom Carlson.  I believe those were the major
10  two that worked on the analytics team at the time.
11        MR. SMITH:  Okay.  That's all I have.
12        MR. BECK:  Thank you.  We'll reserve signature.
13             (Witness excused.)

81

```
  1              IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
  2                       EASTERN DIVISION

  3   DAVID DAVIES d/b/a DAVIES HOME      )
      SERVICES, individually and as       )
  4   the representative of a class of    )
      similarly situated persons,         )
  5                                       )
                        Plaintiff,        ) No. 13-CV-3546
  6                                       )
  7          vs.                          )
                                          )
  8   W.W. GRAINGER, INC., and JOHN       )
      DOES 1-12,                          )
  9                                       )
                        Defendants.       )
 10

 11          I, ROBERT J. FINN, state that I have read the

 12   foregoing transcript of the testimony given by me at my

 13   deposition on the 15th day of October, A.D., 2013, and

 14   that said transcript constitutes a true and correct

 15   record of the testimony given by me at the said

 16   deposition except as I have so indicated on the errata

 17   sheets provided herein.

 18                              _____
                                     ROBERT J. FINN
 19

 20   SUBSCRIBED AND SWORN to
      before me this _____ day
 21   of _____, 2013.

 22

 23   _____
           NOTARY PUBLIC
 24
```

82

```
  1   UNITED STATES OF AMERICA        )
      NORTHERN DISTRICT OF ILLINOIS   )
  2   EASTERN DIVISION                )   SS.
      STATE OF ILLINOIS               )
  3   COUNTY OF COOK                  )

  4

  5          I, Teresa Resendez, Certified Shorthand

  6   Reporter, do hereby certify that on October 15, 2013,

  7   the deposition of the witness, ROBERT J. FINN, called

  8   by the Plaintiff, was taken before me, reported

  9   stenographically, and was thereafter reduced to

 10   typewriting under my direction.

 11          The said deposition was taken at the offices

 12   of Bock & Hatch, LLC, 134 North LaSalle Street, Suite

 13   1000, Chicago, Illinois; and there were present counsel

 14   as previously set forth.

 15          The said witness, ROBERT J. FINN, was first

 16   duly sworn to tell the truth, the whole truth, and

 17   nothing but the truth, and was then examined upon oral

 18   interrogatories.

 19          I further certify that the foregoing is a

 20   true, accurate, and complete record of the questions

 21   asked of and answers made by the said witness, ROBERT

 22   J. FINN, at the time and place hereinabove referred to.

 23

 24
```

83

```
  1          The signature of the witness, ROBERT J. FINN,

  2   was reserved by agreement of counsel.

  3          The undersigned is not interested in the

  4   within case, nor of kin or counsel to any of the

  5   parties.

  6          Witness my signature as a Certified Shorthand

  7   Reporter in the State of Illinois on October 18, 2013.

  8

  9

 10

 11

 12                          _____
                              TERESA RESENDEZ, CSR
 13                           CSR No. 084-003718

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

## $

**$221** [1] 67:19
**$25** [1] 30:20
**$25,000** [2] 51:13,18

## 0

**084-003718** [1] 83:13

## 1

**1** [10] 3:8 21:12,16,18 22:22 26:2 45:3 65:7 67:24 68:1
**1-12** [1] 1:9
**1.8** [2] 11:2 50:15
**10** [1] 33:15
**10:00** [1] 1:19
**100** [1] 2:14
**1000** [2] 1:18 82:13
**12** [4] 72:4,21 73:5 79:12
**134** [3] 1:17 2:4 82:12
**15** [2] 1:19 82:6
**15-page** [1] 72:10
**15th** [4] 67:15 68:14,16 81:13
**16th** [1] 68:13
**18** [1] 83:7
**1994** [1] 68:13
**1dgx4** [1] 69:12

## 2

**2** [18] 3:9 24:1 25:22 26:21,22 27: 2,6 28:23 29:1,5,8 45:3 59:15,16 60:15 68:2,7,9
**2004** [1] 12:23
**2007** [1] 70:18
**2008** [26] 16:17,18 18:5,11 19:15, 23 20:6 32:11,14 38:22 39:2,3,4, 13 41:20,24 42:3 54:1,4 55:6,16 67:15 68:14,16 78:2 80:3
**2009** [26] 16:15,19 18:5,11 19:15, 23 20:6 23:1 24:7 32:11,14,23, 24 38:23,24 41:20 42:11,16 43: 19 47:19 50:6 54:2,3 55:16 78:2 80:3
**2013** [5] 1:19 49:3 81:13 82:6 83: 7
**21** [1] 3:8
**224** [1] 70:20
**26(a)(l** [1] 24:6
**28** [1] 3:9
**2nd** [2] 23:1 32:23

## 3

**3** [12] 3:10 25:12 26:21 27:14,18 64:13,16,19 66:8 68:2,9 69:9
**30(b)(6** [1] 25:2
**312** [1] 2:10
**35** [1] 2:9
**3we70** [1] 69:14

## 4

**4** [11] 3:4,11 25:12 26:21 27:23 68:3,9 70:4,5,9,12
**404-3933** [1] 59:19

## 5

**5** [12] 3:12 24:6 25:13,14 26:2,5 71:17,21,24 72:8,13 79:12
**50** [1] 10:14
**500** [1] 10:17
**535-1047** [1] 2:15

**558-7422** [1] 2:10

## 6

**6** [4] 25:13,14 26:2,13
**60602** [1] 2:5
**64** [1] 3:10

## 7

**7** [2] 26:21 28:7
**70** [1] 3:11
**71** [1] 3:12

## 8

**8** [2] 26:22 28:16
**800** [1] 56:21
**835800897** [1] 66:9
**847** [2] 2:15 70:20
**866** [1] 59:19

## 9

**9n999** [1] 69:17

## A

**a-i-m-e-e** [1] 31:16
**a-k** [1] 7:8
**a.d** [1] 81:13
**a.m** [1] 1:19
**ability** [4] 6:6,10 25:17 69:5
**able** [4] 5:10 16:19 45:22 80:1
**absolute** [1] 27:12
**account** [2] 43:4 64:23
**accurate** [2] 34:9 82:20
**acronyms** [1] 13:5
**act** [1] 47:13
**action** [4] 29:11,12,15 34:12
**actual** [2] 59:4 63:5
**actually** [3] 12:14 74:24 76:11
**addition** [1] 14:7
**address** [2] 67:4,5
**addressed** [1] 25:17
**adhere** [1] 47:13
**advertisement** [25] 15:22 30:1,9 31:22 32:10 33:6 34:17 36:19 38: 13,22 39:13 40:11,15 41:18 60:2, 7,9,14 62:14 63:6,8,14 71:9 73: 12 74:7
**advertisements** [16] 29:23 32: 16,18,19 33:16 34:7,13 35:9 43: 13 54:1,17 59:12 60:12 73:22 74: 12 78:1
**advertising** [24] 14:9,13,14,17, 20 15:14,19,23 16:1,4,11,14,15, 20 17:10,12 19:13,17,20,23 20:3, 5 24:4 42:6
**advice** [1] 37:17
**affect** [2] 6:6,10
**affirmative** [5] 72:5,9,16,23 79: 11
**ago** [1] 19:5
**agree** [1] 35:23
**agreement** [5] 40:21 41:17 42:5 55:11 83:2
**ahead** [5] 10:23 34:20 35:5 62:21 65:12
**aimee** [2] 31:15,16
**alleges** [1] 32:22
**almost** [1] 10:3
**already** [2] 41:15 53:11
**although** [2] 25:1 30:2

**amended** [2] 29:12,15
**america** [1] 82:1
**amy** [1] 7:18
**analytics** [8] 61:10,14 62:9,13,14 80:1,2,10
**ancillary** [1] 41:17
**another** [1] 5:15
**answer** [31] 5:21 6:2,6,10 10:23, 24 23:12 27:9,20 28:3,12,20 35: 5 38:16 45:23 46:17 47:3 52:20 57:17 59:2 62:5 71:13 72:9,16 74:2 75:4 76:6 77:11,13 78:10, 19
**answering** [2] 5:2 25:6
**answers** [2] 5:11 82:21
**anticipate** [1] 75:7
**anybody** [12] 7:9,13,17 8:18 17:6 19:4 23:21,23 27:4 31:18 48:4 61:11
**anyway** [2] 5:21 76:1
**appear** [2] 21:24 22:1
**appearances** [1] 2:1
**applies** [1] 43:4
**appropriate** [2] 25:20 31:7
**approved** [1] 38:8
**approximately** [1] 34:5
**april** [3] 24:6 48:8 49:2
**area** [1] 70:20
**aren't** [1] 14:1
**around** [1] 42:3
**assistance** [2] 37:11,16
**associate** [1] 43:7
**assume** [2] 36:21 54:6
**assumed** [1] 5:22
**assumption** [1] 44:19
**attached** [5] 24:17 31:23 39:8 59: 10 60:15
**attempted** [1] 24:17
**attention** [12] 22:3 26:22 28:6 29: 14 35:15,18 36:5 37:6 59:14 72: 3,20 73:4
**attorneys** [4] 4:13 6:17 26:4 31: 9 71:2
**automatically** [2] 68:24 70:1
**available** [1] 44:13
**aware** [7] 31:21 55:23 60:11,15, 17 61:15 75:22

## B

**back** [20] 6:1,3 9:8 12:7,22 13:22 20:20 26:24 27:15,24 28:7,8,16, 17 47:19 53:13 57:19 59:14 62:8 63:16
**bad** [2] 74:5 75:10
**banners** [1] 14:21
**barred** [1] 73:6
**based** [8] 26:3 47:12 51:4 55:17 62:8,14 65:14 73:15
**basis** [3] 35:10 44:21 46:21
**beat** [1] 79:10
**became** [2] 66:14 67:1
**beck** [42] 10:22 20:20 22:7,17 23: 10 24:10,22 25:7,12,16 27:7,19 28:2,11,19 35:4 37:17,22 45:10 46:15 47:1 49:21 52:15,21 56:2 57:16 59:1 62:4,20 65:11 68:19 69:19 71:12 74:1 75:3 76:5,18 77:7 78:9,18 79:21 80:12

**begins** [1] 37:7
**behalf** [2] 2:7,17
**belief** [5] 26:3 46:21 47:10,12,19
**believe** [16] 7:8 11:5 18:24 26:1 32:17 42:2,11 44:7 54:20,22 55: 20 64:8 69:3,6 71:6 80:9
**best** [2] 5:1 77:13
**between** [13] 18:5,10 38:22 40:3 45:16 46:3,22 55:14 63:10 75:1, 24 76:10 77:3
**beyond** [12] 8:9 22:15 24:11,23 48:22 52:15,21 57:16 59:1 68:19 69:4 78:9
**big** [1] 65:1
**bit** [8] 9:8,11,12 10:22 40:13,14, 15 43:18
**blanket** [1] 69:15
**bock** [1] 82:12
**book** [1] 70:18
**both** [2] 31:10 38:2
**bottom** [6] 35:16 37:6 38:3,23 39: 16,17
**bought** [1] 67:19
**boy** [2] 49:6 64:11
**branch** [1] 43:5
**branches** [1] 43:6
**break** [1] 49:22
**brenda** [21] 16:23 18:2 19:19 20: 4 30:11,14,18,19 31:1 32:15,17 36:9,10,11 37:13 38:2,9,17,18 49:9 62:12
**brett** [1] 7:14
**bridge** [1] 22:16
**bring** [2] 11:17 55:7
**broadened** [1] 14:7
**business** [9] 4:14 15:24 17:23 18:2,5,12 19:7,9,10,11 22:24 30: 17 34:12 35:2 51:2,5,8,12 53:14 58:23 60:24 61:20 66:2 67:5 73: 21 74:10,20,21 79:13
**businesses** [11] 10:9 19:17 34: 14 35:10 52:11 58:6,13,16 75:7, 8 79:15

## C

**c-a-r-l-s-o-n** [1] 7:12
**call** [23] 15:8,9,9,10,11,11 22:3 26:22 29:14 35:15,18 37:6 48:5 49:2,5,9 56:22 59:14 61:18,19, 23 72:3 73:4
**called** [6] 4:3 49:20 72:4,16,20 82:7
**calling** [6] 15:1,7 19:12 28:6 42: 5 50:7
**calls** [3] 23:10 27:7 46:15
**came** [2] 47:24 71:1
**campaign** [6] 6:23 8:1,2,4 42:6 55:15 61:7 74:19
**capacity** [1] 25:1
**card** [1] 69:24
**carlson** [7] 7:10,11 18:24 19:1 20:18,24 80:9
**case** [3] 65:21 74:18 83:4
**cash** [1] 69:24
**catalogs** [1] 14:19
**categories** [3] 25:5,10 79:5
**cease** [2] 16:13,14
**center** [4] 15:6,9,10,11

**certain** [4] 61:7 63:7 64:11 68:24
**certainly** [1] 53:4
**certified** [3] 1:13 82:5 83:6
**certify** [2] 82:6,19
**cetera** [1] 63:18
**change** [10] 14:6 36:20,22 38:5, 23,24 39:19,21 40:13 62:13
**changed** [4] 13:23 14:3 36:15,17
**changes** [1] 39:2
**check** [2] 69:24 79:19
**chicago** [3] 1:18 2:5 82:13
**chicken** [1] 64:9
**choose** [1] 67:11
**circle** [1] 9:8
**circulars** [1] 24:4
**circumstances** [3] 22:22 24:2, 16
**civil** [1] 1:15
**claim** [1] 73:5
**clarification** [2] 5:15,17
**clarified** [2] 22:13 65:21
**clarify** [2] 6:2 75:11
**class** [3] 1:5 29:12,15
**clear** [3] 4:24 5:12,20
**code** [2] 1:14 69:10
**codes** [1] 70:20
**collateral** [2] 14:20,24
**column** [1] 69:10
**combine** [2] 58:19,21
**combined** [1] 59:5
**come** [7] 26:24 27:15,24 28:7,8, 16,17
**commencing** [1] 1:18
**common** [1] 13:9
**communication** [11] 45:16,16, 20 46:3,10,13,22 47:6 59:24 60: 4 63:16
**communications** [5] 10:5 11:7 14:4 15:17 63:10
**companies** [1] 61:13
**company** [6] 10:8,17 13:13,16 51:22 52:3
**complaint** [8] 24:18 29:11,12,16 31:23 39:8 48:12 59:10
**complete** [1] 82:20
**component** [1] 67:3
**compressed** [2] 30:4,6
**computer** [1] 33:20
**conditions** [2] 30:21 31:6
**conference** [2] 48:5 49:19
**confused** [1] 72:11
**consent** [10] 73:18 75:12,13,20 76:13,16,22 77:3,10,17
**consented** [5] 73:6,11 74:7 77: 14,20
**constitutes** [1] 81:14
**construct** [1] 19:9
**constructed** [1] 42:10
**contact** [2] 57:7 66:23
**contained** [2] 27:5,17
**content** [4] 30:6 36:19,22 37:3
**contention** [1] 79:13
**context** [1] 48:15
**contract** [12] 41:4,5,12 45:1,8 54: 23 55:3,10,14
**contractors** [1] 75:7
**contracts** [6] 8:12,16,24 9:5 41:

2 55:7
**contractual** [2] 40:21 41:24
**control** [2] 61:2,5
**conversation** [4] 5:7 22:13 48:7, 15
**conversations** [2] 26:4 47:14
**cook** [1] 82:3
**copies** [2] 33:6,12
**copy** [3] 12:3 20:20 53:2
**correct** [39] 19:13 27:12 30:16 34:24 35:14 42:1 46:1 50:17 51: 9 52:6,21 57:22 58:1,3,7,10,11, 18 62:2,7 65:8,23,24 66:3,6,10, 19 67:17 68:1,17 71:10,15 73:13 76:23 77:6,21 79:3,18 81:14
**correctly** [4] 10:16 15:6 41:14 61:16
**correspondence** [1] 46:9
**counsel** [4] 4:19 37:18 82:13 83: 2,4
**counter** [1] 43:6
**county** [1] 82:3
**couple** [1] 70:15
**court** [9] 1:1,15 4:21,23 5:10,12 26:23 29:4 81:1
**create** [7] 11:22 12:2 15:23 16:1 19:20 30:22 58:22
**created** [8] 16:24 17:1,5 18:1,2 29:22 30:1,8,14,16,17 31:22 50: 3
**creating** [3] 16:6 32:15,17
**creative** [2] 30:19 31:4
**credit** [2] 43:4 69:24
**criteria** [2] 51:3,4
**cross** [1] 22:16
**cross-check** [1] 44:1
**csr** [1] 83:13
**current** [3] 10:4 24:7,23
**currently** [2] 13:13,15
**customer** [30] 12:11,16 15:4 42: 22 43:1,4,12,16 44:12 54:13 57: 1,5,7,10 60:24 66:9,12,14,15,15, 18,20 67:2,4,11 68:21 73:16 74: 8 76:1 77:20
**customer's** [3] 43:11 57:8 58:10
**customers** [57] 10:20 11:2 12:4, 5,6,17,17,19 13:21,24 14:1 15:1, 8,9,11 40:22,23 42:12,17 43:24 44:1,4,8 50:9,12,15,18,22 51:1,2, 7,18 52:4 53:14 56:22 58:23 59: 6,7,8 61:7,21 62:9,11,24 73:21 74:11,13,14,15,20,23 75:15 76: 12 78:12,16 79:2,17
**D**
**dan** [3] 7:19 18:18 20:13
**database** [20] 12:16,18,20,24 13: 20,23 43:24 50:19,21 52:2,3,6 54:14 57:14,20,24 58:2,4,6 65:1 68:10
**date** [3] 24:7 31:24 48:8
**dates** [3] 36:21,21 68:23
**david** [2] 4:13 22:23
**davies** [36] 4:13,14 22:23,24 25: 13 29:21 47:24 48:16,22 52:22 60:21,23 64:23 66:20 67:18 69: 22 73:16,23 74:9,24 75:2,8 76: 10 77:3,6 78:24

**davies'** [3] 68:11 71:8 76:2
**day** [4] 4:19 81:13
**dead** [1] 79:10
**december** [7] 16:17,18 18:11 19:15,23 20:5 23:1 32:11,23 38: 22 41:20,24 42:3 55:6,16 61:4 78:2
**decent** [1] 49:22
**decided** [2] 19:16 34:13
**decision** [1] 73:14
**deem** [1] 25:5
**defendant** [2] 2:17
**defendants** [1] 1:10
**defense** [4] 72:9,17 73:5 79:11
**defenses** [2] 72:5,24
**define** [3] 51:1,4,11
**defined** [1] 51:8
**degree** [1] 44:3
**dehumidifier** [4] 67:19,20 69:7, 12
**dep** [1] 19:2
**depend** [1] 25:8
**depose** [4] 27:15,24 28:8,9
**deposition** [34] 1:12 3:7 4:15,16 6:2,14 7:1,24 9:10,18 18:22 21:4, 8,12,22,23 23:24 25:1 41:3 47: 18,21 48:11,13 55:1 65:3 70:5, 23 71:17 77:24 81:13,16 82:7,11
**depositions** [1] 1:16
**describe** [2] 68:5,6
**described** [1] 43:16
**description** [1] 15:7
**designated** [1] 22:5
**detail** [1] 67:22
**detailed** [2] 63:21 64:3
**determine** [2] 61:6 77:24
**developed** [1] 24:2
**difference** [6] 39:11 74:22 75:24, 24 76:10 77:2
**differences** [2] 75:1 77:15
**different** [10] 5:6 10:9 39:3,7 56: 5 61:3 68:23 74:4 75:6,9
**differently** [1] 47:5
**digital** [1] 14:20
**direct** [40] 8:19,22 9:6 11:13,14, 21,22 12:2,3,9,14,18 14:8,19 20: 1 45:16 47:6 53:20,24 54:8,10, 16,24 55:10,13,14 56:7,17 57:3, 4 59:24 60:4 61:17,22 62:17 63: 2,6,11,14 64:10
**direction** [2] 41:12 82:10
**directly** [4] 54:7 77:5,19 78:3
**director** [6] 10:5 11:7,13,14,21 12:9 14:4 15:16
**disability** [1] 6:9
**disclosures** [1] 24:5
**discovery** [1] 1:17
**discuss** [4] 22:5 26:21 27:17 34: 17
**discussed** [1] 25:22
**discussion** [5] 9:3 49:24 79:23
**discussions** [2] 4:19 22:8
**distribution** [1] 10:7
**district** [2] 1:1 81:1
**division** [3] 1:2 81:2 82:2
**document** [2] 72:10,13
**documents** [5] 8:5,7,11 70:22

71:1
