Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

H

Only the Westlaw citation is currently available.

United States District Court,
W.D. Michigan,
Southern Division.
PHYSICIANS HEALTHSOURCE, INC., Plaintiff,
v.
STRYKER SALES CORPORATION, Stryker Biotech, L.L.C., Stryker Corporation, John Does 1–10, and Howmedica Osteonics Corp., Defendants.

No. 1:12–CV–0729.
Signed Jan. 12, 2015.

***OPINION AND ORDER***
ROBERT J. JONKER, District Judge.

*\*1* This is a civil action for alleged violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227. Before the Court is Defendant Howmedica's Motion for Summary Judgment (docket no. 91), Defendant Stryker's Motion for Summary Judgment (docket no. 95), and Plaintiff PHI's Motion for Summary Judgment (docket no. 97). The Court finds as a matter of law that the **faxes** at issue are "unsolicited," but that genuine issues of material fact preclude summary judgment for any party on all other issues. Accordingly, the motions are denied because no party is entitled to judgment as a matter of law.

### I. BACKGROUND

Defendant Stryker Corporation and its subsidiaries-Stryker Biotech LLC, Stryker Corp., and Howmedica Osteonics Corp.-design, manufacture, and sell products used in joint replacement and trauma surgeries, including total joint arthroplasties. (R. 27–3, Ex. C., PageID # 265.) Defendants conducted Primary Care Physician ("PCP") seminars relating to the field in which they operate. Howmedica promoted the PCP seminars by **fax**, focusing on either the recipient's medical speciality or geographic location. Howmedica purchased lists of **fax** numbers from Redi–Mail Direct Marketing, Inc. ("RediMail"), a list provider company. The parties disagree whether the seminars were promotional or educational in nature.

Dr. Martinez was a medical doctor in Cincinnati, Ohio. He practiced with Physician's Healthsource, Inc. ("PHI"). On or around October 12, 2009, one or more of Defendants faxed Plaintiff an invitation to attend an upcoming seminar at Jeff Ruby's, a Cincinnati steakhouse. The sent **fax** included a cover letter with the following: "Please join us for an engaging discussion on the latest advancements in orthopaedics, including arthritis of hip & knee and advancements in total joint arthroplasty, presented by Dr. Pamela Petrocy, on Wednesday, October 14th at 6:30pm. RSVP to Jen at [redacted] today. (Dinner will be served.)" (R. 61–4, Ex. D at 2, PageID # 780.) Two pages accompanied the cover letter. The first page included the Stryker logo and a picture of an unidentified orthopedic implant-the parties disagree whether it is one of Defendants' products or a generic product-with the headline, "Advancements in Orthopaedics for The Primary Care Physician." Also included was information concerning the guest speaker, Dr. Pamela Petrocy, an orthopedic surgeon. (R. 61–4, Ex. D at 3, PageID # 781.) The second page repeated information from the first page, as well as noted that covered topics would include "Arthritis of the Hip and Knee" and "Advancements in Total Joint Arthroplasty." (R. 61–4, Ex. D at 4, PageID # 782.) No language providing a recipient with information on how to "opt-out" of future correspondence appeared on the **fax**. It is undisputed that Defendant sent 15,041 similar **faxes** to 8,065 unique numbers between December 3, 2009 and August 8, 2011. (R. 61–8, Ex. G, PageID # 965.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

Defendants say they got Plaintiff's **fax** number-at least indirectly-from Plaintiff itself. Dr. Martinez, a medical doctor, provided both his and PHI's contact information to the American Medical Association ("AMA"). (R. 92, Howmedica Br. at 3, PageID # 2425.) The contact information included a **fax** number as part of his response to the AMA's 2003 Census. Defendants' claim that by including the **fax** number, Dr. Martinez consented to receive at least some faxed communications associated with the licensed use of the AMA's physician database. (R. 92, Howmedica Br. at 2, 8, PageID # 2424, 2430.) In fact, the census form itself does not include *any* formal consent question; rather, it simply says the number "is necessary so you can receive medically-related information, including advertising, approved by the AMA." (R. 92–5, Ex. D at 6, PageID # 2534.) It appears the AMA presumes consent and then offers its members the option of submitting a *separate* request for a "No Contact" or "Do Not Release" option. (R. 92–5, Ex. D at 12, PageID # 2540.) The boilerplate disclosure language certainly does not encourage opt out. To the contrary, after noting some potential issues regarding the "Do Not Release" option in particular, the AMA concludes: "If after careful consideration you decide to request a change [from what appears to be the default position]," the doctor may notify the AMA by email, phone, **fax**, or regular mail, or the doctor may visit the AMA's website. (R. 92–5, Ex. D at 12, PageID # 2540.) Again, this must be made by separate communication, not as part of a "check-the-box" opt-out on the census form itself.

**\*2** The AMA placed Dr. Martinez's contact information in its "masterfile" based on Dr. Martinez's response to the 2003 census form. There is no evidence of his response to any other census form even though it is distributed annually. Nor is there any direct evidence of what Dr. Martinez himself said on the response at any time. Rather, the record consists of what the AMA Masterfile reports was on a form from Dr. Martinez. No original document signed or submitted by Dr. Martinez is part of the record. Provided in the same envelope as the census form was a privacy statement, stating that "Masterfile information is made available to Database Licensees, who operate under strict usage agreements." (R. 92, Howmedica Br. at 9, PageID # 2431.) The privacy statement further stated that the Database Licensees could **fax** information concerning continuing medical education programs, medical equipment and supplies, and general practice-related commercial offers of interest to physicians as consumers. (R. 92, Howmedica Br. at 10, PageID # 2432.) The privacy statement also included information on how to elect either a "Do Not Release" or "No Contact" option, which would have kept Dr. Martinez from receiving **faxes**. (R. 92, Howmedica Br. at 10, PageID # 2432.)