**doing** [6] 4:14 16:15 22:23 25:7 44:20 74:21
**done** [6] 14:17 41:6 60:24 63:1, 17 69:1
**down** [4] 4:22 5:10 28:6 35:17
**drafted** [3] 36:2,7 37:10
**drafts** [2] 38:13,14
**drive** [1] 2:9
**duly** [2] 4:3 82:16
**during** [6] 6:2 16:18 19:15,23 32: 10 59:11

**E**

**e-mail** [5] 2:6 46:9 48:4 53:2 63: 1
**e-mailed** [1] 63:8
**e-mails** [3] 35:8,12 53:6
**each** [6] 32:19,20 62:11 63:11,22 66:11
**earlier** [8] 50:14 53:24 54:2,21 60:22 64:4 65:2 76:23 80:6
**early** [3] 42:11,15 50:6
**early/mid** [1] 43:18
**easier** [1] 25:9
**eastern** [3] 1:2 81:2 82:2
**either** [2] 75:16,19
**elaborate** [1] 12:1
**electronic** [2] 33:10 53:1
**electronically** [2] 53:5 69:1
**employees** [4] 21:7 23:7 26:9,16
**end** [4] 5:1 24:4 32:24 78:2
**enough** [1] 22:17
**enter** [1] 9:2
**entered** [4] 41:3,16 42:4 55:4
**enterprise** [1] 13:9
**entire** [2] 50:21 72:8
**entity** [1] 9:19
**erp** [8] 13:2,3,5,9,14 57:15,20,24
**errata** [1] 81:16
**established** [3] 10:19,20 51:24
**estimate** [3] 10:19,20 51:24
**et** [1] 63:18
**even** [1] 35:3
**event** [1] 26:23
**everybody** [3] 9:20 62:1 77:14
**everyone** [1] 75:13
**everything** [1] 4:22
**exact** [4] 31:24 48:8 49:1 77:23
**exactly** [15] 18:8,8 30:2 39:12,12 48:14 49:17 50:11 53:4 54:6 55: 5,5 56:12,13 78:22
**examination** [3] 3:4 4:5
**examined** [2] 4:4 82:17
**example** [1] 56:1
**except** [1] 81:16
**exchanged** [2] 35:8,12
**excused** [1] 80:13
**execute** [2] 12:4 15:18
**executing** [5] 14:8,9,13 15:13,22
**exhibit** [27] 3:7 21:11,12,18 28: 23 29:1,5,8,15 31:23 33:5 35:16, 24 39:24 59:15,16 60:15 64:16, 19 66:8 70:5,9,12 71:17,21,24 79:12
**exist** [1] 16:13
**existed** [1] 47:19
**existing** [37] 12:6,18 13:20 15:8,

11 40:22,23 41:15 42:12,17,21
43:1 44:1,3,8 50:11 51:1,7 53:14
58:10 59:7,8 60:24 61:21 62:9
73:16 74:8,13,15,20,23 75:15 76:
1,12 78:15 79:1,16
**exists** [1] 46:14
**expect** [1] 67:13
**explain** [4] 41:11 42:20 56:20 66:
12 73:14 74:4
**explained** [1] 53:11
**extent** [5] 5:6,11 25:12,13 73:6

**F**

**facets** [1] 17:9
**facsimile** [1] 24:6
**fact** [1] 47:12
**fair** [1] 22:17
**fall** [1] 25:5
**familiar** [2] 6:20 56:16
**far** [5] 7:22 19:6 32:5,24 63:17
**fax** [164] 6:23 8:1,2,4,8,9 14:21
16:4,6,11,14,15,20,24 17:1,5,9,
12 18:2 19:13,17,20,23 20:3,5
22:24 24:17 29:19,21,23 30:3 31:
12,22 32:6,9,16,19 33:15 34:
4,6,14,17 35:9 36:18 38:7,13,21
39:4,7,8,13,18 40:9,11,14,16,22
41:17 42:6,12,15,17,22 43:2,11,
13,16,19 44:4,6,7,12,15,22 45:2,
18 46:5,23 47:7,13,23 50:9 51:2,
9 52:1,4 53:15,24 54:17 56:8,14,
23 57:4,6,11,19,21,23 58:6,10,
16,23 59:6,7,12,15 60:2,5,6,9,14,
19,22,23 61:4,8,21,24 62:10,11,
13,15,18 63:5,11,14,22 65:7,9,
10,15,16,17,22 66:2,4 71:8,9 73:
7,11,17,22 74:7,8,11,14,15,19,23,
24 75:16 76:1,11,14 77:4,14,19
78:1,3,4,13,15 79:1
**faxed** [2] 56:14 60:16
**faxes** [17] 33:1 36:23 37:8 45:2
53:20,22 55:18 56:11,24 57:2 58:
8,12 59:8,10 60:11 75:14 79:16
**faxing** [1] 55:15
**february** [1] 68:13
**few** [2] 39:2 58:8
**figure** [2] 11:4 79:8
**file** [6] 33:9 57:6,9,13 62:24 63:2
**filed** [3] 48:12 71:5 72:14
**final** [2] 31:2 68:14
**find** [1] 40:16
**finn** [26] 1:12 3:3,7 4:2,9 21:12,
16 24:12,24 25:6,21 29:1,5 37:
23 64:16 70:5,9 71:17,21 72:8,
13 81:11 82:7,15,22 83:1
**first** [19] 4:3 21:10 35:18 36:3 40:
3,5 42:14 54:9 58:8 64:22 66:7,
16,17,24 68:12,12 70:17 73:4 82:
15
**five** [1] 14:18
**flag** [1] 57:4
**focusing** [2] 36:5 66:7
**folder** [2] 33:9,10
**folks** [6] 9:9 14:1 15:11 21:2,4 80:
2
**follow-up** [2] 46:12,20
**follows** [1] 4:4
**font** [1] 35:24

**foregoing** [2] 81:12 82:19
**form** [18] 23:10 27:7 45:10 46:15
47:1 52:24 53:2 56:2 62:4,20 65:
7,11,12 74:1 75:3 76:5,18 77:7
78:18
**formal** [1] 9:15
**former** [4] 21:7 23:7 26:9,16
**forms** [4] 14:14,17 15:13,22
**forth** [1] 82:14
**fortune** [1] 10:17
**forward** [1] 61:22
**found** [4] 44:6 66:4 71:2 76:3
**foundation** [1] 35:4
**frame** [3] 18:6,11 19:24
**frank** [1] 4:11
**full** [1] 4:8
**further** [2] 12:1 82:19
**future** [1] 66:21

**G**

**g-e-l-f-o-n-d** [1] 17:4
**gartner** [5] 18:13 20:8 23:20 54:
21 63:9
**gathering** [1] 34:7
**gave** [5] 6:2 42:17 44:3 53:19
59:7 62:23,23 66:5 74:13,23,24
75:13,20 76:11 78:3
**gears** [1] 40:13
**gelfond** [4] 16:24 17:3 19:20 20:
4
**generally** [3] 30:14,16 35:17
**generated** [1] 70:2
**gentlemen** [2] 54:20 64:4
**geographically** [1] 33:19
**geography** [1] 14:11
**gets** [1] 66:15
**getting** [3] 42:12 72:11 77:14
**giant** [1] 43:24
**give** [17] 5:11 18:7,7 42:22,24 43:
2,6,16 44:7 50:12,21,24 65:22
67:4,8,11 77:23
**given** [5] 4:16 37:18 66:18 81:12,
15
**gives** [3] 41:12 44:12 73:18
**giving** [1] 76:1
**goals** [2] 16:1,2
**got** [6] 27:15 50:7 55:22 57:2,23
71:2
**grainger** [124] 2:13,14 6:19,24 9:
12,13,15,16,19,23 10:2,6,7,16,21
11:15,18 13:1,15,18 14:10,14,17
15:3,6,19 16:11 20:9,24 21:3,5
22:1,23 23:5,7 24:2,5,9,17,21 26:
6,9,14,16 27:4,17 28:10,17 31:8,
19 33:13 38:14,19,22 39:14 40:
16 41:3,6,15,23 42:4,6,14,22 43:
10,11,16 45:17,22 46:3,4,13,23
50:3 51:8,8,11,17,20 52:24 53:
17 54:8,9,12 55:9,15 56:17 57:
12 59:11 60:1,2,5,6,10,16,18 63:
11,16 64:2 65:2 66:13,17 67:4,8,
11 68:12 69:11,22 71:8 72:14 73:
7,22 74:23,24 75:16,21 76:2,11
77:4,18 78:3 79:14,17 81:8
**grainger's** [16] 22:5 29:23 31:11
49:11 50:15 51:7 52:2 57:14,24
65:9 73:10,12 74:6,11 79:12,14
**graphics** [1] 12:3

**great** [1] 49:23
**group** [4] 59:6 66:1 78:23 79:1
**guess** [8] 17:10 22:14 25:9 38:13
44:24 47:16 74:18,18
**guys** [1] 33:1

**H**

**hand** [3] 21:15 64:15 71:20
**handed** [1] 29:4
**handle** [1] 16:14
**handled** [1] 48:6
**handles** [1] 16:11
**happen** [1] 57:3
**happened** [2] 47:11 48:11
**happening** [1] 47:20
**hard** [2] 33:12 53:2
**hardware** [1] 69:4
**hatch** [1] 82:12
**head** [2] 5:8 79:7
**header** [1] 59:16
**help** [5] 19:19 42:6 78:16,24 79:2
**helped** [2] 19:9,20
**hereby** [1] 82:6
**herein** [2] 4:3 81:17
**hereinabove** [1] 82:22
**history** [1] 68:12
**hmtp** [1] 53:6
**hold** [1] 52:15
**home** [5] 1:4 4:14 22:24 66:21
67:4
**hopefully** [2] 4:20 22:20
**horse** [1] 79:10
**hour** [1] 49:21

**I**

**i-n-n** [1] 4:11
**idea** [1] 30:18
**identified** [3] 21:2 24:11,23
**identify** [1] 68:2,4 80:2
**illinois** [5] 1:14,18 2:5 82:13 83:
7
**impairments** [1] 6:9
**important** [3] 4:22 5:13,19
**impressive** [1] 69:16
**in-person** [1] 49:19
**in-staff** [1] 31:9
**inc** [3] 2:13 9:16 81:8
**included** [4] 37:1 39:24 60:21,23
**including** [1] 13:24
**indent** [3] 40:1,2,4
**indented** [1] 40:5
**indicate** [1] 57:10
**indicated** [7] 46:1 57:5 68:13 69:
9 75:23 76:9 81:16
**indicating** [1] 45:15
**indication** [1] 71:7
**individually** [2] 1:4 81:4
**industrial** [1] 10:7
**info** [2] 49:8,15
**inform** [1] 43:12
**information** [8] 51:21 53:12 64:
23 66:24 67:12 68:18,23 70:1
**informed** [2] 46:4 62:17
**infousa** [63] 8:17,18 9:6 40:18,20,
21 41:4,6,12,16,17,23 42:4,11
43:19,23 44:3,6,15,17,21 45:17,
18 46:3,4,22 47:7,7,15,22 48:2,4,
19 49:16,20 50:3,9,12,21 51:7

52:8,10 53:1,9,13,23 54:7 57:23
58:5,9,17,20 59:8 61:20 62:8 66:
2,4 74:16 76:3 77:19 78:4,17,24
**infousa's** [1] 79:2
**initial** [2] 24:5 56:14
**input** [1] 13:18
**inputted** [1] 68:18
**instead** [1] 76:3
**instruct** [1] 52:19
**intended** [2] 35:19 36:6
**interested** [2] 37:20 83:3
**interrogatories** [1] 82:18
**interrupt** [1] 5:2
**investigating** [1] 45:4
**involve** [1] 25:13
**involved** [5] 22:12 34:22 49:4 52:
7 61:9
**isn't** [1] 71:7
**issue** [7] 26:24 60:10 75:12 76:
13,16,22 77:2
**item** [2] 68:22 69:11
**items** [1] 69:23
**itself** [3] 16:6 32:6 63:8

**J**

**james** [1] 2:3
**jim** [2] 4:12 49:21
**job** [4] 11:10 14:5,5 15:7
**john** [8] 1:9 18:13 20:8 23:20 54:
21 63:9 64:5 81:8
**jon@bockhatchllc.com** [1] 2:6
**judge** [1] 22:13
**judge's** [4] 22:9 24:11 25:16,17
**judging** [1] 19:12
**june** [1] 70:18
**junk** [2] 45:2 47:13

**K**

**k-a-s-o-k** [1] 7:8
**kasok** [1] 7:4
**kathy** [1] 7:4
**kin** [1] 83:4
**kind** [3] 37:21 51:20 53:3
**knowledge** [2] 25:1 45:7
**knowledgeable** [3] 23:1,4,8 24:
8,20 26:6,10,10,14,17,17 27:5,
16 28:1,10,18
**knows** [1] 45:11

**L**

**l-a-n-g** [1] 7:18
**lang** [1] 7:18
**language** [8] 36:2,7,12,15 37:10
38:5,7,12
**larger** [1] 58:22
**lasalle** [3] 1:17 2:4 82:12
**last** [12] 4:10 7:7,15,20 14:18 15:
17 17:3 20:20 29:14 33:1,3 59:
15
**laura** [3] 18:24 20:16 80:6
**law** [1] 45:3
**lawsuit** [2] 60:10 71:4
**lead** [1] 32:17
**learn** [1] 47:7
**learned** [2] 47:14,17
**least** [1] 44:20
**leave** [1] 4:23
**legal** [17] 31:6,8,11,19 32:20 36:

12,16 37:11,16,18 38:3,5,7,10
48:6 49:7,12
**less** [2] 51:13,18
**life** [1] 66:21
**limited** [13] 10:10 13:20,24 14:11
17:12 20:3 33:8 36:2 40:23 60:
12 74:6 75:11 76:22
**list** [40] 12:11,16 14:16 16:19 24:
3 44:15 50:3,7,8,9,11,24 51:7,12
52:3,7,10,12,17,24 53:9,14,18,
19,23 54:7,9,12 58:16,19,19,22
61:17,18,20,23 62:2,7,8 63:15
**listed** [7] 15:14 52:4,6 65:7,10 66:
24 75:17
**lists** [2] 59:4 70:16
**little** [15] 9:8,11,12 10:22 25:9 30:
3,5,24 39:2 40:13,14,15 43:18
74:19 75:8
**llc** [1] 82:12
**llp** [1] 2:8
**located** [1] 64:10
**location** [5] 33:17,20,23 39:16,
18
**locations** [1] 10:12
**long** [4] 10:2 11:6,14 19:5
**longer** [3] 57:5,7,11
**look** [8] 21:16 29:6 30:2,6 31:5
64:17 70:10 71:22
**looked** [1] 29:7
**looking** [1] 30:5
**looks** [10] 30:3 35:16 40:7 64:22
65:4,15,16 66:8 67:14 70:17
**lot** [3] 27:11 52:17 75:6

## M

**m-a-c-a-l-p-i-n-e** [1] 7:16
**macalpine** [1] 7:14
**made** [1] 82:21
**mail** [9] 11:22 12:2,3,15,18 14:8,
19 20:1 53:2
**main** [1] 19:6
**maintenance** [1] 51:16
**major** [1] 80:9
**majority** [1] 32:18
**many** [9] 10:20 16:9 17:14 32:13
52:11,14 63:18,18,19
**mark** [5] 21:10 28:23 64:13 70:4
71:16
**marked** [10] 21:13,16,17 29:2,5
64:16 70:6,9 71:18,21
**market** [2] 19:17 34:13
**marketing** [9] 10:5 11:7,13,15,
21 12:9,15 14:4 15:16
**mason** [1] 22:13
**master** [3] 61:18,23 62:24
**material** [1] 69:10
**materials** [1] 51:19
**matter** [2] 69:23 77:18
**mean** [13] 6:21 12:1 13:5,8 14:24
25:16 37:13,15 40:19 44:10 53:1
61:5 68:4
**means** [3] 13:11 41:10 56:12
**media** [1] 14:20
**medications** [1] 6:5
**meeting** [6] 34:16,19,21,22 35:1,
3
**meetings** [1] 35:7
**meets** [1] 16:2

**members** [3] 16:9,19 35:1
**mentioned** [3] 54:21,23 80:6
**message** [1] 30:18
**messaging** [1] 61:3
**messing** [1] 18:16
**mid** [3] 42:11,15 50:6
**might** [3] 5:10 15:5 18:16
**million** [2] 11:2 50:15
**millions** [1] 10:8
**mind** [3] 23:17 75:23 76:10
**minute** [2] 42:13 79:21
**misstates** [2] 56:3 77:8
**mm-hmm** [3] 5:9 15:20 67:16
**month** [9] 31:24 32:3,3 34:8,10,
11,14 62:10,11
**monthly** [3] 32:7 34:5 35:10
**morning** [2] 4:7,20
**most** [9] 23:4 24:8,20 26:6,14 27:
16 28:1,10,17
**move** [2] 24:15 40:14
**mro** [2] 51:13,15
**mtrl** [1] 69:10
**much** [8] 8:14,14 51:24
**multiple** [3] 17:9,10 32:9
**must** [1] 67:1
**myself** [1] 8:1

## N

**n-i-c-o-l-a-s** [1] 7:19
**name** [14] 4:8,10,12 7:7,15,20 9:
15 12:20 17:3,24 18:7 48:3 61:3
**names** [6] 7:2 17:20,22 18:8 52:
3 80:6
**nation** [1] 10:14
**nationwide** [5] 10:11,21 11:3,5
50:15
**necessary** [2] 22:14 67:3
**need** [1] 79:2
**never** [7] 57:19,24 63:23,24 74:
24 76:2,10
**new** [3] 8:22 67:1,3
**news** [1] 63:17
**next** [5] 57:3 65:17 71:16
**nicholas** [4] 7:19 18:18 20:14,15
**nichols** [1] 20:13
**nine** [5] 10:3 15:17 32:14 36:18,
23 37:1,3 38:21 60:19
**nod** [1] 5:8
**nolan** [1] 31:15
**nor** [1] 83:4
**normal** [1] 5:7
**north** [3] 1:17 2:4 82:12
**notary** [1] 81:23
**notes** [1] 79:19
**nothing** [2] 65:17 82:17
**notice** [10] 10:23 21:22,23 22:9
32:6 48:13 52:16,22 57:17 65:6
**number** [53] 22:24 24:1 40:17 42:
18,22 43:2,11,17 44:4,12 45:3,3
47:23 48:20 51:2,9 52:4 56:21,
23 57:5 58:6 59:19,22 63:22 64:
13 65:6,7,9,10,16,22 66:2,4,13,
15,18,20 67:7,9 70:4 71:8 73:17
74:8,23,24 75:16 76:1,11,15 77:
19 78:3,13 79:1
**numbers** [29] 40:22 42:12 43:20
44:6,7,15,22 45:19 46:5,23 47:7
50:10 52:1,17,19 53:15 57:19,21,

58:10,16,24 61:21 69:11 70:
16 77:4,23 78:4,15

## O

**o-p-t-i-m-a** [1] 8:20
**object** [18] 27:7 35:4 45:10 46:15
47:1 52:19 56:2 62:4,20 65:11
71:12 74:1 75:3 76:5,18 77:7 78:
9,18
**objecting** [2] 25:11,14
**objection** [5] 23:10 27:19 28:2,
11,19
**obtain** [2] 43:11 66:23
**obtained** [7] 22:23 53:23 71:4,8
74:8 77:19 78:24
**obviously** [1] 32:24
**october** [4] 1:19 81:13 82:6 83:7
**offer** [5] 30:20 35:19 36:6,24 39:
23
**offers** [1] 15:3
**offices** [1] 82:11
**oftentimes** [1] 5:7
**okay** [78] 4:12,18 5:6,17,18 6:1,3,
4 7:9 9:8,13,14,18,23 10:6 13:12,
18,23 14:3 16:3,13 17:14,19 18:
4,10 19:8,11 20:8 21:10 22:11,
19 29:7 30:23 31:3 34:1 38:9 39:
13 41:14 42:9 43:21 44:5,9 45:6
46:8 47:16 50:5,13 51:6 52:1 53:
8,13 54:5 56:6 59:9 60:1,6 63:1
64:18 65:1,6,19 68:7,15 71:23
72:3,15,20,22 73:2 74:17,22 75:
13 76:17 77:1,16 79:21 80:8,11
**on-staff** [1] 31:9
**once** [5] 22:13 34:8,14 61:16 63:
14
**one** [29] 4:12 17:15 18:21 19:16
24:10 29:23 31:23 32:14,20,24
35:3 37:7 39:4,7 42:21 43:6 44:
24 49:11 54:1,24 57:1 58:22 65:
4 71:16 72:2,12 74:11,16 75:9
**one-pager** [1] 15:2
**one-year** [1] 34:5
**ones** [3] 54:2,3 60:22
**only** [5] 13:21 39:4 40:23 61:23
77:2
**operating** [1] 51:16
**opportunity** [1] 4:24
**opt** [2] 56:22 57:2
**opt-out** [2] 55:19 56:16
**optima** [25] 8:19,20 9:6 53:19,24
54:8,9,16,24 55:10,13,14 56:7,
17 57:3,4 61:17,22 62:17 63:2,6,
10,14,20 64:10
**oral** [1] 82:17
**order** [5] 22:9 24:12,24 25:17 68:
22
**orders** [1] 15:10
**other** [54] 8:18,24 9:5 17:7,7,14,
15,24 18:1 20:4,5 24:18 25:10,
18 30:5 35:24 36:18,23 37:1,3,
18 38:21 43:8 51:3 53:5,11,12
55:22 59:12 60:9,11,14,19 61:1,
13 67:21 68:16 72:5,12,24 73:19,
21,24 74:10,14,22 75:1,2,8,19,
20 76:11 77:3,5
**out** [19] 12:4,14,18 26:23 33:1 34:
8,11,13 35:9 54:1 56:22 57:2 58:

8 59:5,11 62:24 67:22 71:9 79:8
**outside** [2] 54:13 61:13
**over** [11] 5:1 14:18 15:17 21:17
29:6,7 34:5 61:22 63:2 64:17 70:
10
**oversaw** [4] 16:3,5 17:16,17,18
18:4,8 80:15
**oversee** [1] 15:23

## P

**p-a-t-t-i** [1] 7:18
**page** [9] 3:2 22:4 29:15,16 59:
15 64:22 65:7 66:7,24 67:21,24
68:1,7,9 69:9 72:4,21 73:5 79:12
**pages** [13] 44:11 45:5 48:1,20 68:
2 69:8 70:15,15,17,18 71:2,3,11