Database Licensees that obtained contact-information lists from the AMA entered into contractual agreements with the AMA relating to conditions of usage. The AMA's "Conditions of Usage For Facsimile Transmissions" provide in relevant part as follows:

> (iii) DATABASE LICENSEE agrees that facsimile transmissions shall be used for conveying information germane to the practice of medicine. *Any use of conveying consumer and/or commercial information and/or advertising to physician's as general consumers is strictly prohibited. All materials* to be faxed pursuant to the terms of this Section *shall contain* the name, address and telephone number of the organization utilizing the **fax** numbers and contain *the following* **notices** *conspicuously located within the materials:*

>> *If you have questions about this specific* ***fax****, or wish to be removed from receiving future* ***faxes*** *from (sender's name) please call (sender's phone number).*

(R. 92–4, Ex. N at 2, PageID # 2527 (emphasis added).) The **fax** sent to PHI did not include the con-

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

tractual opt-out language or any other opt-out **notice**.

On October 14, 2012, Dr. Petrocy spoke at and moderated the free dinner seminar at Jeff Ruby's Steakhouse. (R. 109, Pl. Br. at 9, PageID # 4277.) Dr. Petrocy was not a Stryker employee, however Stephanie Groh, program director at Stryker, testified that only orthopedic surgeons who used Stryker products were used as seminar speakers because those surgeons understood the clinical features of Stryker's products. (R. 98, Pl. Br. at 11–12, PageID # 2980–81.) The parties agree that five Stryker employees, including three Stryker sales representatives, attended the seminar, although it appears that these individuals did not formally present at the seminar. (R. 109, Pl. Br. at 9, PageID # 4277.) As it did with other presenters, Defendants entered into an agreement with Dr. Petrocy: Stryker's Sponsored Primary Care Physician Seminar Agreement ("PCP Agreement"). The PCP Agreement states that the PCP seminars are "an excellent way to provide physicians with valuable, educational information and raise awareness of orthopaedic treatment options offered by Stryker." (R. 98–2, Ex. A at 2, PageID # 2997.) The PCP Agreement further states that the speaker "will make use only of presentation materials, [meaning PowerPoint slides] provided by Stryker, and will not alter or supplement those materials." (R. 98, Pl. Br. at 9, PageID # 2978.) Aside from retaining the presentation materials, the parties agree that Dr. Petrocy was not compensated for her time. Finally, the PCP Agreement stated that "nothing in this letter of agreement shall be deemed a requirement or an expectation that you purchase, use, recommend, advocate or arrange for the use of any products of Stryker in the treatments of any patient." (R. 98–2, Ex. A at 2, PageID # 2997.)

**\*3** The parties agree that Dr. Petrocy's presentation included a slideshow of the PowerPoint slides provided to her by Stryker, and that in some instances PowerPoint slides contained the Styker logo. Defendants contend that the seminars, and by extension the slides, provide primary care physicians with information that is relevant to the practice of medicine and valuable to their practices. (R. 106, Def. Br. at 14, PageID # 3998.) Plaintiff does not necessarily dispute this contention, but highlights information contained on select slides that Plaintiff argues constitute direct references to Stryker products. (R. 109, Pl. Br. at 10–11, PageID # 4278–79.) One slide titled "Ceramic–on–Ceramic Hip Replacement" reads "Additional information about ceramic hip replacement is available to you: Call 1–888–STRYKER or visit-www.aboutstryker.com." (R. 98–12, Ex. J at 3, PageID # 3437.) A second slide titled "Stryker Implant Technology" includes pictures of Stryker's "EIUS" and "Triathlon" products. (R. 98–12, Ex. J at 8, PageID # 3442.) A third slide expands on the "Triathlon" knee-system product, reading "advanced implant design-potential for greater implant longevity" and "designed for natural knee movement." (R. 98–12, Ex. J at 9, PageID # 3443.) A fourth slide titled "Stryker Implant Technology" notes that its Accolade TMZF product "is an MIS-friendly implant" and "Compatible with ceramic-on-ceramic technology for long-term results." (R. 98–12, Ex. J at 11, PageID # 3445.) A fifth slide titled "[Total Knee Replacement](#)" notes that over "60% of [total knee replacements](#) are performed on women," that Stryker's "Triathlon Knee System was designed with women in mind," and that the product will increase motion, decrease wear, and be a "Better fit for a woman's anatomy." (R. 98–12, Ex. J at 16, PageID # 3450.) A sixth slide titled "Triathlon Knee System" reads "More natural movement to help you get back to being yourself." (R. 98–12, Ex. J at 19, PageID # 3453.) A seventh slide included a quote from a patient who favorably reviewed his Stryker shoulder replacement. (R. 98–12, Ex. J at 20, PageID # 3454.) An eighth slide, "Stryker Navigation," read "Navigation is a visual enabler for MIS surgery facilitating more accurate placement of prosthesis" and "Implant alignment is an important factor that may reduce joint wear and extend the life of the implant." (R. 98–12, Ex. J at 21, PageID # 3455.) A ninth slide, "Anatomic [Hip Implants](#)" reads "Stryker's Anatomic Femoral Heads are larger in size, similar to

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

the top of the femur" and "Anatomically sized for natural-like hip performance." (R. 98–12, Ex. J at 23, PageID # 3457.) And finally, a tenth slide compares Stryker's "X3 Technology" favorably against the industry standard as both products relate to hip wear. (R. 98–12, Ex. J at 24, PageID # 3458.)

On July 16, 2012, PHI filed a class action complaint against the Stryker entities, alleging that Defendants' practice of sending **faxes** violated the Telephone Consumer Protection Act. On December 11, 2013, this Court granted the Plaintiff's Motion to Certify Class. On November 19, 2014, this Court heard oral argument on the parties' cross motions for summary judgment. The parties also submitted post-hearing briefs.