**paid** [3] 55:10,14,22,24 56:7
**painful** [1] 22:21
**paper** [1] 30:22
**paragraph** [25] 22:22 24:15 25:
22 26:5,13,22 27:2,6,14,18,23
28:7 35:18 36:3,6,20,24 37:7 38:
3,23 39:17,24 40:3,4,5
**paragraphs** [4] 25:10 26:2,21 35:
17
**parkway** [1] 2:14
**part** [5] 19:10 35:2 66:1 67:8 69:
18
**particular** [1] 23:17 45:4 48:22
52:4 62:15,18 63:11 65:5,22 72:
2 77:10
**parties** [1] 83:5
**partners** [1] 15:24
**patti** [1] 7:18
**payment** [2] 55:17,19
**pays** [1] 69:24
**peggy** [1] 7:19
**people** [10] 6:19 17:7 18:21 21:2
31:4 63:9 64:1 78:14,15 79:15
**per** [1] 57:7
**percentage** [2] 78:14 79:4
**period** [7] 12:8 16:18 19:16 32:
10 34:6 59:11 80:3
**person** [16] 23:4,17 24:8,20 26:6,
14 27:1,12,17 28:1,10,17 49:8,
11 66:12 77:3
**personally** [1] 52:9
**persons** [2] 23:17 81:5
**pertaining** [1] 1:16
**phone** [8] 2:10,15 15:6 65:6 67:7,
8 70:16 73:17
**physically** [2] 52:9 59:5
**piper** [1] 9:2
**place** [5] 15:10 34:16 48:7 49:2
82:22
**places** [2] 44:11,11
**plaintiff** [7] 2:17 24:18 32:22 40:
14,16 60:1,11,16,19 65:21 73:6,
11 74:6 75:20 79:13 81:6 82:8
**plaintiff's** [4] 4:13 24:18 40:16
73:5
**plan** [5] 34:7,12,17 35:9 41:18
**platform** [1] 13:10
**players** [1] 15:24
**please** [4] 4:7,10 5:16 7:3
**point** [3] 5:15 18:9 27:11
**points** [1] 30:20
**position** [9] 14:3 44:20 73:10,12,

23 74:6,10 76:2 79:14
**possible** [1] 14:16
**possibly** [1] 38:15
**potential** [3] 51:13,15 75:24
**practice** [1] 48:23
**predominantly** [1] 14:12
**preparation** [2] 48:10 70:22
**prepare** [10] 6:13 7:1,23 9:9 18:
21 19:1 21:3,8 41:2 55:1
**prepared** [3] 25:21 26:20 69:19
**preparing** [2] 47:18,21
**present** [1] 82:13
**presented** [3] 24:12,24 25:2
**pretty** [3] 8:14,14 69:20
**prevent** [1] 25:6
**previously** [4] 70:9 71:21 74:21
82:14
**pricing** [1] 7:20
**print** [3] 14:19 35:16 39:21
**printout** [2] 68:10,11
**probably** [5] 27:11 33:14 34:18
38:17 64:4
**procedure** [1] 1:15
**process** [10] 12:14 30:13,23 42:
13,19 43:22 50:14 61:9 67:8 78:
8
**product** [1] 31:2
**products** [2] 10:8 15:2
**program** [1] 55:20
**project** [2] 6:20,21
**pronunciation** [1] 18:16
**protection** [2] 45:2 47:13
**provide** [1] 75:15
**provided** [7] 50:12 55:20 56:17,
21 63:20 67:1 81:17
**providing** [1] 75:16
**provisions** [1] 1:14
**public** [4] 74:9 75:17 76:3 81:23
**publicly** [1] 44:12
**publicly-available** [10] 44:7,9,
22 45:19 46:5,24 47:8 48:1 73:
18 78:5
**pull** [5] 44:22 45:18,18 46:23 47:
7
**pulled** [2] 48:20 78:4
**pulling** [1] 46:4
**purchase** [6] 64:24 67:22 68:11,
13,14 70:1
**purchases** [4] 66:21 68:16,22
69:23
**purpose** [2] 1:17 9:18
**purposes** [2] 42:11 51:12
**pursuant** [2] 1:14 24:6
**put** [8] 12:3 30:20,21 53:6 57:19,
24 68:24 74:9

## Q

**question** [28] 5:2,4,16,20 15:15,
21 20:20 25:8 28:15 36:4 37:19
38:16 41:21 44:16 45:23,24 46:8,
12 47:5 55:12 60:13 72:6,12 74:
5 75:10 76:19 77:9 78:22
**questions** [4] 6:7,11 25:4 82:20
**quite** [1] 5:16
**quotes** [2] 24:4,4

## R

**radio** [1] 14:19

**read** [4] 20:20,22 35:22 81:11
**reads** [2] 24:1,16
**really** [4] 16:23 17:18 61:1 65:20
**reason** [2] 61:1 73:19
**recall** [3] 39:11 49:17 72:23
**receive** [7] 24:3 35:13 37:8 56:
23 57:11 61:17 74:7
**received** [12] 32:22 48:12 55:19
57:1 58:20 59:8 62:7 74:11,15
76:14 77:4 79:16
**receiving** [3] 73:7,11 75:13
**recipient** [3] 35:19 36:6 56:23
**recipients** [11] 24:3,19 42:15 60:
5,6 73:24 75:2,20 77:4,5 78:3
**recognize** [3] 21:17,20 29:8,16
64:19 70:12 71:24 72:1,1,4,7,8,
17
**record** [22] 4:8,24 9:1,3 20:22 22:
7,12 24:1,10,16 45:7,20 46:9,10,
21 49:24 68:2,15 79:21,23 81:15
82:20
**reduced** [1] 82:9
**refer** [2] 9:19 17:20
**referenced** [1] 24:5
**referred** [2] 12:24 82:22
**referring** [7] 12:21,22,22 33:17
61:19 64:3 65:2
**refers** [2] 34:4 36:20
**regard** [1] 58:9
**regarding** [13] 23:5,8 24:9,21 26:
6 27:5,16 28:9 35:8 41:17 55:15
64:2 80:1
**regular** [1] 54:13
**relates** [1] 77:17
**relationship** [3] 41:15,24 79:14
**relayed** [1] 57:12
**remember** [6] 13:10,22 18:8 20:
2 32:5 38:11 41:5 48:3,14,24 49:
6,7,8 55:3 72:19 73:1
**repair** [1] 51:16
**repeat** [1] 15:15
**rephrase** [1] 76:20
**replacement** [1] 69:18
**reported** [1] 82:8
**reporter** [8] 1:13 4:21,23 5:10,12
29:4 82:6 83:7
**reports** [6] 63:20,21,24,24 64:2,3
**representative** [1] 22:5
**represents** [1] 4:13
**requested** [5] 20:22 21:13 29:2
70:6 71:18
**resendez** [2] 1:13 82:5
**reserve** [1] 80:12
**reserved** [1] 83:2
**respect** [13] 24:15 13 16:4 19:
22 22:9 25:22 26:5,13 27:14,24
28:15 39:17 42:15 52:18 56:17
63:21 76:13,14,16
**response** [1] 37:21
**responsibilities** [1] 11:20 14:5,
6
**responsible** [3] 14:8,9 52:10
**restate** [4] 36:4 37:19 41:21 60:
13
**review** [3] 32:20 38:3 70:22
**reviewed** [10] 8:1,4 9:5 30:15 31:
12 36:12,16 37:19 41:2 54:24

**reviewing** [2] 8:5 55:9
**revisit** [1] 6:3
**rider** [2] 22:4,20
**robert** [9] 1:12 3:3 4:2,9 81:11
82:7,15,21 83:1
**rohan** [8] 18:13 20:11 23:22 54:
21 63:9 64:5,6,7
**role** [3] 15:14,21 20:5
**room** [1] 49:18
**roughly** [1] 34:8
**rule** [1] 24:6
**rules** [1] 1:15

## S

**salesperson** [1] 43:3
**same** [15] 5:3 13:16 18:19 27:14,
19 28:2,11,15,19 30:6 33:17 37:
4 38:9 40:10 59:11 67:7 68:10,
10 77:20
**sap** [8] 13:4,6,13,13,14,16 57:15
78:13
**save** [1] 54:12
**saved** [8] 33:6,8,12,16,21 34:1
38:14 39:14
**saw** [2] 63:23,24
**says** [1] 32:6
**scope** [13] 14:7 22:8,14,15 24:11,
23 26:23 52:16,21 57:16 59:1 68:
19 78:9
**scratch** [1] 64:9
**screen** [3] 64:22 65:4,15
**second** [5] 22:4 40:4 45:14 69:
10 79:11
**secure** [4] 33:9,9,17,20
**see** [14] 4:18,21 17:8 32:7 35:19
37:8 59:17,20 69:7 73:7
**seeing** [3] 72:19,23 73:1
**seen** [1] 73:2
**select** [1] 62:9
**selected** [1] 61:3
**selection** [1] 62:23
**self-explanatory** [1] 52:2
**sell** [2] 10:11,12
**seller** [4] 14:20,24 15:3 43:3
**sellers** [1] 15:1
**sells** [2] 10:8 51:17
**send** [17] 12:4,14,18 24:17 34:8,
13 35:9 38:2 43:12 52:24 53:13
54:7 59:11 60:11 61:8 62:15,24
**sending** [4] 52:7,10 63:2 71:9
**senior** [4] 10:5 11:6 14:4 15:16
**sense** [2] 5:4,23
**sent** [31] 8:8 24:17 29:21 30:3 32:
4,10 33:1,16 34:6 36:19,24 38:
10,22 39:4 51:6 53:9 54:1,9 56:8,
14 58:5,8 59:5 60:2,6,18 63:6,15,
18 66:2 78:1
**separate** [3] 41:16 42:4 58:2
**september** [3] 67:15 68:14,16
**server** [2] 33:21,23
**services** [5] 1:4 4:14 15:3 66:21
81:4
**services'** [1] 22:24
**set** [6] 34:19 40:10 43:3 48:4 55:
21 82:14
**seven** [1] 11:8
**she's** [1] 4:21
**sheets** [1] 15:2 81:17

**shopped** [1] 66:17
**short** [1] 49:22
**shorthand** [3] 1:13 82:5 83:6
**shot** [2] 64:23 65:4
**show** [3] 14:21 31:1 70:8
**signature** [3] 80:12 83:1,6
**similarly** [2] 1:5 81:5
**single** [1] 61:24
**sir** [9] 4:7 21:15 22:19 24:15 29:4
37:9 64:15 70:8 71:20
**site** [2] 33:9 53:7
**situated** [1] 81:5
**size** [2] 39:21 51:23
**slightly** [2] 39:3,7
**small** [34] 17:23 18:2,5,11 19:7,9,
10,11,17 30:17 34:12,14 35:2,9,
15,21 51:1,5,8,11 52:11 53:14
58:6,13,16,23 61:20 66:1 73:21
74:10,20 75:6,7 79:15
**smaller** [1] 35:23
**smith** [40] 2:3 3:4 4:6,12 9:1,4 20:
23 21:10,14 22:11,18 24:14 25:4,
9,15,19 28:23 39:3 48:7 38:1
45:12 49:23 50:1 52:18,23 56:4
64:13,14 69:20,21 70:4,7 71:16,
19 76:20,21 79:19,22,24 80:11
**smoother** [1] 25:10
**software** [1] 69:2
**somebody** [11] 21:24 27:15,24
28:8,9 45:17 47:17 48:19 49:6,
14
**somebody's** [1] 26:24
**somehow** [1] 43:24
**sometime** [2] 42:3 48:11
**sometimes** [1] 43:5
**somewhere** [2] 34:2 39:14
**sorry** [9] 15:15 20:21 30:8 34:20
41:22 57:9 72:6,11 76:18
**sort** [6] 22:13 41:16 42:4 46:2,10
50:3
**sounds** [2] 48:11 61:23
**source** [7] 45:19 46:24 73:18 74:
9 75:17 76:4 78:5
**sources** [6] 44:7,10,23 46:5 47:8
48:1
**space** [3] 40:1,2,3
**specials** [2] 32:7 34:5
**specific** [11] 7:2 12:17 15:21 29:
20 30:24 34:18,21 36:21 52:18
56:10 67:22
**specifically** [6] 25:17 30:19 41:7
43:14 48:16 68:21
**specifics** [1] 49:1
**speculation** [3] 23:11 27:8 46:
16
**spell** [6] 4:10 7:7,11,15 17:3 18:
14
**spend** [2] 51:18,24
**spoke** [5] 9:9 18:21 19:1 21:3 59:
9
**spot** [1] 54:13
**square-foot** [1] 51:23
**start** [2] 16:10,16
**started** [2] 11:17 50:7
**starts** [3] 22:4 35:18 67:21
**state** [4] 4:7 72:12 81:11 83:7
**stated** [2] 30:8 47:15

**statement** [4] 41:6,8 42:5,10
**states** [8] 1:1 10:10,14 14:12 22:
22 73:5 81:1 82:1
**stays** [1] 66:20
**stenographically** [1] 82:9
**still** [6] 16:10 20:8,24 21:4 38:19
47:16 66:7 69:7
**stipulate** [1] 52:16
**stop** [2] 6:3 50:13
**stopped** [2] 16:15 22:13
**straightens** [1] 26:23
**strawn** [1] 2:8
**street** [3] 1:17 2:4 82:12
**strike** [8] 8:2 13:19 29:22 36:22
42:20 43:17 58:4 68:8
**subject** [9] 22:7,10 25:16 34:4
54:17 59:15 60:9,14 79:16
**subscribed** [1] 81:20
**subset** [1] 63:15
**success** [1] 61:6
**successful** [1] 63:19
**successfully** [2] 56:8,14
**successfully-sent** [1] 55:24
**suggesting** [1] 37:22
**suite** [2] 1:18 82:12
**supplies** [1] 51:17
**support** [3] 55:19 56:16,24
**supposed** [1] 52:22
**suppression** [3] 57:6,9,13
**supreme** [1] 1:15
**surrounding** [3] 22:23 24:2,16
**sworn** [3] 4:4 81:20 82:16
**system** [3] 13:2,14 57:20

**T**

**t-h-r-o-m-b-a-l-l-i** [1] 18:17
**tackle** [1] 22:14
**talked** [5] 6:17,19 47:22 64:4 65:
20
**target** [4] 12:17 62:1,18 63:16
**targeted** [2] 58:12 73:22
**team** [57] 14:8 16:3,5,9,10,13,19,
20,20,23 17:5,6,15,16,19,23,24
18:1,1,3,5,12 19:10,11,19 30:2,8,
17,19 31:5,6,8,11,19 32:20 34:
12 35:2 36:8,13,16 37:12,16 38:
3,5,8,10 48:6 49:7,12 61:10,14
62:9,13,14 80:1,2,10
**teams** [5] 15:23 17:7,10,14,19
**telemarket** [1] 15:8
**telephone** [1] 48:5
**ten** [6] 32:16,19 34:6 39:18 40:10
59:9
**teresa** [2] 1:13 82:5
**term** [1] 13:9
**terms** [3] 30:21 31:6 55:11
**test** [2] 61:2,5
**testified** [5] 4:4 15:18 44:17 50:
14 76:23
**testify** [2] 25:21 37:17
**testifying** [1] 44:21
**testimony** [6] 30:14 56:3 77:8,8
81:12,15
**themselves** [1] 74:14
**there's** [4] 4:21 33:12 35:16 45:
13 49:11 59:19 61:1 66:8 68:15
75:24 76:9 78:23 79:1
**thereafter** [1] 82:9

**thereof** [1] 1:16
**thinking** [2] 23:16,21
**third** [1] 24:15
**though** [1] 23:15
**thromballi** [3] 18:14 23:22 54:21
**timing** [1] 48:14
**title** [2] 10:4 11:9
**titled** [1] 72:9
**today** [12] 4:15,23 6:5 13:15,23
16:10,10 21:24 22:1,6 26:21 55:
7
**today's** [10] 7:1,24 18:22 19:2 21:
4,8 41:2 47:18 55:1 70:23
**toll-free** [1] 55:21,22 59:19
**tom** [6] 7:10 18:24 19:1 20:18,24
80:9
**took** [4] 32:17 34:16 49:2 53:19
**top** [3] 32:7 59:16 79:7
**topic** [17] 23:2,5,9 24:9,10,13,21,
22 25:2 26:7,11,14,18 27:16 28:
9,16,18
**topics** [7] 22:6 25:22 26:21 27:1,
2,5,17 28:1
**total** [1] 51:19
**touch** [1] 57:2
**towards** [3] 32:7 40:13 79:12
**track** [1] 51:20
**trade** [1] 14:20
**transact** [2] 53:20,21
**transaction** [4] 65:5 66:16 67:15,
18
**transcribe** [1] 4:24
**transcript** [2] 81:12,14
**transmission** [4] 56:8 60:22 62:
18 63:12
**transmissions** [3] 56:1 62:1 73:
7
**transmit** [2] 53:22 54:17
**transmitted** [2] 55:18 56:12
**transmitting** [1] 53:24
**tried** [1] 63:19
**true** [3] 46:7 81:14 82:20
**truth** [3] 82:16,16,17
**try** [2] 61:6 77:13
**trying** [1] 78:21
**turned** [1] 34:11
**two** [11] 11:16 13:5 17:19 25:12
35:17 44:24 45:13 54:20 70:17
79:4 80:10
**two-year** [1] 72:9
**type** [2] 8:7 51:22
**typed** [1] 35:24
**types** [4] 8:11 10:9 51:23 68:23
**typewriting** [1] 82:10

**U**

**unclear** [1] 47:16
**under** [3] 55:10 69:9 82:10
**underneath** [2] 39:23 67:14
**undersigned** [1] 83:3
**understand** [23] 5:9,13,13,16,20,
22 6:6,10 10:16 15:24 26:20 32:
2 36:20 41:23 47:2,3 51:6 58:5,
12 61:16 69:5 73:10 78:22
**understanding** [6] 15:5 30:14
41:14 43:23 53:8 58:15
**understands** [1] 37:23
**understood** [1] 5:22

**unique** [4] 54:13 73:23 74:10,19
**united** [5] 1:1 10:10 14:12 81:1
82:1
**up** [6] 18:16 34:19 40:10 43:4 48:
5 55:21
**update** [1] 62:13
**updated** [1] 57:14

**V**

**vague** [2] 45:10 47:1
**valid** [4] 35:19 36:6,24 39:24
**variations** [14] 32:9,13 33:15 34:
6 36:18,23 37:1,4 38:12,21 39:
18 40:11 59:10 60:19
**various** [5] 14:17 16:19 42:24 43:
15 69:1
**version** [1] 38:9
**versus** [1] 78:15
**via** [1] 24:6
**volume** [2] 55:18 56:11
**vs** [1] 81:7

**W**

**w-o-o-l-e-r-y** [1] 7:19
**w.w** [2] 2:13 9:16 81:8
**wacker** [1] 2:9
**walk** [5] 12:13 22:19 30:13 43:22
50:13
**wanted** [3] 57:2,6 62:14
**way** [22] 14:11 17:20 25:20 38:6,
23 39:19,21 40:14 42:21 44:2 45:
14 50:8 54:16 55:22 56:5 57:12
61:19 68:14 75:19 77:20,22,24
**ways** [5] 42:24 43:8,10,15 45:13
**weiss** [3] 18:24 20:16 80:7
**west** [1] 2:9
**whatnot** [1] 15:10
**whereupon** [1] 4:1
**whether** [8] 56:7,8 60:16,18 69:
23 77:18 78:2,4
**whole** [1] 82:16
**will** [9] 9:20 25:8 28:17 70:1
**winston** [1] 2:8
**wish** [1] 37:7
**wished** [1] 57:11
**wishes** [1] 57:8
**within** [5] 6:19 10:14 25:5 31:8
83:4
**without** [1] 78:16
**witness** [33] 3:2 4:3 11:1 23:13
25:2 27:10,21 28:4,13,21 35:6
46:18 47:4 52:20 57:18 59:3 62:
6,22 65:13 68:20 71:14 74:3 75:
5 76:7 77:12 78:11,20 80:13 82:
7,15,21 83:1,6
**woolerly** [1] 7:18
**word** [3] 8:22 39:2 58:21
**words** [1] 15:8
**work** [19] 9:23 15:24 20:8,24 21:
3,4 30:20 31:5 32:15 38:19 41:7,
7,8 42:5,10 44:18 54:16 61:14
62:12
**worked** [7] 10:2 30:18 43:19 56:
18,20 80:2,10
**working** [2] 58:9,17
**worldwide** [3] 10:11,13 11:3
**writing** [2] 45:6 64:9
**written-down** [1] 46:10

**Y**

**year** [2] 32:14 51:14
**years** [5] 10:3 11:8,16 14:18 15:
17
**yellow** [7] 44:11 45:5 47:24 48:
20 70:15,18 71:11
**yep** [1] 66:10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DAVID DAVIES d/b/a DAVIES HOME SERVICES, individually and as the representative of a class of similarly situated persons, | ) ) ) ) ) | Case No. 13-cv-3546 |
| Plaintiff, | ) ) | Judge Sharon Johnson Coleman |
| v. | ) ) | Mag. Judge Michael T. Mason |
| W.W. GRAINGER, INC, and JOHN DOES 1-12, | ) ) | |
| Defendants. | ) | |

### RULE 30 (B) (6) NOTICE OF DEPOSITION

TO:   Kimball R. Anderson
      Norman K. Beck
      David Luger
      WINSTON & STRAWN LLP
      35 West Wacker Drive
      Chicago, IL 60601

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, on August 28, 2013 beginning at 10:00 A.M. local time and continuing until completed at 134 N. La Salle Street, Suite 1000, Chicago, Illinois 60602, Plaintiff through counsel will take the deposition of the designated witness(es) of W.W. Grainger, Inc. ("Grainger") via stenographic means.

The designated representative(s) of Grainger should be prepared to testify about the topics referenced in the attached "Deposition Rider."