## II. LEGAL STANDARD

**\*4** Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Material facts are those necessary to apply the substantive law. *Id.* at 248. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.* In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when " 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.' " *Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

The filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "each movant separately bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.,* 395 F.3d 533, 538–39 (5th Cir.2004).

## III. DISCUSSION

Before the Court is Defendant Howmedica's Motion for Summary Judgment (docket no. 91), Defendant Stryker's Motion for Summary Judgment (docket no. 95), and Plaintiff PHI's Motion for Summary Judgment (docket no. 97). Defendant Howmedica's Motion for Summary Judgment (docket no. 91) and Plaintiff PHI's Motion for Summary Judgment (docket no. 97) both concern liability under the Telephone Consumer Protection Act, and will be evaluated together. Defendant Stryker's Motion for Summary Judgment (docket no. 95) concerns whether certain defendants should be dismissed from the case. The Court considers each in turn.

***A. Defendant Howmedica's and Plaintiff PHI's Cross Motions for Summary Judgment*** (docket nos. 91, 97)

The Telephone Consumer Protection Act ("**TCPA**"), 47 U.S.C. § 227, provides as follows: "It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States, to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an *unsolicited advertisement,*" unless the transmission falls into one of the exceptions outlined in the **TCPA**. *Id.* § 227(b)(1)(c) (emphasis added). The **TCPA** further provides that the "term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.* § 227(a)(5). The **TCPA** creates a private right of action for any person or entity that receives an advertisement in violation of the act

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

and regulations, and provides for statutory damages in the amount of $500 for each violation as well as injunctive relief against future violations. *Id.* § 227(b)(3). The **TCPA** provides that the Federal Communications Commission ("FCC") "shall prescribe regulations to implement the requirements" of the **TCPA**. *Id.* § 227(b)(2).

**\*5** Defendant Howmedica (as well as all Defendants, should this Court deny their other summary judgment motion) moves for summary judgment on the grounds that the sent **fax** does not fit the statutory definition of "an unsolicited advertisement" as a matter of law, either because the **fax** is not an *advertisement,* or because the **fax**, even if properly understood as an advertisement, is not an *unsolicited* advertisement. Plaintiff PHI moves for summary judgment on the grounds that the sent **fax**, as a matter of law, is both an advertisement and unsolicited within the meaning of the **TCPA**. The Court considers in turn each issue.

*1. Is the Fax an Advertisement?*

*a. The Fax Alone*

An initial question for this Court is whether the **fax** alone is an advertisement within the meaning of the **TCPA**. Howmedica states that the **faxes** are not advertisements because the **faxes** did not promote the commercial availability or quality of Howmedica's goods or services. (R. 92, Howmedica Br. at 2, PageID # 2424; R. 106, Def. Br. at 8, PageID # 3992.) Howmedica notes that the **fax** does not mention any specific property, goods, or services, and so Howmedica argues the **faxes** could not advise of their commercial availability or quality. With respect to the Stryker logo appearing on the **fax**, Howmedica notes that it is an authorized user of the Stryker trademark, and that the logo served merely to identify the sender of the **fax**, as the **TCPA** requires. *See* 47 U.S.C. § 227(d)(1)(B) (noting that it is unlawful to send a **fax** unless a sender clearly identifies the entity sending the message). While Defendants acknowledge that the **fax** included an "unlabeled, unbranded image of an implantable device," Defendants argue that the **faxes** still did not identify the product, did not mention prices, did not identify sales outlets, and did not provide any product descriptions; therefore, according to Defendants, the **faxes** furnished no commercial information of any variety. (R. 106, Def. Br. at 17, 19, PageID # 4001, 4003; R. 122, Howmedica Rep. Br. at 5, PageID # 5615.) Rather than promoting something or contemplating a commercial transaction, Howmedica argues, the **fax** was purely informational, and merely announced an upcoming discussion of interest-a local dinner seminar-to primary care physicians such as Dr. Martinez. (R. 92, Howmedica Br. at 12–13, PageID # 2434–35; R. 122, Howmedica Rep. Br. at 5, PageID # 5615.)

Plaintiff PHI counters that the **faxes** do in fact promote the commercial availability of goods and services. The **fax** invites individuals to a free seminar that offers not only information but also a free dinner at a well-known Cincinnati steakhouse. In addition, PHI states that the **fax** contains a picture of one of Stryker's products (which Defendants dispute), Stryker's name, and Stryker's logo along with an invitation to attend the seminar. (R. 109, Pl. Br. at 15, PageID # 4283.) Plaintiff PHI argues that text "advancements in orthopaedics" on the **fax** relates to specific Stryker products, which are commercially available goods within the meaning of the **TCPA**. (R. 109, Pl. Br. at 15, PageID # 4283.) PHI argues that the availability of a free seminar is evidence of a profit-making motive on behalf of the sender of the **fax**, in this case, a for-profit entity, which in turn establishes, as a matter of law, that a **fax** promoting such a seminar is an advertisement. (R. 98, Pl. Br. at 18–19, PageID # 2988.)

**\*6** Based on a review of the **fax** alone, neither party is entitled to summary judgment. A reasonable fact-finder, drawing all inferences in favor of the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

Plaintiff, could reasonably conclude that the **fax**, at least in part, promotes the quality and availability of Stryker products. On the other hand, a reasonable fact-finder drawing all inferences in favor of the Defendant could reasonably conclude that no particular Stryker product is featured on the **fax**, and that the **fax** is simply promoting an opportunity for continuing medical education in a comfortable environment.