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, if not previously produced, please produce before or at the deposition all documents relied on by the designated representative(s) in preparing for this deposition. This production should include hard copy printouts of any computer screens viewed by the designated representative.

_____
One of Plaintiff's Attorneys

Phillip A. Bock
Richard J. Doherty
James M. Smith
Bock & Hatch, LLC
134 N. La Salle Street, Suite 1000
Chicago, IL 60602



## DEPOSITION RIDER

The designated representative(s) of W.W. Grainger, Inc. ("Grainger") should be prepared to testify about the following topics:

1.      Circumstances surrounding how Grainger obtained David Davies d/b/a Davies Home Services ("Plaintiff")'s facsimile number on or before December 2, 2009.

2.      Circumstances surrounding how Grainger developed a list of recipients who were to receive the "Advertising circulars" as referenced by Grainger in its Initial Disclosures pursuant to Rule 26(a)(1) via facsimile from April 5, 2009 to the current date.

3.      Circumstances surrounding how Grainger sent, or attempted to send, the fax attached to Plaintiff's Complaint to Plaintiff and any other recipients.

4.      Circumstances surrounding how Grainger sent, or attempted to send, any "Advertising circulars" as referenced by Grainger in its Initial Disclosures to any person or entity from April 5, 2009 to the current date.

5.      Circumstances surrounding Grainger's First and Third Affirmative Defenses regarding Plaintiff's consent to receive facsimile transmissions from Grainger as well as the consent from others who received Grainger's facsimile transmissions of "Advertising circulars" from April 5, 2009 to the current date.

6.      Circumstances surrounding Grainger's Second and Fourth Affirmative Defenses regarding Grainger's established business relationship with Plaintiff and others who received Grainger's facsimile transmissions of "Advertising circulars" from April 5, 2009 to the current date.

7.      The "facsimile advertising campaign" as referenced in Grainger's Initial Disclosures pursuant to Rule 26(a)(1).

8.    Circumstances surrounding the "selection of certain recipients of fax advertisement" from InfoGroup, Inc. as referenced in Grainger's Initial Disclosures pursuant to Rule 26(a)(1).

## CERTIFICATE OF SERVICE

The undersigned attorney states that on August 5, 2013, he served a true and correct copy of *Rule 30(B)(6) Notice of Deposition* on the party listed below by depositing the same in the U.S. mail at 134 N. La Salle St., IL 60602 at or before 5:00 p.m., with proper postage prepaid to the following address:

Kimball R. Anderson
Norman K. Beck
David Luger
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601

*Attorneys for W W Grainger, Inc.*

One of Plaintiff's Attorneys

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

DAVID DAVIES d/b/a DAVIES HOME　　　)
SERVICES, individually and as the　　　　)
representative of a class of similarly-situated　)
persons,　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　Plaintiff,　　)　No. 13-CH-9308
　　　　　　　　　　　　　　　　　　)
　　　　　　　　v.　　　　　　　　　　)　Judge Leroy K. Martin
　　　　　　　　　　　　　　　　　　)
W.W. GRAINGER, INC., and JOHN DOES　)
1-12,　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendants.　　)

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, DAVID DAVIES d/b/a DAVIES HOME SERVICES ("Plaintiff"), brings this action on behalf of himself and all other persons similarly situated, through his attorneys, and except as to those allegations pertaining to Plaintiff or his attorneys, which allegations are based upon personal knowledge, alleges the following upon information and belief against Defendants, W.W. GRAINGER, INC. ("Grainger") and JOHN DOES 1-12 collectively ("Defendants"):

## PRELIMINARY STATEMENT

1.　　This case challenges Grainger's practice of faxing unsolicited advertisements.

2.　　The federal Telephone Consumer Protection Act, 47 USC § 227 (the "TCPA"), prohibits a person or entity from faxing or having an agent fax advertisements without the recipient's prior express invitation or permission ("junk faxes" or "unsolicited faxes"). Moreover, the TCPA mandates that if a person or



entity sends a fax advertisement it must always include a very specific opt-out notice that is clearly and conspicuously included on the first page of the advertisement. *See* 47 U.S.C. § 227 (b) (2) (D); and 47 C.F.R. § 64.1200 (a) (4) (iii). The TCPA provides a private right of action and provides statutory damages of $500 - $1,500 per violation.

3.      Unsolicited faxes damage their recipients. A junk fax recipient loses the use of its fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy. Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

4.      On behalf of himself and all others similarly situated, Plaintiff brings this case as a class action asserting claims against Defendants under the TCPA and the common law of conversion.

5.      Plaintiff seeks an award of statutory damages for each violation of the TCPA.

### PARTIES, JURISDICTION AND VENUE

6.      Plaintiff is a resident of, and conducts business in, Cook County, Illinois.

7.      Defendant, Grainger, has its headquarters in Lake Forest, Illinois and conducts business in Cook County, Illinois.

2

8.     Plaintiff sued Defendants John Does 1-12 as it is not clear whether any entities or persons other than Grainger actively participated in the transmission of the subject fax advertisements, or benefitted from the transmissions of Grainger's fax advertisements.

9.     Jurisdiction is conferred by 735 ILCS 5/2-209 in that Grainger has transacted business and committed tortious acts related to the matters complained of herein.

10.    Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, et seq. because some of the tortious acts complained of occurred in Cook County, Illinois.

FACTS

11.    On or about December 2, 2009, Defendants sent, or caused to be sent, an unsolicited fax advertisement that advertised Grainger's goods, products, or services. Exhibit A, copy of the subject fax advertisement.

12.    Plaintiff did not invite or give permission, to anyone, to send Exhibit A to him.

13.    Exhibit A does not contain a clear and conspicuous opt-out notice. Instead, Defendants included an opt-out notice in tiny font that was inserted after Defendants' disclosure regarding the terms of the $25 offer included on the fax advertisement. Id. Additionally, with an asterisk, Defendants call the recipients' attention to Defendants' own disclosure regarding the terms of the $25 offer, but do not use any method to draw the recipients' attention to the opt-out notice. Id.

14.     On the face of the subject fax, it is not understood whether the telephone and facsimile numbers identified in the notice were available to Plaintiff to make an opt-out request 24 hours a day, 7 days a week.

15.     On information and belief, Grainger sent the same facsimile to Plaintiff and more than 39 other recipients without first receiving the recipients' express permission or invitation. This is based, in part, on the fact that the subject fax was not addressed to anyone in particular, that Plaintiff never gave permission to anyone to send the subject fax advertisement to him, and that sending advertisements by fax is an inexpensive way to reach many persons.

16.     There is no reasonable means for Plaintiff (or any other putative Class member) to avoid receiving illegal faxes. Fax machines are left on and ready to receive the urgent communications their owners desire to receive.

<u>CLASS REPRESENTATION ALLEGATIONS</u>

17.     This action has been brought, and may be properly maintained, under 735 ILCS 5/2-801. This action satisfies the class action prerequisites of numerosity, common questions of law or fact predominate over individual questions, the representative parties will fairly and adequately protect the interests of the Class, and the class action is an appropriate method for the fair and efficient adjudication of the controversy.

18.     Plaintiff brings this action as a class action on behalf of himself and all others similarly situated as members of the Class, initially defined as follows:

> All persons who were sent one or more telephone facsimile messages since April 5, 2009, that advertised the

4

commercial availability of property, goods, or services offered by W.W. Grainger, Inc., that did not contain an opt-out notice that complied with federal law.

19.      Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, any officers or directors of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any Judge assigned to this action, and his or her family.

20.      <u>Numerosity/Impracticality of Joinder</u>:  On information and belief, the Class consists of more than thirty-nine people and, thus, is so numerous that joinder of all members is impracticable. The precise number of Class members and their addresses are unknown to Plaintiff, but can be obtained from Defendants' records or the records of third parties.

21.      <u>Questions of Law or Fact Common to the Class</u>:  There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from one Class member to another, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to the following:

    a.      Whether Defendants sent unsolicited fax advertisements;

    b.      Whether <u>Exhibit A</u> advertised the commercial availability of property, goods or services;

c.     The manner and method Defendants used to compile or obtain the list of fax numbers to which it sent <u>Exhibit A</u> and other unsolicited fax advertisements;

d.     Whether Defendants faxed advertisements without first obtaining the recipients' express permission or invitation;

e.     Whether Defendants' opt out notice, violated the TCPA;

f.     Whether Defendants' opt out notice was clear and conspicuous;

g.     Whether Defendants' opt out notice contained telephone and facsimile numbers that were available to Plaintiff and the other Class members 24 hours a day, 7 days a week;

h.     Whether Plaintiff and the other Class members are entitled to statutory damages;

i.     Whether Defendants should be enjoined from faxing advertisements in the future;

j.     Whether the Court should award trebled damages; and

k.     Whether Defendants' conduct as alleged herein constituted conversion.

22.    <u>Fair and Adequate Representation</u>:  Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff does not have any interests adverse to the Class. Plaintiff has retained counsel who are experienced in class action litigation to represent him in this action.

23.    <u>Appropriateness</u>:  A class action is an appropriate method for the fair and efficient resolution of this controversy.

24.    Plaintiff envisions no difficulty in the management of this action as a class action.

COUNT I
<u>TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. § 227</u>

25.    Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

26.    Plaintiff brings Count I on behalf of himself and a class of similarly situated persons.

27.    The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227 (b) (1).

28.    The TCPA defines "unsolicited advertisement," as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227 (a) (4).

29.    The TCPA provides:

   3.    <u>Private right of action</u>.  A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:

      (A)    An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

      (B)    An action to recover for actual monetary loss from such a violation, or to receive

7

$500 in damages for each such violation, whichever is greater, or

(C)    Both such actions.

30.    The Court, in its discretion, can treble the statutory damages if the violation was knowing. 47 U.S.C. § 227.

31.    In relevant part, the TCPA states that "[t]he Commission shall prescribe regulations to implement the requirements of this subsection ... In implementing the requirements of this subsection, the Commission shall provide that a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if... (i) the notice is clear and conspicuous ..." 47 U.S.C. § 227 (b) (2) (D) (i).

32.    Moreover, "a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if... (v) the telephone and facsimile machine numbers and the cost-free mechanism ... permit an individual or business to make such a request at any time on any day of the week." 47 U.S.C. § 227 (b) (2) (D) (v).

33.    Defendants violated the 47 U.S.C. § 227 et seq. by sending advertisements by fax (such as Exhibit A) to Plaintiff and the other Class members without first obtaining their prior express invitation or permission.

34.    Defendants violated the 47 U.S.C. § 227 et seq. by not providing a clear and conspicuous opt out notice. The notice that Defendants did include is barely legible, is in tiny font, is included only after Defendants' disclosure as to the $25 offer contained in the advertisement, and does not contain any method (such as the

8

asterisk Defendants' used for their own disclosure) to direct the recipients' attention to the tiny and illegible opt-out notice. <u>Exhibit A</u>. Additionally, it is not clear whether Defendants provided telephone and facsimile numbers that allowed Plaintiff and the Class members to make an opt-out request at any time on any day of the week.

35.     Facsimile advertising imposes burdens on unwilling recipients that are distinct from the burdens imposed by other types of advertising. The content of the required opt-out notice is designed to ensure that the recipients have the necessary contact information to opt out of future fax transmissions. If senders do not clearly and conspicuously provide the opt-out content to the recipients, then the senders fail to enable the recipients with the appropriate information to stop the burdens imposed by this form of advertisement.

36.     The TCPA is a strict liability statute and Defendants are liable to Plaintiff and the other Class members even if their actions were negligent.

37.     Moreover, Defendants are liable to Plaintiff and the other Class members under the TCPA for including an improper opt-out notice even if Defendants ultimately prove that they obtained prior express permission to send the advertisements by fax or prove that Defendants had an established business relationship with Plaintiff and the other Class members.