The cited case law addressing these issues points in different directions, and in any event, does not disturb this Court's conclusion. PHI cites several factually similar cases from district and state courts in which a court denied a defendant's motion to dismiss (rather than a motion for summary judgment), noting that these cases suggest that a **fax** need not contain an explicit sale offer to constitute an advertisement within the meaning of the **TCPA**. (R. 98, Pl. Br. at 18–19, PageID # 2988.) Even ignoring the difference between a motion to dismiss and a motion for summary judgment, these cases do not compel judgment as a matter of law in this case. The Court agrees that the "**TCPA** does not require that an unwanted and uninvited **fax** make an overt sales pitch to its recipient in order for a cause of action to exist," but finds these other cases distinguishable to the extent Plaintiff offers them in support of its own motion for summary judgment. See *Green v. Time Ins. Co.,* 629 F.Supp.2d 834, 837 (N.D.Ill.2009). For example, in *Green,* the **fax** at issue specified a particular insurance contract that was available to consumers as well as the savings involved in entering into that arrangement; of course, no such specificity (beyond an unmarked picture) is detailed in the **fax** at issue in this case. See *id.* at 834–35.

More helpful to the Plaintiff's case is *Ira Holtzman, C.P.A. v. Turza,* 728 F.3d 682, 685 (7th Cir.2013), in which the Seventh Circuit found that a weekly newsletter comprised 75% of information and 25% of an advertisement was sufficient as a matter of law to establish a **TCPA** violation, reasoning that the ad served to "declare the[ ] availability" of Defendant Turza's attorney services. In so doing, the Seventh Circuit dismissed out of hand any argument that the advertisement on the **fax** was incidental to the overall message; the fact that it appeared at all was enough to support a finding of liability. *See id.* Notably, the advertisement on the newsletter in *Turza* could be construed as a logo-it contained the defendant's name and contract information, noted that he was an attorney at law who specialized in estate and business succession planning, and provided contact information. The Stryker logo appearing on the **fax** is similar to the attorney's letterhead in *Turza,* but still distinguishable. In *Turza,* the letterhead of the attorney invited to follow up with contact information provided. In this case, no contract information is provided on the **fax**, and any linkage between the Stryker logo and a particular product requires resolution of a disputed fact: namely, whether the product pictured is a Stryker product, or a generic sample. Summary judgment is therefore inappropriate.

***7** Other cited cases, such as *Holmes v. Back Doctors, Limited.,* No.CIV.NO.09–540–GPM, 2009 WL 3425961, at *4 (S.D.Ill. Oct.21, 2009) *vacated in part on other grounds,* 695 F.Supp.2d 843 (S.D.Ill.2010), also turn on particular factual nuance. The court in *Holmes* found that the **faxes** at issue were not advertisements, but the **faxes** themselves included medical information directed to a list of regular recipients on a periodic basis, all of which suggests they were an informational newsletter. Similarly, in *Physicians Healthsource, Inc. v. Janssen Pharmaceuticals, Inc.,* No. CIV.A. 12–2132 FLW, 2013 WL 486207, at *7 (D.N.J. Feb.6, 2013), the court found that "the content of the **fax** at issue [did] not suggest the presence of a commercial pretext" because the **fax** "did not offer any free services or goods to Plaintiff's doctors." Here, by contrast, the **fax** offers a free steak dinner to attendees. Whether the free dinner is part of an advertising campaign or a non-commercial educational opportunity depends on how a fact-finder resolves disputed issues of fact, including whether the pictured product is a Stryker product or a generic

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

sample.

The parties cite one case involving a motion for summary judgment. In *Phillip Long Dang, D.C., P.C. v. XLHealth Corp.,* defendants faxed invitations to seminars concerning insurance coverage; the seminars included the defendants' logo as well as logistical information concerning the seminar. *See* No. 109–CV–1076–RWS, 2011 WL 553826, at *1 (N.D.Ga. Feb.7, 2011). The "seminars promised to offer providers ... information regarding claims and utilization management, to demonstrate use of [the defendants'] secure provider portal, and to afford providers and their staffs opportunities to meet CIP representatives." *Id.* Although the court noted that "in many instances" a free seminar serves as a "pretext to advertise commercial products and services," the court found that the **fax** was not a pretext for a commercial enterprise because there was "nothing on the communication" which sought to sell insurance to the recipient or even promote the benefits of becoming a contracted provider. *Id.* at *4. While this Court acknowledges that this case provides support to Defendants, this Court rejects the opportunity to accept its reasoning in full. While the Court agrees that there is nothing on the face of the **fax** at issue in this case that serves as an explicit sale offer, the Court disagrees that this answers the question as to whether this free seminar was "a pretext to advertise commercial products and services." *Id.* at *3. Of course, if the **fax** itself contained an explicit offer to sell, it would be unnecessary to make the follow-up inquiry into whether the message was pretextual, as the message on its own would violate the **TCPA** without any need to ask whether the message was a mere pretext. *See id.*

Howmedica also argues that because the **faxes** were sent to primary care physicians who neither buy nor prescribe orthopedic devices, a commercial nexus between the **fax** and its recipients is lacking as a matter of law. (R. 92, Howmedica Br. at 2, PageID # 2424; R. 106, Def. Br. at 8, 20–21, PageID # 3992, 4004–05.) The Court disagrees. The parties agree that primary care physicians may engage patients and orthopedic surgeons on matters involving orthopedic devices, and that primary care physicians refer patients to orthopedic surgeons. (R. 98, Pl. Br. at 18, PageID # 2987.) It stands to reason that the information referenced on the **fax** could have led primary care physicians to refer more patients or discuss orthopedic products more frequently, and this in turn could stimulate demand for Defendants' products. The Court finds that the relationship between the **fax** recipients and demand for Defendants' products, as opposed to a direct one-to-one link regarding a commercial transaction, is a sufficient basis on which a factfinder could infer the existence of an advertisement, particularly in an industry such as medical devices. And the Court finds nothing in the **TCPA** mandating one degree of separation between buyer and seller for material to constitute an advertisement as a matter of law. While a factfinder could reasonably determine that the separation between buyer and seller weighed in favor of considering the **fax** as educational rather than promotional, such a separation does not mandate resolution as a matter of law.