38.     Defendants knew or should have known that Plaintiff and the other Class members had not given express invitation or permission for Defendants or anybody else to fax advertisements about Grainger's goods, products, or services,

that Plaintiff and the other Class members did not have an established business relationship with Defendants, that <u>Exhibit A</u> is an advertisement, and that <u>Exhibit A</u> and the other advertisements Defendants sent did not display the proper opt out notice as required by the TCPA.

39.    Defendants' actions caused damages to Plaintiff and the other Class members. Receiving Defendants' junk faxes caused the recipients to lose paper and toner consumed in the printing of Defendants' faxes. Moreover, the subject faxes used Plaintiff's and the Class's fax machines. The subject faxes cost Plaintiff time, as Plaintiff and his employees wasted their time receiving, reviewing and routing Defendants' illegal faxes. That time otherwise would have been spent on Plaintiff's business activities. Defendants' faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone. Finally, the injury and property damage sustained by Plaintiff and the other Class members from the sending of <u>Exhibit A</u> occurred outside Defendants' premises.

40.    Even if Defendants did not intend to cause damage to Plaintiff and the other Class members, did not intend to violate their privacy, and did not intend to waste the recipients' valuable time with Grainger's advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally as follows:

10

A.      That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff's counsel as counsel for the class;

B.      That the Court award $500.00-$1,500.00 in damages for each violation of the TCPA;

C.      That the Court enter an injunction prohibiting Defendants from engaging in the statutory violations at issue in this action; and

D.      That the Court award costs and such further relief as the Court may deem just and proper.

<u>COUNT II</u>
<u>CONVERSION</u>

41.     Plaintiff incorporates paragraphs 1 through 24 as though fully set forth herein.

42.     Plaintiff brings Count II on behalf of himself and a class of similarly situated persons.

43.     By sending Plaintiff and the other Class members unsolicited faxes, Defendants improperly and unlawfully converted their fax machines, toner and paper to its own use. Defendants also converted Plaintiff's employees' time to their own use.

44.     Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other Class members owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

11

45. By sending the unsolicited faxes, Defendants permanently misappropriated the Class members' fax machines, toner, paper, and employee time to their own use. Such misappropriation was wrongful and without authorization.

46. Defendants knew or should have known that their misappropriation of paper, toner, and employee time was wrongful and without authorization.

47. Plaintiff and the other Class members were deprived of the use of the fax machines, paper, toner, and employee time, which could no longer be used for any other purpose. Plaintiff and each Class member thereby suffered damages as a result of their receipt of unsolicited fax advertisements from Defendants.

48. Each of Defendants' unsolicited faxes effectively stole Plaintiff's employees' time because persons employed by Plaintiff were involved in receiving, routing, and reviewing Defendants' illegal faxes. Defendants knew or should have known employees' time is valuable to Plaintiff.

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, demands judgment in its favor and against Defendants, jointly and severally as follows:

A. That the Court adjudge and decree that the present case may be properly maintained as a class action, appoint Plaintiff as the representative of the class, and appoint Plaintiff counsel as counsel for the class;

B. That the Court award appropriate damages;

C. That the Court award costs of suit; and

D. Awarding such further relief as the Court may deem just and proper.

12

Respectfully submitted,

DAVID DAVIES d/b/a DAVIES HOME
SERVICES, individually and as the
representative of a class of similarly-
situated persons,

By: _____
One of his attorneys


Phillip A. Bock
James M. Smith
Phillip J. Bullimore
BOCK & HATCH, LLC
134 North La Salle Street, Suite 1000
Chicago, IL 60602
Telephone: 312/658-5500

13

# EXHIBIT A

12/2/2009  12:56  866-404-3933  To: DAVIES HOME SERVICES  P 1/1



**Monthly Specials**



*Limited Time Offer! Ends 12/31/09*

# $25 off*

## your next order of $100 or more

### Choose from any category, including:

- Motors & Power Trans
- Material Handling
- Safety
- Janitorial & Painting
- Hand Tools
- HVAC/R
- Pumps & Plumbing
- Lighting
- And More!

**CALL TODAY**

### Offer only valid when calling

# 1-877-877-6410

From 7 a.m. - 6 p.m. CT, M–F and mention code M-S245

* Offer valid for the intended recipient of this fax and is not transferable. Offer valid on products ordered from December 1, 2009 to December 31, 2009 and only when placing an order by phone at 1-877-877-6410. $25 off applies to your next order of $100 or more at the Grainger catalog each price on products advertised in the Grainger catalog or shown on Grainger.com® only, and does not apply to tax and freight, special or custom products, or Grainger TripleGuard® repair & replacement coverage. The $100 minimum purchase requirement excludes select items from the following categories: Electrical wire and cable, conduit, building wire, copper pipe and tubing, raw materials (blanks, flats, bars, plates, sheet stock, rod stock), A/C refrigerant, live sets, refrigerants, ice melt, power tools, generators, test equipment and gauges. For a list of specific skus excluded, call 1-877-877-6410. Offer cannot be combined with any other promotions or price discounts. All sales are subject to Grainger's current Sales and Terms & Conditions available in Grainger's general catalog and on Grainger.com which are incorporated herein by reference..

If you do not wish to receive faxes from Grainger, please call 1-888-730-4920 extension 1732 and enter the fax number(s) to which you no longer wish to receive correspondence, or fax your request to 1-866-404-3933. Our failure to comply with your request within 30 days of receipt is unlawful.

©2009 W.W. Grainger, Inc M-PU22-B



### Customer Line Item Display

| Customer | 835800897 | WC Branch | 146 |
|---|---|---|---|
| Company Code | 0300 | Alt Payer | |
| | | Head Office | |
| Name | DAVIES HOME SERVICES | Phone | 8478253738 |
| Street | 1108 W CRESCENT AVE | | |
| City | PARK RIDGE | IL  US | |

| St | CoCd | Account | DocumentNo | Assignment | Typ | PK | RCd | Case ID | PM | Amt in loc.cur. | Doc. Date | Reference | Ref.key 1 | Ref |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 0300 | 835800897 | 973343838 | 9733438387 | RV | 01 | | | | 221.27 | 09/15/2008 | 9733438387 | 835800897 | 608 |
| | 0300 | 835800897 | 973343838 | 9733438387 | RV | 15 | | | | 221.27- | 09/15/2008 | 9733438387 | 835800897 | 608 |
| * | 0300 | 835800897 | | | | | | | | 0.00 | | | | |
| ** | 0300 | 835800897 | | | | | | | | 0.00 | | | | |

| Customer | * | WC Branch | * |
|---|---|---|---|
| Company Code | * | Alt Payer | * |
| | | Head Office | * |
| Name | * | Phone | * |
| Street | * | | |
| City | * | * | |

Document 973343838 0300 does not exist in fisc.year 2008 or has been archived    PRA (2) 200  praap034  OVR



EXHIBIT
Finn
3 ID
10/15/13

| CUST_ACCT_NO | CINV_NO | CINV_INVC_PLNT_CD | CINV_DT | CINV_SLS_YY_MM_DT | CORD_DT | CINVL_LN_SHP_QT | CINVL_LN_RTRN_QT |
|---|---|---|---|---|---|---|---|
| 835800897 | 0000106809 | 146 | 16-Feb-94 | 9402 | 16-Feb-94 | 1 | 0 |
| 0835800897 | 0000173369 | 146 | 08-Mar-95 | 9503 | 02-Mar-95 | 0 | 1 |
| 0835800897 | 0000858495 | 970 | 02-Mar-95 | 9503 | 02-Mar-95 | 1 | 0 |
| 0835800897 | 0000089228 | 136 | 28-Apr-95 | 9504 | 02-Jan-00 | 0 | 0 |
| 0835800897 | 0000467558 | 970 | 31-Jul-97 | 9707 | 03-Jun-97 | 1 | 0 |
| 0835800897 | 0000075848 | 146 | 13-Jul-00 | 7 | 13-Jul-00 | 1 | 0 |
| 0835800897 | 0000507180 | 146 | 31-Oct-01 | 110 | 31-Oct-01 | 1 | 0 |
| 0835800897 | 0000740804 | 146 | 02-Mar-05 | 503 | 02-Mar-05 | 1 | 0 |
| 0835800897 | 0973343838 | 146 | 15-Sep-08 | 809 | 15-Sep-08 | 1 | 0 |

| CINVL_CG_PRC_CTGRY_CD | MTRL_CD | MTRL_GRP_CD | PROMO_CD | CINVL_ITEM_PROG_NO | CINV_CUST_ZIP_AD | CINV_CUST_ZIP_5POS_AD |
|---|---|---|---|---|---|---|
| EA | 4C704 | R | 0000 | 00 | 600680000 | 60068 |
| 9A | 9A999 | | 0000 | 00 | 600680000 | 60068 |
| PT | 9N999 | | 0000 | 00 | 600680000 | 60068 |
| 9A | 9A999 | | 0000 | 00 | 000000000 | 00000 |
| PT | 9N999 | | 0000 | 00 | 600680000 | 60068 |
| SR | 5K917 | F2 | 0000 | 99 | 600683957 | 60068 |
| EA | 4M218 | FK | 0000 | 00 | 600683957 | 60068 |
| EA | 3WE70 | L9 | 0000 | 00 | 600683957 | 60068 |
| | 1DGX4 | D3 | | 5000 | 600683957 | 60068 |

| CINV_CORD_TYP_CD | CINV_XTND_PRC_AM | CINV_XTND_CST_AM | CINV_ORORG_PLNT_CD | CINVL_ITEM_PRC_CTGRY_CD | DIVISION |
|---|---|---|---|---|---|
| 03 | 91.9 | 50.9 000 | WA | | 01 |
| 07 | -2.6 | 0 000 | | | 01 |
| 00 | 2.6 | 1.03 000 | | | 02 |
| 00 | -0.23 | 0 000 | | | 01 |
| 00 | 23.16 | 9.38 000 | | | 02 |
| 02 | 52.64 | 34.09 000 | MS | | 01 |
| 03 | 29.6 | 14.07 000 | WA | | 01 |
| 03 | 85.7 | 37.6 000 | WA | | 01 |
| 2 | 201.16 | 105.62 971 | 5000 | | 01 |



EXHIBIT
Finn
4
10/15/13

at&t | **Yellow Pages**
PUBLISHED BY R.H. DONNELLEY

COMMUNITY LIVING

SHOPPING/MALLS

GOVERNMENT PAGES

WHITE PAGES

RESTAURANTS

COUPONS

# NORTH SHORE

## SINCE 1886

AREA CODES **847, 224**

## JUNE 2007

AT&T Illinois

Includes Business Yellow
Pages and Business
White Pages Listings For:

| | |
|---|---|
| Bannockburn | Lincolnshire |
| Buffalo Grove | Lincolnwood |
| Deerfield | Long Grove |
| Des Plaines | Mettawa |
| Diamond Lake | Morton Grove |
| Evanston | Mundelein |
| Gilmer | Niles |
| Glencoe | Northbrook |
| Glenview | Northfield |
| Golf | Park Ridge |
| Green Oaks | Prairie View |
| Half Day | Riverwoods |
| Highland Park | Rondout |
| Highwood | Rosemont |
| Indian Creek | Skokie |
| Ivanhoe | Sylvan Lake |
| Kenilworth | Vernon Hills |
| Lake Bluff | Wheeling |
| Lake Forest | Wilmette |
| Libertyville | Winnetka |

**Willie the Wildcat of Northwestern University**

**NORTH SHORE and surrounding area**

*Lake Michigan*

Endorsed By:





©2007 R.H. Donnelley Publishing & Advertising of Illinois Partnership

| Maps | Weather | Links | News |

For news, weather, sports, Yellow Pages and more, visit

**YELLOWPAGES.COM**™ or **CHICAGOLANDYP.com**℠

Map shows the entire distribution area for business white and yellow page listings.
For a complete list of residential listing areas see the first page of residential white pages.

Dalloul Omar MD 1880 W Winchester Rd Librtyvl 60048 · · · · 247-1010
DalPonte Interiors 1300 Old Skokie Rd Highld Pk 60035 · · · 579-0920
DalPonte Refinishing
  1300 Old Skokie Rd Highld Pk 60035 · · · · · · · · · · · · · · · · 579-0922
Dalsandro Rose Insurance
  6610 N Milwaukee Av Niles 60714 · · · · · · · · · · · · · · · · · · 647-9701
Dalton Design A MD PhD 50 E Hawley Mundlein 60060 · · · · · 566-7121
Dalton Jonathan A MD 707 Lake Cook Rd Derfld 60015 · · · 480-0004
Dalzell Financial Group
  1420 Renaissance Dr Park Ridge 60068 · · · · · · · · · · · · · · · 297-6650
Dam Inn 1000 S Milwaukee Av Wheeling 60090 · · · · · · · · · 537-4350
Dam Snell and Taveirne Ltd
  1512 Artaius Pkwy Librtyvl 60048 · · · · · · · · · · · · · · · · · · 367-4448
Dam Snell Taveirne 1512 Artaius Pkwy Librtyvl 60048 · · · · 816-1459
Damar Natural Stone Import Inc
  750 Anthony Tr Northbrk 60062 · · · · · · · · · · · · · · · · · · · · 272-6666
Damato Glen 3155 Kayjay Dr Northbrk 60062 · · · · · · · · · · · 272-9414
Damen & Engineering Inc
  1420 Renaissance Dr Park Ridge 60068 · · · · · · · · · · · · · · · 803-0166
Damiano Diesel Service 10 S River Rd Des Pl 60016 · · · · · · 635-0109
Damiano & Graham Ltd Glenview · · · · · · · · · · · · · · · · · · · 824-1870
Dan Double 13741 W Laurel Dr Lk Forest 60045 · · · · · · · · · 247-9064
Dan Marc Enterprises Inc
  3449 Milwaukee Dr Northbrk 60062 · · · · · · · · · · · · · · · · · 498-2355
Dan Nitoi Endoscopic Repair
  8650 Laramie Av Skokie 60077 · · · · · · · · · · · · · · · · · · · · 675-8954
Dan Rounion Insurance Agency
  1401 E Oakton Des Pl 60018 · · · · · · · · · · · · · · · · · · · · · · 699-7520
Dan the Key Man 112 E Church Librtyvl 60048 · · · · · · · · · · 362-1077
Dana B Davidson CPA Company PC
  1690 Techny Ct Northbrk 60062 · · · · · · · · · · · · · · · · · · · · 753-9393
Dana Mills Inc 1610 Barclay Av Bufla Grv 60089 · · · · · · · · 913-9700
Da'Nali's Brickoven Pizza & Pasta Cafe
  4032 Oakton Skokie 60076 · · · · · · · · · · · · · · · · · · · · · · · 677-2806
Da'Nali's Brickoven Pizza & Pasta Cafe
  4032 Oakton Skokie 60076 · · · · · · · · · · · · · · · · · · · · · · · 677-2806
D'Anca John PsyD 1600 Dempster Park Ridge 60068 · · · · · 298-8586
Dance Academy of Libertyville
  1135 S Milwaukee Av Librtyvl 60048 · · · · · · · · · · · · · · · · 247-1327
Dance All Night Inc 1340 Woodland Ln Rlvrwds 60015 · · · · 940-9788
Dance Center Evanston 1934 Dempster Evnstn 60202 · · · · · 328-6683
Dance Common Studio Inc
  280 W Palatine Rd Wheeling 60090 · · · · · · · · · · · · · · · · · 459-9071
Dance Elements Inc 815 Waukegan Rd Northbrk 60062 · · · · 564-2799
Dance Factory Disc Jockeys · · · · · · · · · · · · · · · · 888 836-0306
Dance & Music Academy
  3222 Glenview Rd Glenvw 60025 · · · · · · · · · · · · · · · · · · · 832-1855
Dance 'N Tees Inc 109 E Cook Av Librtyvl 60048 · · · · · · · · 816-4525
Dance Time With Friends 8890-A W Dempster Niles · · · · · · 298-5795
Danced 3131 Dundee Rd Northbrk 60062 · · · · · · · · · · · · · 564-8210
DancedDance Centre 3131 Dundee Rd Northbrk 60062 · · · · 564-9120
Dancenter North 540 N Milwaukee Av Librtyvl 60048 · · · · · 367-7970
Dancing Bear Gallery 1922 Central Evnstn 60201 · · · · · · · 869-8080
Dancing Bear Gallery Vintage
  1814 Central Evnstn 60201 · · · · · · · · · · · · · · · · · · · · · · · 424-8080
Danco Plumbing & Heating 4051 Main Skokie 60076 · · · · · 673-0009
Dandana 6747 Touhy Av Niles 60714 · · · · · · · · · · · · · · · · 647-7777
D'Andrea Heating Air Conditioning Refrigeration Inc
  2728 Chicago Rd S Chgo Hts · · · · · · · · · · · · · · · · 800 321-6040
Dangel Advertising 289 E Deerpath Lk Forest 60045 · · · · · 482-9930
D'Angelo Insurance Agency Inc
  395 E Dundee Rd Wheeling 60090 · · · · · · · · · · · · · · · · · · 541-2200
Dangremond Adrianna MD
  750 Green Bay Rd Winetka 60093 · · · · · · · · · · · · · · · · · · 446-0202
Dani Miriam DDS 422 Green Bay Rd Kenilwrth 60043 · · · · 256-7700
Dania Furniture Collections
  1001 Skokie Bl Northbrk 60062 · · · · · · · · · · · · · · · · · · · · 205-1822
Dania Home And Office Interiors
  1001 Skokie Bl Northbrk 60062 · · · · · · · · · · · · · · · · · · · · 205-9910
Daniel Benjamin S CPA 2860 S River Rd Des Pl 60018 · · · · 635-0793
Daniel Blank & Sherwin Esterm An Financial Advisors
  2530 Crawford Av Evnstn 60201 · · · · · · · · · · · · · · · · · · · 328-8191
Daniel F Hofstetter Ltd 2400 Ravine Wy Glenvw 60025 · · · 729-0050
Daniel Fajerstein 555 Skokie Bl Northbrk 60062 · · · · · · · · 714-1800
Daniel Greenman & Co