*b. Beyond the Fax Itself*

**\*8** Another question debated by the parties is whether the Court should consider only the **fax** itself or both the **fax** and the actual seminar that the **fax** promoted in determining whether the **fax** constituted an advertisement as a matter of law. Defendants argue that only consideration of the **fax** is appropriate because the language of the **TCPA** does not purport to regulate anything other than the *transmission* of unsolicited advertisements. (R. 92, Howmedica Br. at 13, PageID # 2435.) Defendants further argue that nothing in the **TCPA** directs the Court to look beyond the face of the **fax** transmission in determining whether a defendant has sent an unsolicited advertisement, and that a seminar, by definition, cannot be understood as a transmission. (R. 106, Def. Br. at 8, PageID # 3992.) Therefore, the argument goes, anything that occurred at the seminar is outside the scope of the **TCPA**. (R. 122, Howmedica Rep. Br. at 2, PageID # 5612.)

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

Plaintiff counters by citing other circuits for the proposition that the **TCPA** is a remedial statute that should be broadly interpreted. (R. 106, Def. Br. at 8, PageID # 3992.) Defendant responds by saying the issue of whether the **TCPA** is punitive or remedial is unsettled in the Sixth Circuit, and that the only permissible course of action is to apply the **TCPA's** plain meaning, which in Defendants' view leads to a narrow interpretation that excludes consideration of the seminar. (R. 106, Def. Br. at 18, PageID # 4002.) Of course, even if Defendants are correct about this, they are still not entitled to summary judgment for the reasons already discussed. Even so, the Court will address the issue to determine whether Plaintiff is entitled to summary judgment once the seminar itself is included, and to frame the issues for trial, based on the Court's ultimate conclusion that no party is entitled to summary judgment.

The Court finds that the **TCPA's** text does not require a court to put on evidentiary blinders in deciding whether a particular **fax** amounts to an advertisement. The ultimate statutory question is whether the **fax** at issue falls within the statutory definition. In answering that question, nothing in the statute puts an artificial limit on information a court may consider. Congress knows how to limit the evidentiary record when it wants to do so. *See, e.g.,* Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9613(j)(1) ("In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record."); Immigration Reform and Control Act of 1986, 8 U.S.C.A. § 1160(e)(3)(B) (noting that "judicial review shall be based solely upon the administrative record established at the time of the review"); *see also Cronin v. U.S. Dep't of Agric.,* 919 F.2d 439, 441 (7th Cir.1990) (discussing the general requirement that a district court limit its review to the administrative record). In the absence of any statutory restriction, the ordinary rules of evidence apply. See Fed.R.Evid. 401–02; Fed.R.Civ.P. 56(c).

And the actual content of a seminar can logically shed light on whether a particular **fax** promoting the seminar is merely providing non-commercial educational opportunities, or advertising the commercial availability or quality of particular products. Anyone who has received an invitation to a free breakfast or cocktail hour at a beach resort knows a lot more about whether the invitation was an advertisement for a time-share opportunity after actually attending the event.

**\*9** This is the same practical insight that the FCC has embodied in its policy statement regarding offers for free goods or services. The FCC regulations implementing the **TCPA** clarify, "[t]he term advertisement means any material advertising the commercial availability or quality of any property, goods, or services." 47 C .F.R. § 64.1200(f)(1). The FCC's policy statements further provide that "offers for free goods or services that are part of an overall marketing campaign to sell property, goods, or services constitute advertising the commercial availability or quality of any property, goods, or services." *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C. Rcd. 14014, 14097 (2003). More directly on point, the FCC has concluded that "facsimile messages that promote goods or services even at no cost, such as ... free consultations or seminars are unsolicited advertisements under the **TCPA's** definition. *In many instances, 'free' seminars serve as a pretext to advertise commercial products and services.* By contrast, only those facsimile communications that contain only information, such as industry news articles, legislative updates, or employee benefit information, would not be prohibited by the **TCPA** rules." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005,* 71 FR 25967–01 (2006) (emphasis added).

The parties disagree whether case law supports affording deference to the FCC's comments. But this disagreement is beside the point. The issue is not

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

deference; it is simply common sense. We know from common experience-whether at time-share resorts or otherwise-that "free offers" often come with strings attached. Understanding the full context is not only helpful, but often essential, to evaluating the true nature of what is being offered. To the extent the FCC guidance embodies this common sense notion, it reinforces the Court's conclusion that the question of whether the **fax** is an advertisement may be illuminated by more than the **fax** itself. Refining fine points of administrative law regarding levels of judicial deference to various forms of agency action is unnecessary in this case.

In looking at the broader factual information, Plaintiff argues that its motion for summary judgment should be granted simply because Defendants are for-profit entities and the seminar was free. Plaintiff notes that Stryker paid for the expenses associated with the seminars, including those for food and handout materials. (R. 98, Pl. Br. at 17, PageID # 2986.) But the Court finds that this fact alone is insufficient for purposes of deciding a motion for summary judgment. It is certainly unclear why Defendant would provide free dinners without receiving, or expecting to receive, something in return-if there is, as any professor would tell his students in an introductory economics course, no "free lunch," it stands to reason that there is similarly no "free dinner." But the Court is not inclined to adopt a hard-and-fast rule centered on the motives of the Defendants for purposes of ascertaining whether a seminar is focused on education or promotion for the reasons described above. Rather, the fact that Defendants paid for the seminar's associated expenses would be one consideration for a factfinder in evaluating the nature of the seminar, and the **fax** promoting it.