  2820 Riverwoods Rd Rlvrwds 60015 · · · · · · · · · · · · · · · · 267-0557
Daniel M Haycraft MD PC
  5225 Old Orchard Rd Skokie 60077 · · · · · · · · · · · · · · · · · 581-1890
Daniel Mc Cain & Associates Real Estate Appraisers
  PO Box 665 Winetka 60093 · · · · · · · · · · · · · · · · · · · · · · · 784-0502
Daniel Realty Investment Properties
  2733 Hurd Av Evnstn 60201 · · · · · · · · · · · · · · · · · · · · · · 733-8200
Daniel S Kaplan 101 Waukegan Rd Nlfld 60093 · · · · · · · · · 501-5300
Daniel Toll 560 Green Bay Rd Winetka 60093 · · · · · · · · · · 501-4130
Daniel Wright Junior High School
  1370 Riverwoods Rd Rlvrwds 60015 · · · · · · · · · · · · · · · · 295-1560
Danielewicz Brian DDS
  740 Florsheim Dr Librtyvl 60048 · · · · · · · · · · · · · · · · · · · 816-3377
Danielle Janine Jewelry 990 Grove Evnstn 60201 · · · · · · · 424-0954
Daniels Auto Body 517 4th Wilmet 60091 · · · · · · · · · · · · · 251-3393
Daniels Christian MD
  2450 Dempster Av Glenvw 60025 · · · · · · · · · · · · · · · · · · · 803-8613
Daniels & Hirsh Entertainment
  450 Susan Ln Derfld 60015 · · · · · · · · · · · · · · · · · · · · · · · 914-0444
Daniel's Jewelry 1455 Waukegan Rd Glenvw 60025 · · · · · · 998-5222
Daniels Long & Pinsel 19 N County St Wkgn 60085 · · · · · · 623-5900
Daniels Richard arty 19 N County St Wkgn 60085 · · · · · · · 623-5900
Daniels Rick 1330 Kurtis Ln Lk Forest 60045 · · · · · · · · · · 615-1717
Danley's Garage World
  3000 Dundee Rd Northbrk 60062 · · · · · · · · · · · · · · · · · · · 562-9390
Danlin Furniture Conservators Northbrook 60062 · · · · · · · 441-0300
Danloe & Associates 411 Ruckland Av Lk Bluf 60044 · · · · · 234-2300
Dann Dee Display 7555 Caldwell Av Niles 60714 · · · · · · · · 588-1600
Dann Dee Display Fixtures
  7555 Caldwell Av Niles 60714 · · · · · · · · · · · · · · · · · · · · · 588-1601
Dann Dee Display Fixtures
  7555 Caldwell Av Niles 60714 · · · · · · · · · · · · · · · · · · · · · 647-7984
Danon Gallery 1124 Central Av Wilmet 60091 · · · · · · · · · · 256-5612
Danos Perry DDS 1700 Dempster Mortn Grv 60053 · · · · · · 965-6223
Dan's Decorating
  3102 Greenbriar Dr Glenvw 60025 · · · · · · Morton Grove Tel No 966-8681

Danstrom Bob 331 Fairview Av Derfld 60015 · · · · · · · · · · · 405-0263
Dantec Medical Inc
  1480 Renaissance Dr Park Ridge 60068 · · · · · · · · · · · · · · · 298-8701
Danwin Construction Co
  1828 S Washington Av Park Ridge 60068 · · · · · · · · · · · · · 692-8002
Danziger Kosher Catering Inc
  3910 W Devon Av Linwod 60712 · · · · · · · · · · · · · · · · · · · 982-1818
Daou Raymond MD 150 N River Rd Des Pl 60016 · · · · · · · · 297-0333

## DAPIER MARK E atty
### General Practice, Real Estate
  222 E Wisconsin Av Lk Forest 60045 · · · · · · · · · · · · · · · · 234-9188
Dapkus John Kitchens & Baths · · · · · · · · · · · · · · 800 499-7153
Darbyshire Kent C arch 1249 Maple Av Wilmet 60091 · · · · 853-8530
Darin Strako Dr 360 S Waukegan Rd Derfld 60015 · · · · · · · 412-0311
Darlington & Assoc Inc
  712 N Dedfola Av Park Ridge 60068 · · · · · · · · · · · · · · · · · 318-1414
Darlin's Lounge 7347 Waukegan Rd Niles 60714 · · · · · · · · 647-8588
Darnall Mary A MS OTR 8340 N Lincoln Skokie 60077 · · · · 679-4977
Darome Conference Calling Service
  1336 Prairie Av Des Pl 60016 · · · · · · · · · · · · · · · · · · · · · 768-8000
Darome Inc 8750 W Bryn Mawr Av Chgo 60631 · · · · · · 773 399-1613
Da Rosa Travel 4416 Oakton Skokie 60076 · · · · · · · · · · · · 677-2550
Dareil Dixson Insurance Agency
  9232 Skokie Bl Skokie 60077 · · · · · · · · · · · · · · · · · · · · · 677-2730
Darren Morrow & Associates
  1580 S Milwaukee Av Librtyvl 60048 · · · · · · · · · · · · · · · · 362-0010
Darrow Street Studios 1713 Darrow Av Evnstn 60201 · · · · 332-1730
Dart Custom Cleaners 4929 Oakton Skokie 60077 · · · · · · · 673-7717
D'Artagnan's Cellar Ltd
  1486 Waukegan Rd Glenvw 60025 · · · · · · · · · · · · · · · · · · 998-0303
Darter Inc 100 S Central Av Univ Pk · · · · · · · · · · · 800 892-1887
Darwin Dietrick
  1550 N Northwest Hwy Park Ridge 60068 · · · · · · · · · · · · · 803-6570
Dasco Insurance Agency Inc
  620 Academy Dr Northbrk 60062 · · · · · · · · · · · · · · · · · · · 291-0660
Daso Trading Inc 7303 Linder Av Skokie 60077 · · · · · · · · · 675-1515
Dassault Falcon Jet Corp Orland Park 60462 · · · · · · 708 349-2121
Data After Hours
  Vernon Hills 60061 · · · · · · · · · · · · · · · · · · · · · · · · · · · · 549-0038
  Vernon Hills · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 549-0039
Data Base Designs Inc
  1645 N Barclay Bl Bufla Grv 60089 · · · · · · · · · · · · · · · · · 634-9355
Data Clean Corp 1033 Graceland Av Des Pl 60016 · · · · · · · 296-3100
Data Lab 7333 Oak Park Av Niles 60714 · · · · · · · · · · · · · · 647-6678
Data Management Inc Peoria · · · · · · · · · · · · · Skokie Tel No 676-7787
Data Managers Inc Vernon Hills · · · · · · · · · · · · · · · · · · · · 816-7099
Data Media Products Inc
  1946 Lehigh Av Glenvw 60025 · · · · · · · · · · · · · · · · · · · · 729-2020
Data Net Systems LLC
  1686 N Barclay Bl Bufla Grv 60089 · · · · · · · · · · · · · · · · · 808-0288
Data Recovery Group 3100 Dundee Rd Northbrk 60062 · · · · 897-5525
Data Rentals-Sales Inc Arlington Heights · · · · · · · · 800 626-0938
Data Service Solutions Inc
  23839 W Andrew Rd Plainfld · · · · · · · · · · · · · · · · · 800 994-3500
Data Source Inc 1420 Higgins Rd Park Ridge 60068 · · · · · · 692-5711
Data System Services Inc
  908 Jorntry Ln Librtyvl 60048 · · · · · · · · · · · · · · Librtyvl Tel No 816-7099
Data Transformations Inc Wilmet 60091 · · · · · · · · · · · · · · 853-0206
Database Marketing Consulting Services Inc
  1201 Huddington Dr Mundlein 60060 · · · · · · · · · · · · · · · · 573-0944
Datafish Inc 3949 W Touhy Av Linwod 60712 · · · · · · · · · · 673-8873
Dataflo Marketing 4361 Highway 22 Long Grv 60047 · · · · · 726-1110
Datamark Corporation 7161 N Cicero Av Linwod 60712 · · · · 673-1700
Datastream 1011 E Touhy Av Des Pl 60018 · · · · · · · · · · · · 294-0582
Date Connection
  · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 976-4328
  · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 800 922-2976
Dateline Connections
  Chicago · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 976-6789
  Price Information · · · · · · · · · · · · · · · · · · · · · · · · · 800 922-2976
Dateline Connections
  311 W Washington · · · · · · · · · · · · · · · · · · · · · · · · · · · · 976-4488
  Price Information · · · · · · · · · · · · · · · · · · · · · · · · · 800 922-2976
Dating Services 1311 W Dundee Rd Wheeling 60090 · · · · · · 465-0922
Daton Promotional Sales
  2720 S River Rd Des Pl 60018 · · · · · · · · · · · · · · · · · · · · · 635-8363
Daube Co 770 Lake Cook Rd Derfld 60015 · · · · · · · · · · · · 940-0160
Dav-Kim Portable X-Ray Serv
  1370 Shermer Rd Northbrk 60062 · · · · · · · · · · · · · · · · · · 564-3139
Dave Baum Media Training Group
  7848 Kildare Av Skokie 60076 · · · · · · · · · · · · · · · · · · · · 676-2155
Dave Bunning Lake Forest · · · · · · · · · · · · · · · · · · · · · · · 615-9564
Dave Chare Photography
  739 N Northwest Hwy Park Ridge 60068 · · · · · · · · · · · · · 696-3188
Dave Pate & Sons Construction Ltd
  Roxel 60172 · · · · · · · · · · · · · · · · · · · · Glnvw Tel No 832-6050
Davenport Robert L PhD
  1535 Lake Cook Rd Northbrk 60062 · · · · · · · · · · · · · · · · · 498-4744
Dave's Advanced Auto Care
  2025 Chestnut Av Glenvw 60025 · · · · · · · · · · · · · · · · · · · 724-6310
Dave's Automotive 8330 Skokie Bl Skokie 60077 · · · · · · · · 329-7080
Dave's Barber Shop Skokie · · · · · · · · · · · · · · · · · · · · · · 676-0726
Dave's Carpet & Furniture Cleaning
  Island Lake · · · · · · · · · · · · · · · · · · · · Des Plaines Tel No 390-0580

## DAVE'S DOWN TO EARTH ROCK SHOP
  www.davesdowntoearthrockshop.com
  704 Main Evnstn 60202 · · · · · · · · · · · · · · · · · · · · · · · · · 866-7374

## DAVE'S HEATING & COOLING
  Skokie · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · 677-5907
Dave's Italian Kitchen 1635 Chicago Av Evnstn 60201 · · · · 475-9463
Dave's Italian Kitchen 1635 Chicago Av Evnstn 60201 · · · · 475-7172
Dave's North Shore Towing
  Lake Forest · · · · · · · · · · · · · · · · · · · Highland Park Tel No 432-0080
Dave's North Shore Towing Lk Bluf · · · · · · · · · · · · · · · · · 615-0080
Dave's Reel Service 602 Avon Ct Vernon Hills 60061 · · · · · 549-7170

Davey Tree & Lawn Care
  Residential 220 Sumac Rd Wheeling 60090 · · · · · · · · · · · 537-4340
  Utility Division
  800 Dundee Rd Wheeling 60090 · · · · · · · · · · · · · · · · · · · 426-8555
David Adler Cultural Center
  1700 N Milwaukee Av Librtyvl 60048 · · · · · · · · · · · · · · · 367-0707
David & Associates Skokie · · · · · · · · · · · · · · · · · · · · · · · 679-8585
David Axelrod & Associates Inc
  1448 Old Skokie Rd Highld Pk 60035 · · · · · · · · · · · · · · · · 579-9700
David C Wallace 820 Davis Evnstn 60201 · · · · · · · · · · · · · 864-6600
David D Spiegel & Associates
  570 Lake Cook Rd Derfld 60015 · · · · · · · · · · · · · · · · · · · 940-8100
David Erickson arty 1625 Shermer Rd Northbrk 60062 · · · · 272-0800
David G Spak arty 1 Northfield Plaza Nfld 60093 · · · · · · · 441-3234
David H Cutler & Assoc 5550 Touhy Av Skokie 60077 · · · · · 673-8600
David J White Associates
  447 Illinois Rd Wilmet 60091 · · · · · · · · · · · · · · · · · · · · · 256-8826
David Jacquelino MD 909 Davis Evnstn 60201 · · · · · · · · · · 866-3700
David John W DDS 1430 Thacker Des Pl 60016 · · · · · · · · · 824-9919
David Kolssak 213 S Milwaukee Av Wheeling 60090 · · · · · · 537-7499
David Kravtsov DDS 142 S 16th S River Rd Des Pl 60018 · · 296-2633
David M Freedman
  210 Skokie Valley Rd Highld Pk 60035 · · · · · · · · · · · · · · · 579-0780
David M Siegel & Associates
  790 Chaddick Dr Wheeling 60090 · · · · · · · · · · · · · · · · · · 520-8100
David M Zinder Ltd Atty 500 Lake Cook Rd Derfld 60015 · · 914-0632
David Malin & Co Ltd 425 Huehl Rd Northbrk 60062 · · · · · · 498-1224
David Michael & Co 450 Skokie Bl Northbrk 60062 · · · · · · · 480-1260
David Noble and Company
  900 Westcliff Ln Derfld 60015 · · · · · · · · · · · · · · · · · · · · · 914-0806
David R Kaplan LCPC
  401 S Milwaukee Av Wheeling 60090 · · · · · · · · · · · · · · · · 537-0488
David Seiberling Ltd
  637 E Gold Rd Mt Elis 60005 · · · · · · · · · · · · · Evanston Tel No 864-7870
David Shane 444 Skokie Bl Wilmet 60091 · · · · · · · · · · · · · 256-3100
David Sherman & Company
  500 Skokie Bl Northbrk 60062 · · · · · · · · · · · · · · · · · · · · · 509-1414
David Simon Photography
  3985 Gregory Dr Glenvw 60025 · · · · · · · · · · · · · · · · · · · · 803-9450
David Stuart Financial 899 Skokie Bl Northbrk 60062 · · · · 564-1280
David and Sue Bachausen
  714 E Prospect Av Lk Bluf 60044 · · · · · · · · · · · · · · · · · · 234-5925
David Wisniewski 4711 Golf Rd Skokie 60076 · · · · · · · · · 673-3560

## DAVID'S BISTRO
  623 N Wolf Rd Des Pl 60016 · · · · · · · · · · · · · · · · · · · · · · 803-3233
David's Bridal 700 N Milwaukee Av Vernon Hills 60061 · · · 816-7663
David's Bridal Alterations
  700 N Milwaukee Av Vernon Hills 60061 · · · · · · · · · · · · · 816-8806
David's Inc 4352 W Touhy Av Linwod 60712 · · · · · · · · · · · 675-4100
Davidson Commission
  720 Smoke Tree Rd Derfld 60015 · · · · · · · · · · · · · · · · · · · 405-9400
Davidson Gregory DN Skokie · · · · · · · · · · · · · · · · · · · · · 675-1115
Davidson Harlan Inc 773 Glenn Av Wheeling 60090 · · · · · · 541-9720
Davidson Jonathan DDS 9215 Skokie Bl Skokie 60077 · · · · 329-9801
Davidson Marie A PhD Glenview 60025 · · · · · · · · · · · · · · · 486-9106
Davidson RW 901 Florsheim Dr Librtyvl 60048 · · · · · · · · · 816-4969
Davies Home Services
  824 Busse Hwy Park Ridge 60068 · · · · · · · · · · · · · · · · · · 825-3741
Davies Home Services
  824 Busse Hwy Park Ridge 60068 · · · · · · · · · · · · · · · · · · 825-3738
Davies Susan A MD 4250 Dempster Skokie 60076 · · · · · · · 763-8850
Davin Industries Inc
  1881 Commerce Dr Elk Grove 60007 · · · · · · Rosemont Tel No 296-0077
Davis Cleaners 518 Davis Evnstn 60201 · · · · · · · · · · · · · · 864-4915
Davis Cleaners & Shirt Launderers
  4047 Dempster Skokie 60076 · · · · · · · · · · · · · · · · · · · · · 674-1918
Davis Custom Top & Trim
  4001 W Jackson Bl Chgo · · · · · · · · · · · · · · · · · · 800 281-2929
Davis Dann Levin LLC 400 Central Av Highld Pk 60035 · · · · 266-2217
Davis & Davis Dentistry 1430 Thacker Des Pl 60016 · · · · · 824-4919
Davis Drapery Specialists
  4047 Dempster Skokie 60076 · · · · · · · · · · · · · · · · · · · · · 674-1918
Davis & Engert Dentistry 20 Main Park Ridge 60068 · · · · · 698-2161
Davis Flowers 1022 Davis Evnstn 60201 · · · · · · · · · · · · · · 475-8224
Davis Flowers 1022 Davis Evnstn 60201 · · · · · · · · · · · · · · 475-8288
Davis Gary MD 1001 Central Av Evnstn 60201 · · · · · · · · · · 570-1410
Davis James DDS 20 Main Park Ridge 60068 · · · · · · · · · · · 698-2161

## DAVIS JEAN 1405 Elmwood Av Evnstn 60202 · · · · 492-1002
Davis John 170 Cambridge Rd Des Pl 60016 · · · · · · · · · · · 299-3892
Davis John F 912 Busse Hwy Park Ridge 60068 · · · · · · · · · 692-2701
Davis Larry arty 960 Rand Rd Des Pl 60016 · · · · · · · · · · · 390-8100
Davis Larry MD
  10 Phillips Rd Vernon Hills · · · · · · · · · · · · · · · · · · · · · · · 367-5400
  36100 N Brookside Dr Glenvw · · · · · · · · · · · · · · · · · · · · · 367-5400
Davis Lloyd MD 2410 McHenry Rd Bufla Grv · · · · · · · · · · · 459-1160
Davis Lloyd S Dr 1901 E Golf Rd Des Pl 60016 · · · · · · · · · 298-4088
Davis Louis T & Assocs Inc Agency
  6838 N Kolmar Av Linwod 60712 · · · · · · · · · · · · · · · · · · 933-0190
Davis Marilyn 2881 Summit Av Highld Pk 60035 · · · · · · · · 432-3597

## DAVIS MATTHEW C DDS
  1775 Glenview Rd Glenvw 60025 · · · · · · · · · · · · · · · · · · · 729-8400
Davis Oscar F MD 560 Greenbay Road Winetka · · · · · · · · · 446-8737
Davis Patty 1027 Davis Evnstn 60201 · · · · · · · · · · · · · · · · 332-2656
Davis R Scott Inc Highland Park 60035 · · · · · · · · · · · · · · · 433-9410
Davis Scott & Assoc
  166 Southfield Dr Vernon Hills 60061 · · · · · · · · · · · · · · · 716-3630
Davis Scott & Associates
  166 Southfield Dr Vernon Hills 60061 · · · · · · · · · · · · · · · 816-3637
Davis St Shoe & Luggage Repair
  1608 Maple Av Evnstn 60201 · · · · · · · · · · · · · · · · · · · · · 864-0620
Davis Street Fishmarket 501 Davis Evnstn 60201 · · · · · · · 869-3474
Davis Street Land Co
  1849 Green Bay Rd Highld Pk 60035 · · · · · · · · · · · · · · · · 926-4208
Davis Street Land Company 622 Davis Evnstn 60201 · · · · · 425-4004
Davis TA & Assoc 614 Green Bay Rd Kenlwrth 60043 · · · · · 256-8900
Davis Transporation 1040 Wesley Av Evnstn 60202 · · · · · · 328-8510

at&t

NORTHBROOK PUBLIC LIBRARY
NORTHBROOK, IL 60062

EXTRA OFFICE COPY

# REFERENCE COPY

Real Yellow Pages

PUBLISHED BY DEX

AT&T Illinois

June 2008

## North Shore

Area Codes 847, 224

Bannockburn
Buffalo Grove
Deerfield
Des Plaines
Diamond Lake
Evanston
Gilmer
Glencoe
Glenview
Golf
Green Oaks
Half Day
Highland Park
Highwood

Indian Creek
Ivanhoe
Kenilworth
Lake Bluff
Lake Forest
Libertyville
Lincolnshire
Lincolnwood
Long Grove
Mettawa
Morton Grove
Mundelein
Niles
Northbrook

Northfield
Park Ridge
Prairie View
Riverwoods
Rondout
Rosemont
Skokie
Sylvan Lake
Vernon Hills
Wheeling
Wilmette
Winnetka

YELLOWPAGES.COM
DexKnows.com

DEX.