*10 Similarly, looking at whether the seminar content was educational or promotional is not open to decision as a matter of law. Defendant Howmedica states that even if the Court examines the content of the underlying seminars, the **faxes** still do not constitute unsolicited advertisements because the seminars provided *bona fide* medical education for doctors. (R. 122, Howmedica Rep. Br. at 2, PageID # 5612.) Plaintiff predictably disagrees, focusing on the multiple PowerPoint slides that could certainly be said to raise awareness of Defendants' products and their quality. Plaintiff observes that the PCP agreement prohibited presenters from altering the slides, including those that relate to Defendants' products and technology. Defendant Howmedica states that of the 68 total slides, few reference its own products, and maintains that even if the PCP agreement stated that the speakers may not alter the provided PowerPoint slides, Dr. Petrocy and other presenters did in fact alter the PowerPoint slides; apparently "a number of the presenters altered the presentations to eliminate references to Stryker products or branding." (R. 122, Howmedica Rep. Br. at 3, PageID # 5613.) Defendant Howmedica also notes that nothing in the PCP contracts requires the presenters to promote the Defendants' orthopedic products, the agreement specifically states that there is "no requirement or expectation" that the presenters engage in such conduct. (R. 122, Howmedica Rep. Br. at 2, PageID # 5613.) According to Defendants, the fact that presenters "discussed [Defendants'] products does not mean that they promoted their use, as opposed to informing attendees about how orthopedic devices can address the medical needs of patients." (R. 122, Howmedica Rep. Br. at 2–3, PageID # 5612–13.)

The Court finds that the PowerPoint slides and the circumstances of the seminar could lead a reasonable factfinder to find for or against either side. On the one hand, a factfinder could conclude that any references to Stryker or its products in the PowerPoint slides were for the purpose of discussing how medical devices can be used to treat orthopedic conditions, and were thus part of the overall educational design of the presentation. On the other, a factfinder could conclude that the references to Stryker or its products in the PowerPoint slides were for the purpose of advertising the commercial availability and quality of Stryker's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

products in the hopes that primary care physicians would undertake steps to stimulate demand for Stryker products. And the surrounding circumstances can similarly be viewed either way. The issue of whether the seminar was principally educational or promotional in nature simply cannot be decided as a matter of law, and so the Court will deny the parties' motions for summary judgment on these issues. And because Plaintiff is not entitled to summary judgment without showing as a matter of law *both* that the **fax** was an advertisement *and* unsolicited, Plaintiff's motion for summary judgment must be **DENIED.**

*2. Was the fax unsolicited?*

**\*11** The second question for this Court to consider is whether the **fax** was unsolicited, which is the only kind of **fax** expressly regulated by the **TCPA**. The relevant portion of the **TCPA's** definition of "unsolicited advertisement" focuses on transmissions "to any person without that person's prior express invitation or permission." 47 U.S.C. § 227(a)(5). An "unsolicited advertisement" sent by **fax** violates the **TCPA** unless the sender can establish three things: (1) the sender has an established business relationship with the recipient; (2) the sender obtained the recipient's **fax** number either through a voluntary communication between the two or through a public source on which the recipient voluntarily made the number available; and (3) the **fax** has an opt-out **notice** meeting the requirements of the statute. *See id.* § 227(b)(1)(c). The parties focus on the third requirement because even assuming the first two conditions are satisfied, there is no factual dispute regarding the absence of any opt-out language on the **fax** at issue in this case.

The statutory opt-out-**notice** requirement outlines some requirements and directs the FCC to prescribe additional regulations to implement the requirement. *Id.* § 227(b)(2)(D). The accompanying regulation states, "[a] facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section." 47 C.F.R. § 64.1200(a)(4)(iv). The corresponding FCC regulation states the following:

(iii) The advertisement contains a **notice** that informs the recipient of the ability and means to avoid future unsolicited advertisements. A **notice** contained in an advertisement complies with the requirements under this paragraph only if—

(A) The **notice** is **clear** and **conspicuous** and on the first page of the advertisement;

(B) The **notice** states that the recipient may make a request to the sender of the advertisement not to send any future advertisements to a telephone facsimile machine or machines and that failure to comply, within 30 days, with such a request meeting the requirements under paragraph (a)(4)(v) of this section is unlawful;

(C) The **notice** sets forth the requirements for an opt-out request under paragraph (a)(4)(v) of this section;

(D) The **notice** includes—

(1) A domestic contact telephone number and facsimile machine number for the recipient to transmit such a request to the sender; and

(2) If neither the required telephone number nor facsimile machine number is a toll-free number, a separate cost-free mechanism including a Web site address or email address, for a recipient to transmit a request pursuant to such **notice** to the sender of the advertisement. A local telephone number also shall constitute a cost-free mechanism so long as recipients are local and will not incur any long distance or other separate charges for calls made to such number; and

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

**\*12** (E) The telephone and facsimile numbers and cost-free mechanism identified in the **notice** must permit an individual or business to make an opt-out request 24 hours a day, 7 days a week.

*Id.* § 64.1200(a)(4)(iii). The FCC has reiterated that the opt-out **notice** is required for all **fax** advertisements, even if there is an established business relationship or the sender has obtained prior consent. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk **Fax** Prevention Act of 2005, 71 Fed.Reg. 25967–01, 25972, 2006 WL 1151584 (2006) ("In addition, entities that send facsimile advertisements to consumers from whom they obtained permission must include on the advertisements their opt-out **notice** and contact information to allow consumers to stop unwanted **faxes** in the future."). The Court observes that the AMA's own license agreement with Database Licensees also requires a conspicuous opt-out **notice**. The **fax** at issue here did not include any opt-out language.