Your Local Expert

Community Living

Shopping/Malls

Government Pages

White Pages

Restaurants

Coupons

**BUSINESS WHITE PAGES**      DalPonte—Davis   **61**

DalPonte Interiors
1300 Old Skokie Rd Highld Pk 60035············847 579-0920
DalPonte Refinishing
1300 Old Skokie Rd Highld Pk 60035············847 579-0922
Dalsandro Rose Insurance
6410 N Milwaukee Av Niles 60714············847 647-9701
Dalton John E PhD
21078 W Highway 176 Mundlein 60060············847 566-7121
Dalton Jonathan A MD
9702 Lake Cook Rd Dsrfid 60015············847 480-0004
Dalzell Financial Group
1490 Renaissance Dr Park Ridge 60068············847 297-6650
Dam Inn 1000 S Milwaukee Av Wheeling 60090······847 537-4350
Dam Resel and Tawerne Ltd
1532 Artalus Pkwy Librtyvl 60048············847 367-4448
Dam Snell Taverne
1532 Artalus Pkwy Librtyvl 60048············847 616-1459
Damar Natural Stone Imports Inc
250 Anthony Tr Northbrk 60062············847 272-6666
Damen & Engineering Inc
1420 Renaissance Dr Park Ridge 60068············847 803-0166
Damiano Diesel Service
10 S Elmer Rd Des Pl 60016············847 635-0109
Damiano & Graham Ltd Glenview············847 824-1870
Dan Deublo 12743 W Laurel Dr La Forest 60045·····847 247-9064
Dan Marc Enterprises Inc
3469 Whitaway Dr Northbrk 60062············847 498-2355
Dan Nitoi Endoscope Repair
3650 Lorraine Av Skokie 60077············847 675-8954
Dan Seals for Congress
405 Lake Cook Rd Dsrfid 60015············847 945-8900
Dan the Key Man 112 E Church Librtyvl 60048·····847 362-1077
Dana B Davidson CPA Company PC
1650 Techny Rd Northbrk 60062············847 753-9393
Dana-Mills Inc 1610 Barclay Av Bullo Grv 60089····847 913-9700
Da Nall's Cafe 4032 Oakton St Skokie 60076·······847 647-2950
D'Anca John PsyD
1400 Dempster Park Ridge 60068············847 298-8586
Dance Academy Of Libertyville
1337 S Milwaukee Av Librtyvl 60048············847 247-1327
Dance All Night Inc
1940 Woodland Ln Riverwls 60015············847 940-9788
Dance Center Evanston
1934 Dempster Evnstn 60202············847 328-6683
Dance Connxion Studio Inc
288 W Palatine Av Wheeling 60090············847 459-9071
Dance Factory Disc Jockeys·········888 836-0306
Dance & Music Academy
1222 Glenview Rd Glenvw 60025············847 832-1855
Dance 'N Tees Inc 199 E Cook Av Librtyvl 60048····847 816-4525
Dance Time With Friends
470 W Dempster Niles············847 298-5795
Danced Inc 3131 Greenleaf St Northbrk 60062······847 564-9120
Dancenter North
340 N Milwaukee Av Librtyvl 60048············847 367-7979
Dancing Bear Gallery 1972 Central Evnstn 60201···847 869-8080
Dancing Bear Gallery Vintage
1814 Central Evnstn 60201············847 424-8080
Danco Plumbing & Heating 4051 Main Skokie·······847 673-0099
D'Andrea Heating Air Conditioning Refrigeration Inc
2728 Chicago Rd S Chgo Hts············800 321-6040
Dangel Advertising
189 E Deerpath LK Forest 60045············847 482-9930
D'Angelo Insurance Agency
6400 Lake Cook Rd Dsrfid 60015············847 541-2200
D'Angelo Insurance Agency Inc
305 E Dundee Rd Wheeling 60090············847 541-2200
Dangremond Adrianna MD
750 Green Bay Rd Winetka 60093············847 446-0202
Dani Miriam DDS
1402 Green Bay Rd Northbrk 60043············847 256-7700
Dania Furniture Collections
1001 Skokie Bl Northbrk 60062············847 205-1822
Dania Home And Office Interiors
1001 Skokie Bl Northbrk 60062············847 205-9910
Daniel Benjamin S CPA
8560 S Elmer Rd Des Pl 60016············847 635-0793
Daniel Blank & Sherwin Esterm An Financial Advisors
2530 Crawford Av Evnstn 60201············847 328-8191
Daniel Greenman & Co
7820 Fleetwoods Rd Riverwls 60015············847 267-0557
Daniel J Stryker CPA Ltd
3200 Shermer Rd Northbrk 60062············847 272-7388
Daniel M Haycraft MD PC
5325 Old Orchard Rd Skokie 60077············847 501-1890
Daniel Realty Investment Properties
2733 Hurd Av Evnstn 60201············847 733-8200
Daniel S Kaplan 161 Waukegan Rd Hld 60035·······847 501-5300
Daniel Wright Junior High School
1600 Portsheim Dr Librtyvl 60048············847 295-1560
Danielewicz Brian DDS
740 Florsheim Dr Librtyvl 60048············847 816-3377
Danielle Janine Jewelry
990 Green Evnstn 60201············847 424-0954
Daniels Auto Body 517 4th Wilmet············847 251-3393
Daniels Christian MD
1242 Waukesha Av Glenvw 60025············847 803-8613
Daniels & Hirsh Entertainment
600 Susan Ln Dsrfid 60015············847 914-0444
Daniels Isaac LLC 7358 Lincoln Av Lincwd········847 675-6700
Daniels Jewelry
1436 Waukegan Rd Glenvw 60025············847 998-5222
Daniels Long & Pinsel
10 N Lasge Chgo Wrgn 60065············847 623-5900
Danielsons Richard atty 10 N County St Wrgn 60085·847 623-5900
Danieta Daniel 9141 W Barberry Ln Des Pl 60016···847 824-7153
Danley's Garage World
9120 Kenton Rd Northbrk 60062············847 562-9390
Danlin Furniture Conservators
Northbrook 60062············847 205-1605

Danloe & Av Lk Gbyl 60044············847 234-2300
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714············847 588-1600
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-0193
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-1070
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-1257
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714············847 588-1601
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-1620
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714············847 588-1631
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-1633
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714············847 588-1634
Dan Dee Display Fixtures
7555 Caldwell Av Niles 60714·······Niles Tel No 847 588-1635
Dan Dee Display Fixtures
6611 Caldwell Av Niles 60714············847 647-7994
Danon Gallery 1124 Central Av Wilmet 60091······847 256-5050
Danos Perry DDS 5700 Dempster Mortn Grv 60053···847 965-6223
Dan's Decorating 3102 Greenbriar Dr
Glenvw 60025·············Morton Grove Tel No 847 966-8681
Danuta Jurczak Inc Wheeling············847 520-9671
Danwin Construction Co
1818 S Washington Av Park Ridge 60068············847 692-8002

## DANZIGER KOSHER CATERING INC
3910 W Devon Av Lincwd 60712············**847 982-1818**

Daou Raymond MD 159 N River Rd Des Pl 60016···847 297-0333

## DAPIER MARK E
### General Practice, Real Estate
222 E Wisconsin Av Lk Forest············**847 234-9188**

Dapkus John Kitchens & Baths············800 499-7163
Darbyshire Kent G arch
1249 Maple Av Wilmet 60091············847 853-8530
Darin Strako Dr 360 S Waukegan Rd Dsrfid 60015···847 412-0311
Dark Group Inc 3400 Dundee Northbrk············847 715-9927
Darkovsky Mikhail MD
333 E Route 83 Mundlein 60060············847 970-9922
Darlington & Assoc Inc
712 N Delphia Av Park Ridge 60068············847 318-1414
Darlin's Lounge 7247 Waukegan Rd Niles 60714····847 647-8588
Darome Conference Calling Service
1536 Prairie Av Des Pl 60016············847 768-8000
Darome Inc 8750 W Bryn Mawr Av Chgo 60631······773 399-1613
Darrell Dixson-State Farm Insurance Agent
5232 Skokie Bl Skokie 60077············847 677-2730
Darren Morrow & Associates
1560 S Milwaukee Av Librtyvl 60048············847 362-0010
Darrow Street Studios
1711 Darrow Av Evnstn 60202············847 332-1730
Dart Custom Cleaners 4929 Oakton Skokie 60077···847 673-7717
D'Artagnan's Cellar Ltd
3436 Waukegan Rd Glenvw 60025············847 998-0303
Dasco Insurance Agency Inc
620 Academy Dr Northbrk 60062············847 291-0660
Daso Trading Inc 7320 Linder Av Skokie 60077·····847 675-1515
Dasom Community Church
800 Lee Des Pl 60016············847 299-5496
Dassault Falcon Jet Corp Orland Park 60462······708 349-2121
D'Astici Frank 1400 Woodland Dr Dsrfid 60015·····847 940-7893
Data After Hours
Vernon Hills 60061············847 549-0038
············847 549-0039
Data Base Designs Inc
1645 N Barclay Bl Bullo Grv 60089············847 634-9355
Data Clean Corp 1023 Graceland Des Pl············847 296-9360
Data Clean Corp 1023 Graceland Av Des Pl 60016···847 296-3100
Data Clean Corp 1023 Graceland Av Des Pl 60016···847 296-6036
Data Clean Corp 1023 Graceland Av Des Pl 60016···847 296-6037
Data Clean Corp 1023 Graceland Av Des Pl 60016···847 296-6871
Data Clean Corp 1023 Graceland Av Des Pl 60016···847 296-6873
Data Clean Corp 1033 Graceland Av Des Pl 60016···847 296-6875
Data-Lab 7333 Oak Park Av Niles 60714············847 647-6678
Data Management Inc Peoria·········Skokie Tel No 847 676-2787
Data Managers Inc Vernon Hills············847 816-7099
Data Media Products Inc
1946 Lehigh Av Glenvw 60025············847 729-2020
Data Recovery Group
3190 Dundee Rd Northbrk 60062············847 897-5525
Data Service Solutions Inc
23639 W Andrew Rd Plainfld············800 994-3500
Data Systems Inc 1740 Harding Rd Park Ridge 60068·847 692-5711
Data Transformations Inc Wilmet 60091············847 853-0206
Data Transition Company Mortn Grv············847 470-8870
Datafish Inc 3940 W Touhy Av Lincwd 60712······847 673-8806
Datafio Marketing
4361 Highway 22 Long Grv 60047············847 550-1110
Datamark Corporation
7161 N Cicero Av Lincwd 60712············847 673-1700
Datastream 1011 E Touhy Av Des Pl 60018·······847 294-0582
Date Connection
Price Information···········976-4328
·········800 922-2976
Dav-Kim Portable X-Ray Serv
641 Academy Dr Northbrk 60065············847 564-3139
Dave Mann Media Training Group
7840 Kildare Av Skokie 60076············847 676-2155
Dave Bunning Lake Forest············847 615-9564
Dave Pate & Sons Construction Ltd
Rosell 60172·············Glvw Tel No 847 832-6050
Davenport Robert L PhD
1535 Lake Cook Rd Northbrk 60062············847 498-4744

Dave's Advanced Auto Care
2025 Chestnut Av Glenvw 60025············847 724-6310
Dave's Automotive 8330 Skokie Bl Skokie 60077····847 329-7080
Dave's Barber Shop Skokie············847 676-0706

## DAVE'S DOWN TO EARTH ROCK SHOP
www.davesdowntoearthrockshop.com
704 Main Evnstn 60202············**847 866-7374**
Dave's Dugout 8043 N Milwaukee Av Niles 60714···847 470-1477

## DAVE'S HEATING & COOLING
Skokie············**847 677-5907**

Dave's Italian Kitchen
1635 Chicago Av Evnstn 60201············847 475-6044
Dave's Italian Kitchen
1635 Chicago Av Evnstn 60201············847 864-6000
Dave's North Shore Towing
Lake Forest············Highland Park Tel No 847 432-0080
Dave's North Shore Towing Lk Blvd············847 615-0080
Dave's Reel Service
5033 Dempster Skokie 60077············847 549-7170
Davey Tree & Lawn Care
Utility Division
270 Rock Rd Dr E Dundee 60118············847 426-8555
David Adler Cultural Center
1700 N Milwaukee Av Librtyvl 60048············847 367-0707
David & Associates Insurance
1750 N Park Dr Glenvw 60025············847 679-8585
David Axelrod & Associates Inc
1448 Old Skokie Rd Highld Pk 60035············847 579-9700
David D Schwartz DDS 9933 Lawler Ave Skokie·····847 677-2808
David Cutler and Associates
8420 Grass Point Rd············847 673-8600
David Danzig & Associates
9135 Hapudicello Av Skokie············847 940-8100
David J White Associates
447 Illinois Rd Wilmet 60091············847 256-8826
David Jacqueline MD 909 Davis Evnstn 60201······847 866-3700
David John W DDS 1430 Theatre Dr Des Pl 60016····847 824-4919
David Katz & Associates
210 Skokie Valley Rd Highld Pk 60035············847 579-1300
David Kolisnak 221 S Milwaukee Av Wheeling 60090·847 537-7499
David M Siegel & Associates
790 Chaddick Dr Wheeling 60090············847 520-8100
David Malin & Co Ltd
425 Huehl Rd Northbrk 60062············847 498-1224
David Michael & Co 450 Skokie Bl Northbrk 60062··847 480-1260
David Noble and Company
909 Westcliff Ln Dsrfid 60015············847 914-0806
David R Kaplan LCPC
401 S Milwaukee Av Wheeling 60090············847 537-0488
David Roth Woodworking
707 Washington Evnstn 60202············847 866-9920
David S Gifland Ltd
320 Lake Cook Rd Dsrfid 60015············847 317-0160
David Seiberling Ltd
637 E Gold Rd Arl Hts 60005·········Evanston Tel No 847 864-7870
David Shane 444 Skokie Bl Wilmet 60091············847 256-3100
David Sherman & Company
500 Skokie Bl Northbrk 60062············847 509-1414
David Simm Photography
3985 Gregory Dr Glenvw 60025············847 803-9450
David Stuart Financial
899 Skokie Bl Northbrk 60062············847 564-1280

## DAVID'S BISTRO
623 N Wolf Rd Des Pl 60016············**847 803-3233**

David's Bridal
700 N Milwaukee Av Vernon Hills 60061············847 816-7663
David's Bridal Alterations
700 N Milwaukee Av Vernon hills 60061············847 816-8806
David's Inc 4352 W Touhy Av Lincwd 60712·······847 675-0100
Davidson Commission
720 Sewart Tree Rd Dsrfid 60015············847 405-9400
Davidson Harlan Inc
773 Glenn Av Wheeling 60090············847 541-9720
Davidson Jonathan DDS
9215 Skokie Bl Skokie 60077············847 329-9801
Davidson Marie A PhD Glenview 60025·······847 486-9106
Davies Home Services
824 Busse Hwy Park Ridge 60068············847 825-3741
Davies Home Services
824 Busse Hwy Park Ridge 60068············847 825-3738
Davies Susan A MD 4700 Dempster Skokie 60076···847 763-8850
Davin Industries Inc 1881 Commerce Dr
Elk Grove 60007·············Rosemont Tel No 847 296-0077
Davis Cleaners 538 Davis Evnstn 60201············847 864-4915
Davis Cleaners & Shirt Launderers
4047 Dempster Skokie 60076············847 674-1918
Davis Custom Top & Trim
4901 W Jackson St Chgo············800 281-2929
Davis Dann Levin LLC
600 Central Av Highld Pk 60035············847 266-2217
Davis & Davis Dentistry
1430 Thacker Des Pl 60016············847 824-4919
Davis Drapery Specialists
4047 Dempster Skokie 60076············847 674-1918
Davis & Engert Dentistry
20 Main Park Ridge 60068············847 698-2161
Davis Flowers 1022 Davis Evnstn 60201············847 475-8224
Davis Gary MD 1009 Central Evnstn 60201··········847 570-1410
Davis James DDS 20 Main Park Ridge 60068·······847 698-2161

## DAVIS JEAN
1405 Elmwood Av Evnstn 60201············**847 492-1002**

Davis John 1701 W Cambridge Rd Des Pl 60018·····847 299-3892
Davis John P 912 Busse Hwy Park Ridge 60068·····847 692-2701
Davis Larry atty 960 Rand Rd Des Pl 60016·······847 390-8100
Davis Lloyd MD 214 McHenry Rd Bullo Grv·······847 459-1160

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DAVID DAVIES d/b/a DAVIES HOME       )
SERVICES, individually and as the    )
representative of a class of similarly situated )     Case No. 13 CV 3546
persons,                             )
                                     )     Hon. Sharon Johnson Coleman
              Plaintiff,             )
                                     )     Magistrate Judge Mason
       v.                            )
                                     )
W.W. GRAINGER, INC. and JOHN DOES 1- )
12,                                  )
              Defendants.            )

### ANSWER AND AFFIRMATIVE DEFENSES

Defendant W.W. Grainger, Inc. ("Grainger"), by its attorneys, for its answer and

affirmative defenses to Plaintiff's Amended Class Action Complaint, hereby answers as follows:

### PRELIMINARY STATEMENT

1.      This case challenges Grainger's practice of faxing unsolicited advertisements.

**ANSWER:**  Grainger denies the allegations in Paragraph 1, except admits that this lawsuit

makes allegations against Grainger related to the practice of faxing unsolicited advertisements.

2.      The federal Telephone Consumer Protection Act, 47 USC § 227 (the "TCPA"),
prohibits a person or entity from faxing or having an agent fax advertisements without the
recipient's prior express invitation or permission ("junk faxes" or "unsolicited faxes").
Moreover, the TCPA mandates that if a person or entity sends a fax advertisement it must always
include a very specific opt-out notice that is clearly and conspicuously included on the first page
of the advertisement. *See* 47 U.S.C. § 227 (b) (2) (D); and 47 C.F.R. § 64.1200 (a) (4) (iii). The
TCPA provides a private right of action and provides statutory damages of $500 - $1,500 per
violation.

**ANSWER:**  The allegations in paragraph 2 contain conclusions of law, and accordingly no

response is required.  To the extent a response is required, Grainger denies the allegations in

Paragraph 2.

1



3.     Unsolicited faxes damage their recipients. A junk fax recipient loses the use of its fax machine, paper, and ink toner. An unsolicited fax wastes the recipient's valuable time that would have been spent on something else. A junk fax interrupts the recipient's privacy. Unsolicited faxes prevent fax machines from receiving authorized faxes, prevent their use for authorized outgoing faxes, cause undue wear and tear on the recipients' fax machines, and require additional labor to attempt to discern the source and purpose of the unsolicited message.

**ANSWER:**  Grainger denies the allegations in Paragraph 3.

4.     On behalf of himself and all others similarly situated, Plaintiff brings this case as a class action asserting claims against Defendants under the TCPA and the common law of conversion.

**ANSWER:**  Grainger denies the allegations in Paragraph 4, except admits that Plaintiff purports to assert class claims against Grainger under the TCPA and the common law of conversion.

5.     Plaintiff seeks an award of statutory damages for each violation of the TCPA.

**ANSWER:**  Grainger denies the allegations in Paragraph 5, except admits that Plaintiff seeks statutory damages under the TCPA.

## PARTIES, JURISDICTION AND VENUE

6.     Plaintiff is a resident of, and conducts business in, Cook County, Illinois.

**ANSWER:**  Grainger is without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

7.     Defendant, Grainger, has its headquarters in Lake Forest, Illinois and conducts business in Cook County, Illinois.