Plaintiff PHI argues that the FCC's regulation in 47 C.F.R. § 64.1200(a)(4)(iv) and the accompanying commentary control. (R. 109, Pl. Br. at 24–25, PageID # 4292–93.) PHI points to various courts that have deferred to the FCC on the subject, holding that if a **fax** does not strictly comply with opt-out requirement, the defendant cannot raise a consent defense. *See, e.g., Turza,* 728 F.3d at 683 ("Turza's **faxes** did not contain opt-out information, so if they are properly understood as advertising then they violate the Act whether or not the recipients were among Turza's clients."); *Nack v. Walburg,* 715 F.3d 680, 685 (8th Cir.2013) ("[W]e believe that the regulation as written requires the senders of **fax** advertisements to employ the above-described opt-out language even if the sender received prior express permission to send the **fax**."); *Bais Yaakov of Spring Valley v. Alloy, Inc.,* 936 F.Supp.2d 272, 285–87 (S.D.N.Y.2013) (same); *Vandervort v. Balboa Capital Corp.,* 287 F.R.D. 554 (C.D.Cal.2012) (same); *Aventura Chiropractic v. Med Waste Mgmt.,* LLC, No. 12–21695–CIV, 2013 WL 3463489, at \*4 (S.D.Fla. July 3, 2013) (same).

In response, first Defendant Howmedica argues that the **fax** was not unsolicited because, as part of the AMA's 2003 Census, Dr. Martinez gave express written consent to receive faxed advertisements associated with the licensed use of the AMA's physician database. (R. 92, Howmedica Br. at 2, 8, PageID # 2424, 2430.). Defendant further argues that this is all by itself sufficient to defeat liability under the **TCPA**, and that it need not separately comply with the statutory elements of the defense of consent. But this argument does not take the statute as a whole seriously. In understanding what Congress meant by "unsolicited," the Court looks first to the statutory definition, which focuses on the recipient's "prior express invitation or permission." 47 U.S.C. § 227(a)(5). But the phrase is itself susceptible to multiple reasonable constructions. An "express invitation or permission" is something more than the absence of objection to an established practice, or even a conscious choice to accept an established practice of allowing **faxes** because it seems less onerous at the time than taking the initiative to send a separate communication opting out of the practice. *See id.* Tolerating the presence of a door-to-door solicitor at the house is not the same thing as an express invitation or permission. Moreover, even assuming for purposes of argument that there really was some express consent from Dr. Martinez in 2003, does the statutory phrase require separate consent or invitation for each individual transmission, or only for a particular category of transmissions? And if the latter, who decides whether a particular **fax** is within the category? Also, if categorical consent is enough, how often must it be received and how does a person revoke consent after a change of heart? And what if the person who gave categorical consent is not the person who actually owns the **fax** machine receiving the transmission? In short, the statutory phrase leaves room for reasonable construction.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

***13** In construing the proper reach of the definition, Congress itself provided some clues by singling out three elements for a successful consent defense, one of which is an opt-out **notice**. *See id. § 227(b)(1)(C).* That opt-out **notice** is required even when there is an established business relationship, and even when there is no question that the sender received the **fax** number directly from the recipient (or from a public source), and not from someone who sold or licensed the information. These congressional choices support construction of the term "unsolicited" in this context that will ensure **fax** recipients have real and practical control-and means to control-what is sent to them on their own **fax** machines. Defendants' construction isolates one statutory word and ignores what Congress itself said about the inextricably linked issue of consent. Here, Defendants included no opt-out language on their **fax**, and accordingly have no basis for satisfying the statutory defense of consent. The FCC regulation on this issue makes the case even easier on this point. The FCC's regulation unequivocally requires all advertisements to include an opt-out **notice**. This is, at a minimum, a fair interpretation of the congressional scheme. Congress's use of the term "unsolicited" in the same statute including an express defense and definition of consent reasonably supports the conclusion that Congress meant to treat the terms as equivalent, at least for purposes of requiring opt-out language on all **faxes**. And regulations that are reasonably within the statutory language are entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

As a matter of law, the **fax** was "unsolicited" within the meaning of the overall statutory framework Congress enacted because it did not include the opt-out language required for a successful defense of consent, and was not sent by "express invitation or permission" of the Plaintiff, as the Court construes the phrase.

The congressional and FCC requirement of opt-out language is entirely reasonable, as the facts of this case demonstrate. Whatever consent Plaintiff gave was, at best, indirect. It came from one of its employees in an annual census to the AMA. And the "consent" appears more like the acceptance of an established practice than an express "check-the-box" opt-in decision. At a minimum, no one-not Plaintiff or any of its employees-gave any direct consent to the sender of the **fax** at issue here, or to the marketing company that provided the **fax** list to the sender. Defendants' theory here would effectively say that once a single doctor in a multi-doctor practice gave consent to the AMA in an annual survey, **faxes** from anyone that the AMA sold the number to would be "solicited" and beyond the **TCPA**, at least until all doctors in the practice withheld consent in separate communications to the AMA. Given the inherent ambiguity in what is "solicited" or "unsolicited" in this factual morass, Congress and the FCC could reasonably conclude that the unequivocal requirement of a simple opt-out **notice** on every **fax** was the only way to give practical effect to the purpose of the **TCPA**. Apparently even the AMA reached the same conclusion because it required its Database Licensees to include an opt-out mechanism, too.

***14** The Defendants' remaining points similarly do not carry the day. Defendants argue that the FCC regulation violates the First Amendment by imposing a ban on commercial speech. (R. 106, Def. Br. at 29, PageID # 4013.) The Court disagrees. Regardless of whether the Court applies the analytical framework in *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), or the "time, place, and manner" analysis applicable to content-neutral restrictions on free speech, the Court discerns no constitutional violation. *See generally Bd. of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (noting that "application of the *Central Hudson* test was 'substantially similar' to the application of the test for validity of time, place, and manner restrictions upon protected speech").

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

Neither Congress nor the FCC is drawing any content-based line tied to the subject of the advertisement. Rather, they are simply ensuring that an advertiser not impose the costs of the **fax** itself on the target. That is a perfectly reasonable regulation on the manner of the commercial communication.