**ANSWER:**  Grainger admits the allegations in Paragraph 7.

8.     Plaintiff sued Defendants John Does 1-12 as it is not clear whether any entities or persons other than Grainger actively participated in the transmission of the subject fax advertisements, or benefitted from the transmissions of Grainger's fax advertisements.

**ANSWER:**  Grainger is without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

2

9.     Jurisdiction is conferred by 735 ILCS 5/2-209 in that Grainger has transacted business and committed tortious acts related to the matters complained of herein.

**ANSWER:**  Grainger denies the allegations in Paragraph 9.  Further answering, Grainger does not contest that this Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1331.

10.     Venue is proper in Cook County pursuant to 735 ILCS 5/2-101, et seq. because some of the tortious acts complained of occurred in Cook County, Illinois.

**ANSWER:**  Grainger denies the allegations in Paragraph 10.  Further answering, Grainger does not contest that venue is appropriate in the United States District Court for the Northern District of Illinois, Eastern Division.

## FACTS

11.     On or about December 2, 2009, Defendants sent, or caused to be sent, an unsolicited fax advertisement that advertised Grainger's goods, products, or services. Exhibit A, copy of the subject fax advertisement.

**ANSWER:**  Grainger denies the allegations in Paragraph 11, except admits that on or about December 2, 2009, it caused the fax transmission of an advertisement to Plaintiff.

12.     Plaintiff did not invite or give permission, to anyone, to send Exhibit A to him.

**ANSWER:**  Grainger denies the allegations in Paragraph 12.

13.     Exhibit A does not contain a clear and conspicuous opt-out notice. Instead, Defendants included an opt-out notice in tiny font that was inserted after Defendants' disclosure regarding the terms of the $25 offer included on the fax advertisement. Id. Additionally, with an asterisk, Defendants call the recipients' attention to Defendants' own disclosure regarding the terms of the $25 offer, but do not use any method to draw the recipients' attention to the opt-out notice. Id.

**ANSWER:**  Grainger denies the allegations in Paragraph 13.

14.     On the face of the subject fax, it is not understood whether the telephone and facsimile numbers identified in the notice were available to Plaintiff to make an opt-out request 24 hours a day, 7 days a week.

**ANSWER:**  Grainger denies the allegations in Paragraph 14.

15. On information and belief, Grainger sent the same facsimile to Plaintiff and more than 39 other recipients without first receiving the recipients' express permission or invitation. This is based, in part, on the fact that the subject fax was not addressed to anyone in particular, that Plaintiff never gave permission to anyone to send the subject fax advertisement to him, and that sending advertisements by fax is an inexpensive way to reach many persons.

**ANSWER:** Grainger denies the allegations in Paragraph 15, except admits that it caused the fax transmission of an advertisement to persons other than Plaintiff.

16. There is no reasonable means for Plaintiff (or any other putative Class member) to avoid receiving illegal faxes. Fax machines are left on and ready to receive the urgent communications their owners desire to receive.

**ANSWER:** Grainger denies the allegations of Paragraph 16 to the extent they purport to suggest that Grainger sent "illegal faxes." Grainger is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

## CLASS REPRESENTATION ALLEGATIONS

17. This action has been brought, and may be properly maintained, under 735 ILCS 5/2-801. This action satisfies the class action prerequisites of numerosity, common questions of law or fact predominate over individual questions, the representative parties will fairly and adequately protect the interests of the Class, and the class action is an appropriate method for the fair and efficient adjudication of the controversy.

**ANSWER:** The allegations in Paragraph 17 contain conclusions of law, requiring no response. To the extent an answer is required, Grainger denies the allegations in Paragraph 17.

18. Plaintiff brings this action as a class action on behalf of himself and all others similarly situated as members of the Class, initially defined as follows:

> All persons who were sent one or more telephone facsimile messages since April 5, 2009, that advertised the commercial availability of property, goods, or services offered by W.W. Grainger, Inc., that did not contain an opt-out notice that complied with federal law.

**ANSWER:** Grainger denies the allegations in Paragraph 18, except admits that Plaintiff purports to bring this action as a class action on behalf of the described individuals.

4

19.    Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, any officers or directors of Defendants, the legal representatives, heirs, successors, and assigns of Defendants, and any Judge assigned to this action, and his or her family.

**ANSWER:**  Grainger denies the allegations in Paragraph 19, except admits that Plaintiff

purports to exclude the described individuals from the putative class.

20.    Numerosity/Impracticality of Joinder: On information and belief, the Class consists of more than thirty-nine people and, thus, is so numerous that joinder of all members is impracticable. The precise number of Class members and their addresses are unknown to Plaintiff, but can be obtained from Defendants' records or the records of third parties.

**ANSWER:**  The allegations in the first sentence of Paragraph 20 contain conclusions of law,

requiring no response.  To the extent a response is required, Grainger denies the allegations in

Paragraph 20.

21.    Questions of Law or Fact Common to the Class: There is a well-defined community of interest and common questions of law and fact that predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from one Class member to another, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to the following:

      a.    Whether Defendants sent unsolicited fax advertisements;
      b.    Whether Exhibit A advertised the commercial availability of property, goods or services;
      c.    The manner and method Defendants used to compile or obtain the list of fax numbers to which it sent Exhibit A and other unsolicited fax advertisements;
      d.    Whether Defendants faxed advertisements without first obtaining the recipients' express permission or invitation;
      e.    Whether Defendants' opt out notice, violated the TCPA;
      f.    Whether Defendants' opt out notice was clear and conspicuous;
      g.    Whether Defendants' opt out notice contained telephone and facsimile numbers that were available to Plaintiff and the other Class members 24 hours a day, 7 days a week;
      h.    Whether Plaintiff and the other Class members are entitled to statutory damages;
      i.    Whether Defendants should be enjoined from faxing advertisements in the future;
      j.    Whether the Court should award trebled damages; and
      k.    Whether Defendants' conduct as alleged herein constituted conversion.

**ANSWER:**  The allegations in Paragraph 21 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger denies the allegations in Paragraph 21.

22.  <u>Fair and Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff does not have any interests adverse to the Class. Plaintiff has retained counsel who are experienced in class action litigation to represent him in this action.

**ANSWER:**  The allegations in Paragraph 22 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger is without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

23.  <u>Appropriateness</u>: A class action is an appropriate method for the fair and efficient resolution of this controversy.

**ANSWER:**  The allegations in Paragraph 23 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger denies the allegations in Paragraph 23.

24.  Plaintiff envisions no difficulty in the management of this action as a class action.

**ANSWER:**  Grainger is without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

**COUNT I**
**TELEPHONE CONSUMER PROTECTION ACT. 47 U.S.C. § 227**

25.  Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

**ANSWER:**  Grainger repeats and incorporates by reference its responses to Paragraphs 1-24.

26.  Plaintiff brings Count I on behalf of himself and a class of similarly situated persons.

**ANSWER:**  Grainger denies the allegations in Paragraph 26, except admits that Plaintiff purports to bring Count I on behalf of himself and a putative class.

27.  The TCPA prohibits the "use of any telephone facsimile machine, computer or other device to send an unsolicited advertisement to a telephone facsimile machine...." 47 U.S.C. § 227 (b) (1).

**ANSWER:**   The allegations in Paragraph 27 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger admits that Plaintiff selectively quotes from 47 U.S.C. § 227 and refers to that statute for a complete citation.

28.     The TCPA defines "unsolicited advertisement," as "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's express invitation or permission." 47 U.S.C. § 227 (a) (4).

**ANSWER:**   The allegations in Paragraph 28 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger admits that Plaintiff selectively quotes from 47 U.S.C. § 227 and refers to that statute for a complete citation.

29.     The TCPA provides:

> 3.     <u>Private right of action</u>.  A person may, if otherwise permitted by the laws or rules of court of a state, bring in an appropriate court of that state:
>
> (A)     •An action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,
>
> (B)     An action to recover for actual monetary loss from such a violation, or to receive  $500 in damages for each such violation, whichever is greater, or
>
> (C) Both such actions.

**ANSWER:**   The allegations in Paragraph 29 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger admits that Plaintiff selectively quotes from 47 U.S.C. § 227 and refers to that statute for a complete citation.

30.     The Court, in its discretion, can treble the statutory damages if the violation was knowing. 47 U.S.C. § 227.

**ANSWER:**   The allegations in Paragraph 30 contain conclusions of law, requiring no response.

31.     In relevant part, the TCPA states that "[t]he Commission shall prescribe regulations to implement the requirements of this subsection ... In implementing the requirements of this subsection, the Commission shall provide that a notice contained in an

unsolicited advertisement complies with the requirements under this subparagraph only if... (i) the notice is clear and conspicuous ..." 47 U.S.C. § 227 (b) (2) (D) (i).

**ANSWER:** The allegations in Paragraph 31 contain conclusions of law, requiring no response. To the extent a response is required, Grainger admits that Plaintiff selectively quotes from 47 U.S.C. § 227 and refers to that statute for a complete citation.

32. Moreover, "a notice contained in an unsolicited advertisement complies with the requirements under this subparagraph only if... (v) the telephone and facsimile machine numbers and the cost-free mechanism ... permit an individual or business to make such a request at any time on any day of the week." 47 U.S.C. § 227 (b) (2) (D) (v).

**ANSWER:** The allegations in Paragraph 32 contain conclusions of law, requiring no response. To the extent a response is required, Grainger admits that Plaintiff selectively quotes from 47 U.S.C. § 227 and refers to that statute for a complete citation.

33. Defendants violated the 47 U.S.C. § 227 et seq. by sending advertisements by fax (such as Exhibit A) to Plaintiff and the other Class members without first obtaining their prior express invitation or permission.

**ANSWER:** Grainger denies the allegations in Paragraph 33.

34. Defendants violated the 47 U.S.C. § 227 et seq. by not providing a clear and conspicuous opt-out notice. The notice that Defendants did include is barely legible, is in tiny font, is included only after Defendants' disclosure as to the $25 offer contained in the advertisement, and does not contain any method (such as the asterisk Defendants' used for their own disclosure) to direct the recipients' attention to the tiny and illegible opt-out notice. Exhibit A. Additionally, it is not clear whether Defendants provided telephone and facsimile numbers that allowed Plaintiff and the Class members to make an opt-out request at any time on any day of the week.

**ANSWER:** Grainger denies the allegations in Paragraph 34.

35. Facsimile advertising imposes burdens on unwilling recipients that are distinct from the burdens imposed by other types of advertising. The content of the required opt-out notice is designed to ensure that the recipients have the necessary contact information to opt-out of future fax transmissions. If senders do not clearly and conspicuously provide the opt-out content to the recipients, then the senders fail to enable the recipients with the appropriate information to stop the burdens imposed by this form of advertisement.

**ANSWER:** Grainger denies the allegations of Paragraph 35 to the extent they purport to suggest that Grainger violated the TCPA. Grainger is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph, and therefore denies the same.

36. The TCPA is a strict liability statute and Defendants are liable to Plaintiff and the other Class members even if their actions were negligent.

**ANSWER:** The allegations in Paragraph 36 contain conclusions of law, requiring no response. To the extent a response is required, Grainger denies the allegations in Paragraph 36.

37. Moreover, Defendants are liable to Plaintiff and the other Class members under the TCPA for including an improper opt-out notice even if Defendants ultimately prove that they obtained prior express permission to send the advertisements by fax or prove that Defendants had an established business relationship with Plaintiff and the other Class members.

**ANSWER:** The allegations in Paragraph 37 contain conclusions of law, requiring no response. To the extent a response is required, Grainger denies the allegations in Paragraph 37.

38. Defendants knew or should have known that Plaintiff and the other Class members had not given express invitation or permission for Defendants or anybody else to fax advertisements about Grainger's goods, products, or services, that Plaintiff and the other Class members did not have an established business relationship with Defendants, that Exhibit A is an advertisement, and that Exhibit A and the other advertisements Defendants sent did not display the proper opt out notice as required by the TCPA.

**ANSWER:** Grainger denies the allegations in Paragraph 38.

39. Defendants' actions caused damages to Plaintiff and the other Class members. Receiving Defendants' junk faxes caused the recipients to lose paper and toner consumed in the printing of Defendants' faxes. Moreover, the subject faxes used Plaintiff's and the Class's fax machines. The subject faxes cost Plaintiff time, as Plaintiff and his employees wasted their time receiving, reviewing and routing Defendants' illegal faxes. That time otherwise would have been spent on Plaintiff's business activities. Defendants' faxes unlawfully interrupted Plaintiff's and the other class members' privacy interests in being left alone. Finally, the injury and property damage sustained by Plaintiff and the other Class members from the sending of Exhibit A occurred outside Defendants' premises.

**ANSWER:** Grainger denies the allegations in Paragraph 39.

9

40.     Even if Defendants did not intend to cause damage to Plaintiff and the other Class members, did not intend to violate their privacy, and did not intend to waste the recipients' valuable time with Grainger's advertisements, those facts are irrelevant because the TCPA is a strict liability statute.

**ANSWER:**   The allegations in Paragraph 40 contain conclusions of law, requiring no response.  To the extent a response is required, Grainger denies the allegations in Paragraph 40.

The "Wherefore" Paragraph following Paragraph 40 of the Amended Complaint states Plaintiff's request for relief, to which no response is required.   To the extent a response is required, Grainger denies the allegations set forth in the "Wherefore" paragraph following paragraph 40 and the lettered paragraphs that follow, and denies that Plaintiff is entitled to any of the relief requested therein, or any relief whatsoever.

## COUNT II
## CONVERSION

41.     Plaintiff incorporates paragraphs 1 through 24 as though fully set forth herein.

**ANSWER:**  Grainger repeats and incorporates by reference its responses to Paragraphs 1-24.

42.     Plaintiff brings Count II on behalf of himself and a class of similarly situated persons.

**ANSWER:**   Grainger denies the allegations in Paragraph 42, except admits that Plaintiff purports to bring Count II on behalf of himself and a putative class.

43.     By sending Plaintiff and the other Class members unsolicited faxes, Defendants improperly and unlawfully converted their fax machines, toner and paper to its own use. Defendants also converted Plaintiff's employees' time to their own use.

**ANSWER:**  Grainger denies the allegations in Paragraph 43.

44.     Immediately prior to the sending of the unsolicited faxes, Plaintiff and the other Class members owned an unqualified and immediate right to possession of their fax machines, paper, toner, and employee time.

**ANSWER:**   Grainger denies the allegations of Paragraph 44 to the extent they purport to suggest that Grainger sent unsolicited faxes.   Grainger is without knowledge or information

10

sufficient to form a belief as to the truth of the remaining allegations in this Paragraph, and

therefore denies the same.

45.     By sending the unsolicited faxes, Defendants permanently misappropriated the
Class members' fax machines, toner, paper, and employee time to their own use. Such
misappropriation was wrongful and without authorization.

**ANSWER:** Grainger denies the allegations in Paragraph 45.

46.     Defendants knew or should have known that their misappropriation of paper,
toner, and employee time was wrongful and without authorization.

**ANSWER:** Grainger denies the allegations in Paragraph 46.

47.     Plaintiff and the other Class members were deprived of the use of the fax
machines, paper, toner, and employee time, which could no longer be used for any other purpose.
Plaintiff and each Class member thereby suffered damages as a result of their receipt of
unsolicited fax advertisements from Defendants.

**ANSWER:** Grainger denies the allegations in Paragraph 47.

48.     Each of Defendants' unsolicited faxes effectively stole Plaintiff's employees'
time because persons employed by Plaintiff were involved in receiving, routing, and reviewing
Defendants' illegal faxes. Defendants knew or should have known employees' time is valuable
to Plaintiff.

**ANSWER:** Grainger denies the allegations in Paragraph 48.

The "Wherefore" Paragraph following Paragraph 48 of the Amended Complaint states

Plaintiff's request for relief, to which no response is required.  To the extent a response is

required, Grainger denies the allegations set forth in the "Wherefore" paragraph following

paragraph 48 and the lettered paragraphs that follow, and denies that Plaintiff is entitled to any of

the relief requested therein, or any relief whatsoever.

## GENERAL DENIAL

Except as otherwise expressly recognized above, Grainger denies each and every

allegation contained in paragraph 1 through 48, including, without limitation, the headings and

11

subheadings contained in the Amended Class Action Complaint, and specifically denies any liability to Plaintiff or any members of the class that Plaintiff purports to represent. Pursuant to Rule 8(d) of the Federal Rules of Civil Procedure, averments in the Amended Class Action Complaint to which no responsive pleading is required shall be deemed denied. Grainger expressly reserves the right to amend and/or supplement its Answer.

## AFFIRMATIVE AND OTHER DEFENSES

The statement of any defense hereinafter does not assume the burden of proof for any issue as to which applicable law places the burden upon Plaintiff. Grainger expressly reserves the right to amend and/or supplement their defenses.

### First Defense

Plaintiff's claim is barred to the extent that Plaintiff consented to receiving facsimile transmissions from Grainger.

### Second Defense

Plaintiff's claim is barred to the extent that Plaintiff had an established business relationship with Grainger.

### Third Defense

Plaintiff's class claims are barred to the extent that recipients consented to receiving facsimile transmissions from Grainger.

### Fourth Defense

Plaintiff's class claims are barred to the extent that recipients had established business relationships with Grainger.

### Fifth Defense

Plaintiff's recovery is barred, in whole or part, by the failure of Plaintiff to mitigate damages.

### Sixth Defense

Plaintiff's claims are barred because the Telephone Consumer Protection Act of 1991, codified at 47 U.S.C. § 227, is unconstitutionally vague and impinges upon freedom of speech rights granted by the First Amendment of the United States Constitution.

### Seventh Defense

Plaintiff's class claims for statutory damages are barred as unconstitutional to the extent they would impose excessive fines in violation of the Eighth Amendment to the United States Constitution.

### Eighth Defense

Grainger reserves the right to raise any additional defenses, cross-claims, and third-party claims, not asserted herein of which it may become aware through discovery or other investigation.

WHEREFORE, Grainger respectfully requests that this Court dismiss Plaintiff's suit with prejudice, enter judgment in Grainger's favor and against Plaintiff, award to Grainger all attorneys' fees and costs incurred in defense of this action, and award to Grainger such other and further relief to which they are entitled.

### Grainger Demands Trial by Jury.

13

Dated:  June 3, 2013                                    Respectfully submitted,

                                                        W.W. GRAINGER, INC.

                                                        By:  /s/Norman K. Beck
                                                            Kimball R. Anderson  #49980
                                                            Norman K. Beck  #6275116
                                                            David Luger  #6299381
                                                            WINSTON & STRAWN LLP
                                                            35 West Wacker Drive
                                                            Chicago, IL 60601
                                                            Telephone: (312) 558-5600
                                                            Facsimile: (312) 558-5700
                                                            nbeck@winston.com

                                                            *Attorneys for W.W. Grainger, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2013, copies of the foregoing document were served electronically on all counsel of record, by operation of the Court's CM/ECF system.

/s/David Luger