Defendants also note that on October 30, 2014, the FCC released an Order concerning the **TCPA** (docket no. 183), which states that "some parties who have sent **fax** ads with the recipient's prior express permission may have reasonably been uncertain about whether our requirement for opt-out **notices** applied to them" and that the FCC is providing a six-month window in which senders of **faxes** may apply for a retroactive waiver of the FCC's opt-out requirement, provided that senders comply with the FCC's regulations within six months. (R. 183–1, Ex. A at 2, PageID # 7984.) The Stryker Entities have filed a Petition for Waiver with the FCC. (R. 183–1, Ex. A at 2, PageID # 7984.) But the waiver issue does not impact the Court's decision, for three reasons. First, as noted above, this Court's ruling rests not merely on the FCC's regulation, but on the statutory term itself. Second, the Court finds that nothing in the waiver-even assuming the FCC ultimately grants it-invalidates the regulation itself. The regulation remains in effect just as it was originally promulgated. Third, the FCC cannot use an administrative waiver to eliminate statutory liability in a private cause of action; at most, the FCC can choose not to exercise its own enforcement power. *See generally Turza,* 728 F.3d at 688 ("Section 227 [of the **TCPA**] authorizes private litigation, however; recipients [of **faxes**] need not depend on the FCC."). It would be a fundamental violation of the separation of powers for the administrative agency to "waive" retroactively the statutory or rule requirements for a particular party in a case or controversy presently proceeding in an Article III court.

Based on the above analysis, this Court finds that the **fax** was "unsolicited" as a matter of law. Therefore, Plaintiff's motion as to this particular issue is granted (though summary judgment on liability as a whole cannot be entered for the Plaintiff for the reasons separately listed in the previous section), and Defendants' motion for summary judgment must be **DENIED.**

***B. Defendant Stryker's Motion for Summary Judgment (docket no. 95)***

**\*15** The Stryker entities consist of Defendant Stryker Sales Corporation, Defendant Stryker Biotech LLC, and Defendant Stryker Corporation, their parent company. Stryker asserts that PHI has not met its evidentiary burden to establish that Stryker Sales Corp., Stryker Biotech LLC, or Stryker Corp. had any involvement with the alleged sending of **faxes**. (R. 96, Def. Br. at 2, PageID # 2755.) Stryker states that neither Stryker Sales Corp. nor Stryker Biotech Corp. is involved with the sale or manufacture of orthopedic implant devices. Stryker further states that there is no evidentiary basis for piercing the corporate veil and affixing liability to the parent company, Stryker Corp. (R. 96, Def. Br. at 3, PageID # 2757.) *See Seasword v. Hilti, Inc.,* 449 Mich. 542, 537 N.W.2d 221, 224 (Mich.1995) ("Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities."). Stryker also notes that PHI did not take a deposition of a corporate representative from any of the three entities, and that all eleven deponents indicated that they worked exclusively with Howmedica Osteonics Corporation. (R. 96, Def. Br. at 5, 10 PageID # 2758, 2764.) Stryker also states that the statutory language of § 227(b) does not provide for vicarious liability, and that even in cases where federal courts have found vicarious liability, the courts have premised their findings on doctrines of agency. (R. 96, Def. Br. at 9–10, PageID # 2762–63.)

PHI counters that Stryker's written discovery responses admit that they sent the **faxes** in question. (R. 105, Pl. Br. at 2, PageID # 3958.) PHI states that Stryker contracted with a company called Mudbug to

Slip Copy, 2015 WL 139559 (W.D.Mich.)
**(Cite as: 2015 WL 139559 (W.D.Mich.))**

send the **faxes**, and also states that Stryker used desktop faxing software to send the **faxes**. (R. 105, Pl. Br. at 3–4, PageID # 3959–60.) PHI also states that Stryker's claim about agency as it relates to vicarious liability as well as its piercing the corporate veil claims are erroneous, and cites the FCC regulations which define "sender" in the Telecommunications Act as "the person or entity *on whose behalf* a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10) (emphasis added).

Stryker argues that it has consistently denied involvement with the sending of **faxes**, and that to the extent it answered an interrogatory asking if "you or someone on your behalf sent [a **fax**]" in the affirmative that it meant Howmedica, which was a wholly-owned subsidiary of Stryker Corporation. (R. 125, Stryker Rep. Br. at 4–6, PageID # 5761–63.) As such, Stryker argues that the interrogatory answers are consistent with its position that no genuine issue of material fact exists. (R. 125, Stryker Rep. Br. at 8, PageID # 5765.) And Stryker cites a myriad of cases which it says indicate that ambiguities-here, the word "you"-should be construed in favor of the propounding party, PHI. (R. 125, Stryker Rep. Br. at 8–9, PageID # 5765–66.)

**\*16** The Court finds that it may be the case that the **faxes** were not sent on Stryker's behalf, but the Court also finds that it cannot say so as a matter of law. The totality of the circumstances, including Defendants' discovery responses, and the use of Stryker's name and logo on both the sent **fax** and the PowerPoint slides displayed at the seminar, suggest that a reasonable factfinder could conclude that Howmedica, Stryker's subsidiary, sent the **faxes** on behalf of the Stryker entities, or that the Stryker entities are otherwise properly accountable here. Accordingly, the Court **DENIES** the Stryker entities' motion for summary judgment on this issue.

### IV. CONCLUSION

For the foregoing reasons, Defendant Howmedica's Motion for Summary Judgment (docket no. 91) is **DENIED;** Defendant Stryker's Motion for Summary Judgment (docket no. 95) is **DENIED;** and Plaintiff PHI's Motion for Summary Judgment (docket no. 97) is **DENIED** in all respects except one: namely, on the issue of whether the **fax** was "unsolicited," on which the Court finds as a matter of law that it was.

IT IS SO ORDERED.

W.D.Mich.,2015.
Physicians Healthsource, Inc. v. Stryker Sales Corp.
Slip Copy, 2015 WL 139559 (W.D.Mich.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.