

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**


Only the Westlaw citation is currently available.

United States District Court, W.D. Kentucky,
Louisville Division.
SPINE AND SPORTS CHIROPRACTIC, INC., an Ohio corporation, individually and as the representative of a class of similarly-situated persons, Plaintiff
v.
ZIRMED, INC., and John Does 1–10, Defendants.

Civil Action No. 3:13–CV–00489–TBR.
Signed June 30, 2014.


Brian J. Wanca, Ryan M. Kelly, Anderson & Wanca, Rolling Meadows, IL, George D. Jonson, Matthew E. Stubbs, Montgomery, Rennie & Jonson, Cincinnati, OH, for Plaintiff.

Catherine Grealis, Tonia Klausner, Wilson Sonsini Goodrich & Rosati, New York, NY, Janet P. Jakubowicz, Natalie D. Montell, Bingham Greenebaum Doll LLP, Louisville, KY, for Defendants.

### MEMORANDUM OPINION AND ORDER

THOMAS B. RUSSELL, Senior District Judge.

**\*1** This matter is before the Court upon Plaintiff Spine and Sports Chiropractic, Inc.'s, Motion for Class Certification and Request for Oral Argument. (Docket No. 34.) Defendant ZirMed, Inc., has responded. (Docket No. 36.) Plaintiff Spine and Sports Chiropractic, Inc., has replied. (Docket No. 40.) This matter is now fully briefed and ripe for adjudication. For the following reasons and consistent with the below opinion, the Court will **GRANT** Plaintiff Spine and Sports Chiropractic, Inc.'s, Motion for Class Certification, with the amendments discussed below. (Docket No. 34.) The Court's amended class definition is the following:

All persons or entities who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) that were successfully sent a copy of the Fax Ad from ZirMed; (4) on November 7th or 8th of 2012.

Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., Chiropractic has recently filed a Motion to Intervene. (Docket No. 47.) Defendant ZirMed has responded. (Docket No. 51.) Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., has replied. (Docket No. 52.) The Court will **DENY** this motion because, as will be discussed further below, entities that were unsuccessfully sent the ZirMed fax advertisement cannot state a claim as a matter of law. (Docket No. 47.)


BACKGROUND


© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

Plaintiff Spine and Sports Chiropractic, Inc. (S & S), alleges that on November 8, 2012, it received an adver-
tisement, (Docket No. 1–2), via its facsimile machine for various products and services offered by Defendant ZirMed.
(*See* Docket No. 34–3.) S & S alleges ZirMed had not received permission to send this advertisement, and the fax ad
did not include an opt-out notice meeting the requirements of the Telephone Consumer Protection Act (TCPA). The
TCPA makes it unlawful "to send to a telephone facsimile machine an unsolicited advertisement, unless—" certain
requirements are met. 47 U.S.C. 227(b)(1)(C). S & S claims entitlement to the statutory damages provided by the
TCPA.[FN1] Additionally, S & S seeks to represent a class consisting of other recipients of ZirMed's allegedly unlawful
advertisement. (Docket No. 34, at 3.)

> FN1. 47 U.S.C. 227(b)(3) provides that "a person or entity may" bring "an action to recover for actual
> monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is
> greater." Additionally, if the Court finds the defendant "willfully or knowingly violated this subsection or
> regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award
> to an amount equal to not more than 3 times the amount available."

Regarding the proposed class, S & S alleges that through SimplyCast, a hired fax broadcaster, ZirMed attempted
to transmit the fax ad to approximately 1,500 chiropractors via their fax machines in five batches occurring over the
course of November 7th and 8th.[FN2] It appears that 663 fax ads successfully transmitted on November 7th and 8th
2012, while 799 transmissions failed to be sent for various reasons. (Docket No. 36, at 13.) These reasons included
busy signals and lack of detection of a carrier. (*Id.*) The proposed class definition seeks to encompass all of these
recipients, regardless of whether the transmission was successful. It is undisputed that the same fax advertisement was
sent or attempted to be sent to all proposed class members, including S & S. Plaintiff's proposed class definition is:

> FN2. The FCC has concluded that "the entity or entities on whose behalf facsimiles are transmitted are ul-
> timately liable for compliance with the rule banning unsolicited facsimile advertisements." *Compressor
> Eng'g Corp. v. Mfrs. Fin. Corp.,* 292 F.R.D. 433, 436 (E.D.Mich.2013). "Thus, a defendant 'cannot escape
> liability simply by hiring an independent contractor to transmit the unsolicited facsimiles on their behalf.' "
> *Id.* (citation omitted).

**\*2** All persons who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five
Transmission Lists; (3) that was successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed; (4) on
November 7th or 8th of 2012.
(Docket No. 34, at 24.) ZirMed opposes this proposed class definition for several reasons and argues the Court
should deny class certification.

STANDARD

I. Standard for Class Certification Under Federal Rule of Civil Procedure 23

A district court has broad discretion in certifying a class action, but it must exercise that discretion within the
framework of Federal Rule of Civil Procedure 23. *Coleman v. General Motors Acceptance Corp.,* 296 F.3d 443, 446
(6th Cir.2002). A court may not certify a class that fails to satisfy all four prerequisites of Rule 23(a): numerosity,
commonality, typicality, and adequacy of representation. *Ball v. Union Carbide Corp.,* 385 F.3d 713, 727 (6th
Cir.2004). Rule 23(a) provides, in relevant part:

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

(a) **Prerequisites.** One or more members of a class may sue ... as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

A court must conduct "a rigorous analysis" to ensure that each of the four prerequisites of Rule 23(a) are satisfied. *Ball,* 385 F.3d at 727. "Such an analysis," the Supreme Court counsels, "will frequently entail overlap with the merits of the plaintiff's underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend,* ––– U.S. –––, ––––, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal quotation marks omitted) (quoting *Walt–Mart Stores, Inc.v. Dukes,* ––– U.S. ––––, ––––  –  ––––, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2013)).

In addition to satisfying Rule 23(a)'s prerequisites, the moving party "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Coleman,* 296 F.3d at 446; *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir.1998) (en banc). In this case, Plaintiff S & S claims certification is appropriate under Rule 23(b)(3). Rule 23(b)(3) states:

(b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

....

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy ...

For Rule 23(b)(3), a court must "find that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Comcast,* 131 S.Ct. at 1432 (internal quotation marks omitted). The Supreme Court advises that "[i]f anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," given that Rule 23(b)(3) "is designed for situations in which class-action treatment is not as clearly called for." *Id.* (internal quotation marks omitted) (quoting *Dukes,* 131 S.Ct. at 2558; *Amchen Prods., Inc. v. Windsor,* 521 U.S. 591, 614–15, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

DISCUSSION

**\*3** In Defendant ZirMed's response, (Docket No. 36, at 9–10), to Plaintiff's Motion for Class Certification,

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

(Docket No. 34), it asserts two primary objections to certification: (1) the proposed class definition is improper because it includes persons/entities who do not have a TCPA claim as a matter of law; and (2) Plaintiff S & S is not a member of the class it seeks to represent. ZirMed also makes several additional arguments for why the Court should deny the Motion for Class Certification

The Court will address ZirMed's two primary objections first, and then address the remaining arguments by considering each of the applicable requirements of Federal Rule of Civil Procedure 23.

*Defendant ZirMed's First Primary Objection: Plaintiff's Proposed Class Includes Persons/Entities Who Do Not Have a TCPA Claim as a Matter of Law*

"Although not specifically mentioned in [Rule 23], the definition of the class is an essential prerequisite to maintaining a class action." *Adams v. The Fed. Materials Co.,* 2006 WL 3772065, at *3 (W.D.Ky. Dec.19, 2006). The class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the class. *See id.* ZirMed argues the Court should deny S & S's motion before even addressing the requirements of Rule 23 "because of multiple problems with S & S's proposed class definition." (Docket No. 36, at 17.) S & S has requested that the Court certify the following class:

All persons who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) that was successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed; (4) on November 7th or 8th of 2012.

(Docket No. 34, at 24.) ZirMed argues this class definition includes persons/entities that cannot state a TCPA claim as a matter of law. Specifically, ZirMed argues that: (1) only fax machine owners, rather than holders/subscribers of the account associated with a fax number, can state a TCPA claim as a matter of law; and (2) the persons/entities who were "unsuccessfully" sent the fax ad cannot state a TCPA claim as a matter of law.

1) ZirMed's First Claim: Fax Phone Number Subscribers Cannot State a TCPA Claim as a Matter of Law

ZirMed argues that only owners of the fax machine, and not subscribers of the relevant fax phone number, have cognizable claims under the TCPA. The Eastern District of Michigan and at least one state court have found that only owners of fax machines have cognizable claims under the TCPA. *See Compressor Eng'g Corp. v. Mfrs. Fin. Corp.,* 292 F.R.D. 433, 448–49 (E.D.Mich.2013); *Machesney v. Lar–Bev of Howell, Inc.,* 292 F.R.D. 412, 425 (E.D.Mich.2013); *APB Assocs., Inc. v. Bronco's Saloon, Inc.,* 297 F.R.D. 302, 2013 WL 1789275, at *16 (E.D.Mich. Apr.26, 2013); *Kennard v. Electronic Data Sys. Corp.,* 1998 WL 34336245 (Tex.Dist.1998).

On the other hand, a substantial majority of courts have found that ownership of a fax machine is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers to fax phone numbers have standing to assert a claim under the TCPA. *See, e.g., Arnold Chapman & Paldo Sign & Display Company v. Wagener Equities, Inc.,* 747 F.3d 489, 491–92 (7th Cir.2014) (stating it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute" and implying subscribers are proper claimants by stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *St. Louis Heart Ctr., Inc. v. Vein Ctrs. For Excellence, Inc.,* 2013 WL 6498245, at *5 (E.D.Mo.2013); *Physicians Healthsource v. Stryker Sales,* 1:

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

12–cv–00729, at 9–10 (W.D.Mich.2013); *Chapman v. Wagener Equities, Inc.,* 2014 WL 540250, at *4 (N.D.Ill.2014); *Bridgeview Health Care Ctr. Ltd. v. Clark,* 2011 WL 4628744, at *3 (N.D.Ill.2011) ("language regarding ownership of the receiving machine is not required by the Act"); *A Aventura Chiropractic Ctr. ., Inc. v. Med Waste Mgmt., LLC,* 2013 WL 3463489, at *5 (S.D.Fla.2012) (finding that defining class membership by ownership is problematic). Under the proposed class definition a member of the class must be a "subscriber to the account associated with the fax number," which may not necessarily be the owner of the fax machine. Therefore, the Court must determine whether subscribers of fax numbers can state a TCPA claim as a matter of law.

a. Statutory Language and Legislative History
   ***4** As for who can assert a claim for junk fax violations, the TCPA states, in relevant part:

   (1) Prohibitions

   It shall be unlawful for any person within the United States, or any person outside the United States if the **recipient** is within the United States ... **to send,** to a telephone facsimile machine, an unsolicited advertisement, unless—

      (i) the unsolicited advertisement is from a sender with an established business relationship with the recipient;

      (ii) the sender obtained the number of the telephone facsimile machine through—

      (I) the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

      (II) a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution ... **and**

   (iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D)

      ....

   (3) Private right of action

   A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

   (A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

   (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.

47 U.S.C. § 227(b)(1), (3) (emphasis added). The plain language of this statute gives standing to any "person or entity" that was a "recipient" of an "unsolicited advertisement." There is no indication that this classification is reserved only for fax machine owners.

ZirMed argues that the legislative history requires the finding that only fax machine owners have standing. The Court highlights the legislative history here to provide context for the cases which rely upon it, however, ultimately the Court finds the plain language of the statute is determinative. The legislative history, in relevant part, states:

### FACSIMILE ADVERTISING

An office oddity during the mid–1980s, the facsimile machine has become a primary tool for business to relay instantaneously written communications and transactions. In an effort to speed communications and cut overnight delivery costs, millions of offices in the Untied States currently send more than 30 billion pages of information via facsimile machine each year. However, the proliferation of facsimile machines has been accompanied by explosive growth in unsolicited facsimile advertising, or "junk fax ."

**\*5** Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

....

The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter. In the case of fax advertisements, however, the recipient assumes both **the cost associated with the use of the facsimile machine** and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax advertisement regardless of their interest in the product or service being advertised.

In addition to the **costs** associated with fax advertisements, when a facsimile machine is receiving a fax, **it may require several minutes or more to process and print the advertisement. During that time, the fax machine is unable to process actual business communications.** Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time. Since businesses have begun to express concern about

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

the interference, interruptions and expense that junk fax have placed upon them, states are taking action to eliminate these telemarketing practices. Connecticut and Maryland have enacted laws banning the use of facsimile machines for unsolicited advertising. Similar bills are currently pending in the legislatures of about half the states.

H.R. REP. 102–317, 10, 25 (emphasis added). This Court reads the legislative history as expressing that the TCPA was intended to address the costs—including paper, ink, and time—of receiving these unwanted "junk" faxes. These "costs" would include the tying up of the fax line while processing these faxes. *See generally Compressor,* 292 F.R.D. at 447–48. Accordingly, the Court does not read the legislative history as requiring fax machine ownership in order to state a claim. Instead, the Court reads the legislative history as expressing an intention to broadly combat the costs associated with "junk" faxes, whether those costs are imposed on the fax machine owners or on other types of plaintiffs—such as subscribers to the fax phone numbers.

b. Split of Non–Binding Authority as to Whether Ownership of a Fax Machine is Required to State a Claim Under the TCPA

There is a split of non-binding authority as to whether ownership of a fax machine is required to state a claim under the TCPA. The vast majority of courts find ownership of a fax machine is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers of phone numbers can state a claim under the TCPA. On the other hand, a small minority of courts find that only fax machine owners are proper claimants. Other than arguably the Seventh Circuit, no Court of Appeals, including the Sixth Circuit, has decided this issue. *See Wagener Equities, Inc.,* 747 F.3d at 492 (stating that it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute").[FN3] This Court is not bound by any of this authority. However, because the parties relied on many of the cases in their briefing, the Court will discuss the split of authority to present the arguments on either side.

> FN3. The Court notes that the parties submitted supplemental briefing, (Docket Nos. 49, 50), on the *Wagener Equities* case and disagree on whether it addressed if "subscribers" are proper claimants under the TCPA. While the Seventh Circuit did not explicitly address this issue, this Court reads the decision as strongly implying subscribers can state a claim under the TCPA because of its explicit holding finding no ownership limitation in the TCPA. *See Wagener Equities, Inc.,* 747 F.3d at 491–92. Notably, that decision stated that "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it ...". *Id.*

i. Case Law Holding Only Fax Machine Owners Can State a Claim Under the TCPA

**\*6** ZirMed submits to the Court, (Docket No. 36, at 20), that the reasoning in the *Compressor* case, which held that only owners of the fax machine and not holders of the phone numbers have a claim under the TCPA, is persuasive and should be followed here. *Compressor Eng'g Corp.,* 292 F.R.D. at 448–49. In that case, the Eastern District of Michigan stated:

Defendants have challenged the standing of proposed class members to assert claims and have challenged the proposed class definitions as fundamentally flawed because they do not include a requirement that the class members owned the fax machines that received the fax advertisements at issue.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

....

Although there is no Sixth Circuit authority addressing the standing issue, this Court concludes that, based upon the language of the statute and its legislative history, the person or entity that owned the fax machine that received the unsolicited fax advertisement at issue is the person or entity with standing to assert a TCPA claim. Thus, Plaintiffs would have to identify the *persons or corporate entities who owned the fax machines* that received the fax advertisements at issue in order to determine who would be a member of any of the classes.

*Id.* at 447, 450. In coming to this conclusion, the court emphasized the language of the statute makes it unlawful to send an unsolicited fax advertisement "to a telephone facsimile machine" and the legislative history. *Id.* at 448–49.

ii. Case Law Holding Ownership is Not Required to State a Claim Under the TCPA and Fax Machine Phone Number Subscribers Can State a Claim Under the TCPA

Conversely, other cases have found that ownership is not required to state a claim under the TCPA and strongly imply, if not outright hold, that subscribers of fax lines have standing to assert a claim for a TCPA violation. For example, in *St. Louis Heart Center,* the Eastern District of Missouri considered the reasoning in the *Compressor* case and emphasized that the TCPA provides that a "person or entity" may bring an action "based on a violation of this subsection or the regulation prescribed under this subsection." *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *5. It found "[t]here is no language in the TCPA indicating that only fax machine owners have a private right of action" and that the courts finding otherwise, such as *Compressor,* should not have turned to the legislative history because the statute is not ambiguous. *Id.* Additionally, the court noted this conclusion comports with common sense because the TCPA was intended to, at the very least, address "the misuse of ink and paper by junk advertisers" and the "*misappropriation of the fax line,* preventing legitimate faxes from being sent or received." *Id.* (emphasis added).[FN4] The court further noted that "[a] party other than a fax machine owner could be and often is responsible for supplying ink and paper or *paying a telephone company for use of a fax line* and should not be excluded from the putative class." *Id.* (emphasis added). Thus, the court explicitly held that ownership of a fax machine is not required to state a claim and strongly implied, if not outright held, that subscribers of phone numbers could state a claim. Responding to concerns of potential liability to multiple parties for each fax sent, the court noted that the TCPA sets statutory damages at $500 for "each such violation," not per person.

> FN4. The court also noted that since "[a] party other than the fax machine owner could be, and often is, responsible for supplying ink and paper or paying a telephone company for use of a fax line, it should not be excluded from the putative class." *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *5.

**\*7** A large number of other courts have come to the same conclusion as *St. Louis Heart Center,* explicitly holding that ownership of a fax machine is not required to state a claim under the TCPA and strongly implying, if not outright holding, that subscribers of phone numbers can state a claim under the TCPA. *See, e.g., Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating it would be "arbitrary" to limit relief to owners of fax machines "and there is no suggestion of such a limitation in the statute" and implying subscribers are proper claimants by stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *Chapman,* 2014 WL 540250, at *4 (N.D.Ill.2014) (finding the TCPA does not contain language requiring ownership); *Clark,* 2011 WL 4628744, at *3 ("language regarding ownership of the re-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

ceiving machine is not required by the Act"); *Stryker Sales,* 1:12–cv–00729, at 9–10 (W.D.Mich.2013) (opining that limiting a class definition to fax machine owners does not eliminate the mismatch between the identifiable person and the injured person and that limiting the class definition to subscribers results in a close fit between the identifiable information and at least one injury: interrupted use of the fax line); *Med Waste Mgmt. ., LLC,* 2013 WL 3463489, at * 5 (finding that defining class membership by ownership is problematic). Notably, although not determinative, the Seventh Circuit recently explicitly held that relief is not limited to owners of fax machines and strongly implied, if not outright held, that subscribers can state a claim under the TCPA. *Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it").

c. Conclusion—Fax Line Subscribers are Proper Claimants

The Court notes this is a developing area of law and one where the Sixth Circuit has yet to definitively speak. However, it is clear that a substantial majority of the courts opining on this issue have found that ownership of the fax machine is not required to state a claim. In fact, it appears the Eastern District of Michigan and a state trial court are the only courts to explicitly hold that ownership is required. Furthermore, many courts, upon holding that ownership of a fax machine is not required to state a claim, have gone on to strongly imply, if not outright hold, that subscribers to phone numbers are proper claimants under the TCPA.

Upon a careful review of the plain language of the statute, the parties' comprehensive briefing, and the above mentioned cases, this Court agrees with the reasoning of the cases finding that ownership of a fax machine is not required to state a TCPA claim. This Court also agrees with the cases that strongly imply, if not outright hold, that subscribers of fax phone numbers are proper claimants under the TCPA. This conclusion comports with the plain language of the statute, which gives standing to a "person or entity" who is a "recipient," with no indication these recipients must also be fax machine owners. A subscriber to the fax phone number would clearly be a "recipient" of a fax upon a successful transmission of that fax, as would an owner of the fax machine. Therefore, this Court holds that both subscribers of phone numbers and owners of fax machines are proper claimants under the TCPA and that TCPA relief is not limited to owners of fax machines. Accordingly, Plaintiff S & S's proposed class is not improper because it encompasses subscribers.

**\*8** Even if the Court were to consider the legislative history, which is unnecessary given the plain language of the statute, the Court would find it supports this holding because the legislative history expresses that the TCPA was intended to address the costs of "junk" faxes. These "costs" would include the tying up of the fax line while processing these faxes. *See Compressor,* 292 F.R.D. at 447–48; *Wagener Equities, Inc.,* 747 F.3d at 491–92 (stating "[w]hether or not the user of the fax machine is an owner, he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it"); *St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *5 (E.D.Mo.2013) (stating "[a] party other than a fax machine owner could be, and often is, responsible for ... paying a telephone company for use of a fax line and should not be excluded from the putative class"). The tying up of the fax line is a cost incurred by the fax phone number subscriber, irrespective of whether they own the fax machine.

For the above reasons, this Court holds that Plaintiff S & S's proposed class is not improper because it includes subscribers to the fax phone numbers. Ownership of a fax machine is not required to state a TCPA claim. Fax phone number subscribers, like owners of the fax machines, are proper claimants under the TCPA.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

2) ZirMed's Second Claim: "Intended" Recipients Who Were "Unsuccessfully" Sent a Fax Cannot State a Claim as a Matter of Law

ZirMed also argues that the class definition includes persons/entities that cannot state a TCPA claim as a matter of law because it includes those who were "unsuccessfully" sent the fax ad. There is a split of authority as to whether "intended" recipients who were "unsuccessfully" sent a fax can state a claim as a matter of law. Some courts find that such "intended" recipients cannot state a claim as a matter of law. *See, e.g., Chapman,* 2014 WL 540250, at * 8–9 (finding that "to send" under the TCPA means that the fax was released from the sending machine and the receiving device indicated receipt, but noting that circumstantial evidence that the fax was successfully transmitted is sufficient—direct proof of actual receipt is not required); *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris,* 2013 U.S. Dist. LEXIS 155912, at * 44, 2013 WL 5972173 (S.D.Fla. Oct. 22, 2013). ZirMed argues the reasoning in these cases is persuasive and should be followed by this Court.

Other courts find that "intended" recipients who were "unsuccessfully" sent a fax can state a claim as a matter of law.[FN5] *See, e.g., St. Louis Heart Ctr., Inc.,* 2013 WL 6498245, at *4 (acknowledging that "success rate" of sending the fax was only 80%, but nonetheless finding that the failed 20% could be included in the class); *A Fast Sign Co. v. Am. Home Servs., Inc. .,* 291 Ga. 844, 846–47, 734 S.E.2d 31 (Ga.2012); *Critchfield Physical Therapy v. Taranto Group, Inc.,* 293 Kan. 285, 298–99, 263 P.3d 767 (Kan.2011). S & S argues the reasoning of these cases is persuasive and should be followed by this Court.[FN6] The Court notes that it is not bound by any of the authority cited by the parties and that no Circuit, including the Sixth Circuit, has decided this issue.

FN5. ZirMed contends that some of the cases cited by S & S do not actually stand for the proposition that unsuccessful transmission attempts give "intended" recipients standing to assert a claim under the TCPA. (Docket No. 36, at 23–24.) Rather, they merely stand for the proposition that circumstantial evidence, apart from the plaintiff printing out the actual fax, is permissible to show faxes had been "sent" for TCPA purposes. The Court agrees with ZirMed that S & S has confused the propositions for which these cases stand, but notes that, in any event, other cases—which are cited by this Court—do stand for the proposition that unsuccessful transmissions give standing for a TCPA claim.

Relatedly, the Court notes there is distinction between a *successful transmission* of a fax advertisement and *physical proof of receipt* of a fax advertisement. *See Reliable Money Order, Inc. v. McKnight Sales Co.,* 281 F.R.D. 327, 331 (E.D.Wis.2012) (noting that "[s]everal courts have found that the TCPA does not require knowledge of receipt, only that a fax was successfully transmitted," when certifying a class of those to whom the fax was "successfully transmitted"). As the Court will hold below, the former is necessarily required for standing under the TCPA. The latter is not necessarily required for standing. In this case, there was admittedly no successful transmission of the fax advertisement to a portion of the proposed class. Accordingly, the evidentiary concerns involving proof of receipt, which was the subject of many of the cases cited by S & S, is irrelevant.

FN6. S & S also appears to contend that the Court should refrain from deciding this legal issue and certify the class. However, this is an issue that can be decided as a matter of law, the parties briefed, and has a direct bearing on the appropriate definition of a class. "Merits questions may be considered to the extent—but only

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* —— U.S. ——, —— – ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013). The certification analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.,* 133 S.Ct. at 1432 (internal quotation marks omitted) (quoting *Dukes,* 131 S.Ct. at 2551–52)). Accordingly, the Court will decide whether the "intended" recipients who were unsuccessfully sent a fax have a claim as a matter of law under the TPCA.

**a. Case Law Holding "Intended" Recipients of "Unsuccessful" Transmissions Have Standing**

**\*9** In *A Fast Sign Company, Inc.,* the Georgia Supreme Court, in a short opinion mainly relying on authority from Kansas state courts, found that a sender was "liable for the unsolicited advertisements it attempts to send to fax machines, whether or not the transmission is completed or received by the targeted recipient." *A Fast Sign Co.,* 291 Ga. at 847, 734 S.E.2d 31. It based its decision on the "construction and interpretation of the language" of the TCPA. *Id.* In *Critchfield,* relied upon by the Georgia Supreme Court, the Kansas Supreme Court found that the TCPA did not require a successfully completed fax transmission, but only an attempt to complete a fax transmission. *Critchfield,* 293 Kan. at 299, 263 P.3d 767. In so holding, the court emphasized that the TCPA prohibits using electronic devices "to send" unsolicited advertisements, while creating no requirement that a transmission be received. *Id.*

**b. Case Law Holding "Intended" Recipients of "Unsuccessful" Transmissions Do Not Have Standing**

Courts finding intended recipients of unsuccessful transmissions are not proper claimants under the TCPA have also emphasized the plain language of the statute. For example, in *Sarris,* the Southern District of Florida emphasized the presence of "recipient" in the statute and stated:

In conjunction with its prohibition on sending an unsolicited fax advertisement, the TCPA also contemplates that the fax advertisement have a "recipient." In the prohibition provision alone, the statute states that it is unlawful to send a fax advertisement "if the *recipient* is in the United States" and goes on to mention the "recipient" five more times. *See* 47 U.S.C. § 227(b)(1)(C) (emphasis added). In so doing, Congress recognized that only a recipient could suffer the injury the TCPA was intended to address.

While the TCPA provides that a person who sends a fax advertisement may be liable, nowhere in the statute does Congress express an intent to circumvent the requirement that a plaintiff have Article III case-or-controversy standing to bring a claim, which requires that the plaintiff demonstrate "a distinct and palpable injury to himself." *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Congress can enact a statute (such as the TCPA) that puts into place a "bounty"—a reward—for a plaintiff who assists in enforcing federal laws. *See Crabill v. Trans Union, LLC,* 259 F.3d 662, 665–66 (7th Cir.2001). However, there still must be an injury for the plaintiff to recover under the statute. *See id.*

In *US Fax Law Center, Inc. v. iHire, Inc.,* the court addressed whether a plaintiff who never received the "junk faxes" at issue had standing to bring TCPA claims against the defendants who allegedly sent the faxes. 362 F.Supp.2d 1248, 1252–53 (D.Colo.2005). There, the plaintiff was an assignee of the TCPA claims of certain entities contending that the defendants had sent "junk faxes." *Id.* at 1250. Examining the question of Article III

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

case-or-controversy standing *sua sponte,* the court concluded that the plaintiff did not suffer an injury in fact sufficient to give it standing to bring the TCPA claims; in fact, plaintiff "suffered no injury at all." *Id.* at 1253; *cf. Doe v. Nat'l Bd. of Med. Exam'rs,* 199 F.3d 146, 153 (3d Cir.1999) (noting that a violation of a statute by itself does not equate to injury and that "[t]he proper analysis on standing focuses on whether the plaintiff suffered an actual injury, not on whether a statute was violated"). Thus, pursuant to the TCPA, Congress conferred a private remedy upon the ***injured recipients*** of a fax advertisement, not upon assignees of the alleged recipients.

   **\*10** ...

   There is no evidence that this Plaintiff was injured by receiving a fax advertisement from Defendant or that this Plaintiff's privacy was ever invaded by Defendant, as the TCPA contemplates.

   *Sarris,* 2013 WL 5972173, at *12–13. Similarly, in a Northern District of Illinois case, the court emphasized "to send" under the TCPA "means not only that a fax was released from the sending machine, but that the receiving device indicated receipt." *Chapman,* 2014 WL 540250, at *8. Accordingly, that court found the proposed class definition "appropriately excludes unsuccessful transmissions," limiting the class to those successfully sent transmissions. *Id.* at * 8–9.

c. This Court's Conclusion—"Intended" Recipients of Unsuccessful Transmissions Are Not Proper Claimants
   The Court reiterates that the above authority is not binding upon it. The applicable language of the TCPA states that:

   (1) Prohibitions

   It shall be unlawful for any person within the United States, or any person outside the United States if the **recipient** is within the United States ... **to send,** to a telephone facsimile machine, an unsolicited advertisement ...

   47 U.S.C. § 227(c) (emphasis added). The Court finds that the inclusion of "to send" negates any argument that unsuccessful transmissions give an intended recipient standing, because inherent in "to send" is that the transmission was *successful.* Additionally, the inclusion of "recipient" requires that a transmission was successfulotherwise there is no "recipient." When an unsuccessful transmission occurs no one "receives" anything.[FN7] Accordingly, the Court finds that "intended" recipients of "unsuccessful" transmissions are unable to state a claim as a matter of law and, therefore, are not appropriate members of the proposed class.

      FN7. This is not inconsistent with cases holding that proof of actual receipt is not necessarily required for standing under the TCPA. When a successful transmission takes place, there is a "recipient" under the TCPA regardless of whether the recipient actually viewed or retrieved the fax.

   While the Court reaches this result by relying on the plain language of the statute, the legislative history is not inconsistent with this result because, as was noted above, the legislative history focuses on the *costs* associated with these unsolicited fax advertisements. Without a *successful* transmission there are no costs imposed, such as tying up of

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

the fax phone number, wasting of ink and paper, or even time spent reading the advertisement, because the transmission was *unsuccessful.*[FN8]

> FN8. While a few courts have apparently concluded that a "cost" is still borne on intended recipients of unsuccessful transmissions because those recipients may have considered it necessary to turn off their fax machine due to unwanted fax transmissions, this Court believes that such a conclusion is based on strained reasoning not consistent with the legislative history. *See, e.g., A Fast Sign Co. .,* 291 Ga. at 847, 734 S.E.2d 31. Therefore, this Court respectfully disagrees with the notion that an unsuccessful transmission still imposes a "cost," as is discussed in the legislative history, on intended recipients.

Accordingly, this Court agrees with ZirMed that S & S's class definition is overbroad in that it includes persons who have no claim under the TCPA. However, this error is not fatal and can be remedied by amending the class definition to remove "unsuccessfully" sent transmissions, leaving only "successfully" sent transmissions.[FN9]

> FN9. Plaintiff has alleged the proposed class contains "1,462 persons." (Docket No. 34–1, at 9.) Apparently, only 663 of these potential class members were "successfully sent" a fax ad. (Docket No. 36, at 13.) Accordingly, it appears the remaining 799 proposed class members cannot state a claim under the TCPA as a matter of law and will not be part of the amended class.

The Court notes that proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc., Chiropractic has recently filed a Motion to Intervene, (Docket No. 47), alleging the same claim Plaintiff S & S makes against Defendant ZirMed. The Court will **DENY** this motion because, as was discussed above, entities that were unsuccessfully sent the ZirMed fax advertisement cannot state a claim as a matter of law. Accordingly, Shelby Chiropractic is not a proper plaintiff and cannot intervene.[FN10]

> FN10. Shelby Chiropractic's Motion to Intervene establishes that it was an "intended" recipient of an "unsuccessfully" transmitted fax:
>
> Second, to the extent that both Spine & Sports Chiropractic and Shelby Chiropractic are adequate representatives, Shelby Chiropractic can serve as the representative of the class of *intended* recipients while Spine & Sports can serve as the representative of the class of actual recipients.
>
> ....
>
> As for timeliness, Shelby Chiropractic had no knowledge that Zirmed had sent it a Fax Ad *as its fax line was busy at the time Zirmed repeatedly attempted to do so.* As such, Shelby Chiropractic only became aware of Zirmed's conduct as a result of discovery conducted in this case.
>
> (Docket No. 47–1, at 4, 7) (emphasis added).

*Defendant ZirMed's Second Primary Objection: Plaintiff S & S is Not a Proper Member of the Class it Seeks to*

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

*Represent*

**\*11** Defendant ZirMed argues that Plaintiff S & S is not a member of the class it seeks to represent. (Docket No. 36, at 9.) Specifically, ZirMed argues S & S has not demonstrated it was a subscriber to the account associated with a fax number "to which ZirMed either sent or attempted to send the ZirMed Fax on November 7 or 8 2012." (Docket No. 36, at 10.) The telephone records for the fax number used by S & S [FN11] reflect that an entity named "Spine RX Management Co." is the subscriber to that number.[FN12]

> FN11. Pursuant to an office sharing agreement, S & S shared its office space with another chiropractor, Dr. Kyle Alexander of Alexander Chiropractic. Under that agreement, Alexander Chiropractic and S & S share use of the fax machine associated with the fax number 614–573–7750.

> FN12. Additionally, and alternatively, ZirMed argues that the fax sent to this shared fax number was intended for Alexander Chiropractic, not S & S. (Docket No. 36, at 14.) ZirMed supports this allegation by pointing out that contact information for Alexander Chiropractic is listed next to the shared fax number on the fax campaign list and the successful transmission list designates Alexander Chiropractic next to the shared fax number, not S & S. The full chiropractic list ZirMed purchased from Eleadlists included separate entries for Alexander Chiropractic and S & S, but ZirMed only uploaded Dr. Alexander's contact information to SimplyCast.

> However, the Court notes the fax itself did not specify to who it was intended. In any event, because the Court holds that fax phone number subscribers may make claims, S & S has standing if it is the subscriber to the account to which ZirMed successfully sent a fax, irrespective of whether it was the "intended" recipient.

In its reply brief, S & S maintains that it is a proper member of the class. S & S states that it holds the referenced account with XO Communications and is the only entity or person that pays the bills associated with this account. (*See* Docket No. 40, at 10.) As for the reason "Spine RX Management Co." appeared on the November 2012 phone bill, S & S alleges that it formerly went by the name Spine RX Management and that some of the bills never got changed.[FN13] *Id.* S & S also argues its responses to interrogatories establish it is a proper member of the class:

> FN13. This explanation is also provided in the deposition of Dr. Kevin Kemp, the President, sole shareholder, and corporate representative of Spine & Sports Chiropractic.

**Interrogatory No. 12**

Identify all facsimile telephone numbers used by or assigned to You. [referring to Spine & Sports Chiropractic]

**RESPONSE: (614) 573–7750**

**Interrogatory No. 13:**

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

Identify any other Person with which You have shared facsimile number, and identify the facsimile number and the dates that the Person(s) shared the facsimile telephone number with You. **RESPONSE: Spine & Sports Chiropractic does not share a facsimile number with any other person. Instead, it holds an account with XO Communications from which it is assigned the number (614) 573–7750. No other person or entity shares this account with Spine & Sports Chiropractic.**

*Interrogatory No. 14*

State whether You were the owner of the facsimile number (614) 573–7750 during the time period to which these interrogatories refer and further identify the telephone service provider, under what name the number is listed, and any Person who has paid for the number to remain active.

**RESPONSE: Yes. XO Communications. Spine & Sports Chiropractic is the holder of the account with XO Communications and is the only entity or person that pays the bills associated with this account.**

(Docket No. 40–1, at 5–6.)

In ZirMed's sur-reply, it argues the interrogatory responses are "self-serving" and the assertion that Spine RX Management Co. changed its name to S & S is "contradicted by other evidence." (Docket No. 43–1, at 7.) Specifically, ZirMed points out that Kevin Kemp testified that "Spine RX was established at the same time that Spine & Sports was." (Docket No. 37–8, at 16.) Kempt stated that:

A: Spine RX was established at the same time that Spine & Sports was ... It was a management company that was managing the practice because I had several physicians and that all—back in—like I said back in '94 and '95.

**\*12** Q: And is that entity still in existence or—

A: I don't believe it is. Things get a little hazy during a divorce and there was a divorce five years ago, and so, you know, like I have to transfer everything and sometimes honestly the legal—the legal naming of things and stuff like that kind of like, okay, this is what we're doing, this is what we're doing, and the judge is standing in front of you, you own this, you own that, da, da, da, da, and you hire an attorney to handle all that stuff for you and I'm not the expert, so ...

Q: Okay. What was—what was the relationship between Spine RX Management and Spine and Sports?

A: You know, Spine RX was a management company that managed two different locations and a group of doctors, and it rented space to the chiropractic corporation, it rented employees, things like that.

(Docket No. 37–8, at 16–17.) Subsequently, Kemp further discussed Spine RX Management Company:
Q: ... Now, you mentioned Spine RX Management Company earlier and I believe you testified that it's no longer in existence? A: We did a name change.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

Q: Name change?

A: To Spine & Sports.

Q: Okay.

A: Yes.

Q: Do you recall when the name was changed?

A: I don't.

Q: Now I believe earlier you testified that Spine RX Management and Spine & Sports were both in existence at the same time; is that correct?

A: Yes.

Q: And so did Spine RX Management merge into Spine & Sports or how did that work?

A: Again, I think a little—probably a little more legalese then I'm able to tell you.

Q: So—

A: Back in the day, Spine RX Management Company paid the bills.

Q: Okay.

A: And eventually—and it became the medical corporation later down the line where the actual services were performed as well. Now, what actually happens in—at the Secretary of State's office, I'm not really exactly sure. I know they have to file papers and do all that, but—

Q: Okay. Now, the bill on the first page is—at least it's dated due January 15th, 2013?

A: Uh-huh.

Q: So this —— the name change would have occurred in the past year?

A: It didn't. I think probably some of the bills just never got changed because you're—I mean, when you—when you have a corporation like that, you know, listing out like each individual human being who has to know the name

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

change and the phone bill still comes in and it probably just never got changed.

(Docket No. 37–8, at 52–53.)

"A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Dukes,* 131 S.Ct. at 2550 (citations omitted). S & S has proposed a class of "subscriber[s] to the account associated with a fax number ... that [were] successfully or unsuccessfully sent a copy of the Fax Ad from Zirmed."

Based upon the responses to the interrogatories, the deposition testimony of Kevin Kemp, the parties' briefing, and the discussion at the hearing, the Court finds that S & S is a proper member of the class because it is a "subscriber to the account associated with a fax number" to which a fax from ZirMed was successfully sent. Kemp testified he was the "sole owner" and "President" of S & S. (Docket No. 37–8, at 14–5.) He also testified that he paid any bills, which would include the relevant phone bill. (*Id.* at 18.) It appears that when Kemp's chiropractic practice was initially set up, it was divided into multiple corporations. One of the corporations was set up to own the property of the practice and the other was set up to employ the persons associated with the practice and collect the revenue. At some point before November 2012, Kemp got rid of Spine RX Management Company and the practice strictly operated under the name of S & S, but Kemp neglected to change the name on the phone bill. Notwithstanding this oversight, Kemp continued to pay that phone bill on behalf of S & S, despite the listing of the then defunct Spine RX Management Company on that bill. Accordingly, the Court finds that S & S is a proper member of the class as the "subscriber to the account associated with a fax number" to which a fax from ZirMed was successfully sent.

*Defendant ZirMed's Remaining Arguments and the Rule 23 Requirements*

**\*13** The Court will address Defendant ZirMed's remaining arguments opposing class certification by considering each of the requirements of Federal Rule of Civil Procedure 23. The Court reiterates that in addition to satisfying Rule 23(a)'s prerequisites, the moving party "must demonstrate that the class fits under one of the three subdivisions of Rule 23(b)." *Coleman,* 296 F.3d at 446; *see also Ball,* 385 F.3d at 727; *Sprague,* 133 F.3d at 397. In this case, Plaintiff S & S claims certification is appropriate under 23(b)(3), which imposes two additional requirements of predominance and superiority

I. FRCP 23(a)(1)—Numerosity

A class may not be certified unless it is so large that joinder of all class members would be "impracticable." FED.R.CIV.P. 23(a)(1). "There is no strict numerical test for determining impracticability of joinder." *In re American Med. Sys. Inc.,* 75 F.3d 1069, 1079 (6th Cir.1996). "However, sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)." *Bacon v. Honda of Amercia Mfg., Inc.,* 370 F.3d 565, 570 (6th Cir.2004) (internal citations omitted).

It is undisputed that the proposed class contains hundreds of persons/entities to whom ZirMed sent advertisements. After accounting for the 799 persons/entities that, as discussed above, are not proper members of the class because they were "unsuccessfully" sent a fax, 663 members remain in the amended class definition. Accordingly, the numerosity requirement of Rule 23(a) is met.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

I. FRCP 23(a)(2)—Commonality

The second requirement for class certification is that "there are questions of law or fact common to the class." FED.R.CIV.P. 23(a)(2). "Although Rule 23(a)(2) speaks of 'questions' in the plural, ... there need only be one question common to the class." *Sprague,* 133 F.3d at 397. "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality." *Id.* What the Court must look for "is a common issue the resolution of which will advance the litigation." *Id.* "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury." *Glazer,* 722 F.3d at 852.

Other courts have found the commonality requirement satisfied when a class of recipients of a "fax blast" of advertisements and TCPA violations are alleged. *See, e.g., Siding and Insulation Co. v. Beachwood Hair Clinic, Inc.,* 279 F.R.D. 442, 444–45 (N.D.Ohio 2012). This Court finds the commonality requirement is met in this case. All class members were sent the same fax and make the same claim: violation of the TCPA based on the receipt of an unlawful advertisement. As a result, the Court's resolution of whether a statutory violation of the TCPA occurred upon receipt of this advertisement, which would include an analysis of whether the opt-out language on the fax ad complies with the requirements of the TCPA, will resolve the claims of each member of the class. The damages issue is also common to the entire class because each class member is only seeking an award of $500 in statutory damages.[FN14] The Court also notes, as will be discussed further in the predominance analysis, the established business relationship and consent defense issues can be resolved on a class-wide basis.

> FN14. 47 U.S.C. 227(b)(3)(B) permits an action to recover actual monetary loss or $500 in statutory damages from a violation, whichever is greater.

III. FRCP 23(a)(3)—Typicality

**\*14** Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED.R.CIV.P. 23(a)(2). A court must determine "whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *Sprague,* 133 F.3d at 399 (citing *Am. Med. Sys.,* 75 F.3d at 1082). "A claim is typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' " *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 561 (6th Cir.2007) (quoting *Am. Med. Sys.,* 75 F.3d at 1082). "[F]or the district court to conclude that the typicality requirement is satisfied, 'a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law.' " *Id.* On the other hand, a claim, if proven, is not typical if it would only prove the named plaintiff's claim. *See Sprague,* 133 F.3d at 399.

Other courts have found the typicality requirement satisfied when a proposed class of recipients of a "fax blast" of advertisements and TCPA violations are alleged. *See, e.g., Beachwood Hair Clinic, Inc.,* 279 F.R.D. at 445. Plaintiff S & S's claim that ZirMed sent a fax in violation of the TCPA arises from the same allegedly prohibited practice that gives rise to the claims of other class members, as it is undisputed the same fax advertisement was sent to all class members. Additionally, Plaintiff is seeking the same damages as all other class members. Accordingly, the typicality requirement is satisfied.

IV. FRCP 23(a)(4)—Adequacy

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

The fourth requirement for class certification is that "the representative parties will fairly and adequately protect the interests of the class." FED.R.CIV.P. 23(a)(4). "There are two criteria for determining whether the representation of the class will be adequate: (1) the representative must have common interests with unnamed members of the class; and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter v. General Motors Corp.,* 532 F.2d 511, 524–25 (6th Cir.1976); *see also Am. Med. Sys.,* 75 F.3d at 1083. "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between the named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prod., Inc. v. Windsor,* 521 U.S. 591, 625–26, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

a. Adequacy of the Representative

Plaintiff S & S was one of the many chiropractors targeted by ZirMed in its facsimile advertising campaign. There is no apparent conflict of interest between S & S and the class it seeks to represent. S & S is entitled to the same relief as all of the other class members, apart from the possibility of an incentive award. There is no indication S & S will not vigorously prosecute the interests of the class, despite ZirMed's contentions otherwise. Accordingly, S & S's interests are aligned with the other class members, and it is an adequate representative of the class.

b. Adequacy of Counsel

**\*15** Federal Rule of Civil Procedure 23(g) delineates the considerations a court must and may consider when appointing class counsel. Rule 23(g)(1)(A) states that a court must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

A court may also "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class ..." FED.R.CIV.P. 23(g)(1)(B).

There does not appear to be a dispute as to the adequacy of counsel to represent the interests of the class. Both Anderson & Wanca and Montgomery, Rennie & Jonson have handled TCPA claims for years and have been designated as class counsel in TCPA matters. The Court has reviewed their credentials and experience, (Docket No. 34, Exhibits J and K), and finds it is adequate. From the briefing, it is apparent they have sufficient knowledge of the applicable law. Finally, it appears they are adequately committed to representing the class and will devote sufficient resources toward that representation. Accordingly, the adequacy requirement is met.

V. FRCP 23(b)(3)—Predominance Requirement

Federal Rule of Civil Procedure 23(b)(3) requires that the court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members ..." FED.R.CIV.P. 23(b)(3). The Rule 23(b)(3) predominance requirement parallels the Rule 23(a)(2) commonality requirement in "that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *Am. Med. Sys.,* 75 F.3d at 1084. "To satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof ...

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

predominate over those issues that are subject only to individualized proof." *Beattie,* 511 F.3d at 564.

The court must determine if the questions common to the class are "at the heart of the litigation." *Powers v. Hamilton County Public Defender Comm'n,* 501 F.3d 592, 619 (6th Cir.2007). "[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988). "The predominance requirement is satisfied unless it is clear that individual issues will overwhelm the common questions and render the class action valueless." *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 297, 307 (E.D.Mich.2001). "Common questions need only predominate: they need not be dispositive of the litigation." *Id* .

**\*16** ZirMed argues that S & S has only alleged one common issue, whether the opt-out language on the ZirMed fax substantially complies with the FCC regulations, while ignoring three substantive issues that predominate over the single opt-out issue.[FN15] (Docket No. 36, at 28.) These three issues are: (1) whether each class member had an "established business relationship" with ZirMed; (2) whether the ZirMed Fax was "unsolicited" with respect to each class member; and (3) who is a member of the class. *Id.* The Court will address each of these issues to determine whether they predominate over common issues.

> FN15. Plaintiff S & S also alleges that whether the ZirMed fax is an "advertisement," as that term is defined by the TCPA, and damages are common issues. ZirMed argues these are not common issues because it has admitted that the fax meets the TCPA's definition of an advertisement and the damages have already been determined to be $500 for each class member.

1. Established Business Relationship Defense

With respect to (1), the established business relationship defense, ZirMed alleges it maintains a database of prospective customer information, including fax numbers, which it has received through a variety of sources. ZirMed states a "preliminary review" reflects that at least 35 faxes were successfully sent to "individuals or entities for which ZirMed already had contact information—from sources other than Eleadlists—at the time of ZirMed's trial fax campaign." (Docket No. 36, at 34.) Accordingly, ZirMed argues that individualized proof will be required to determine whether each fax was sent to an entity with which ZirMed had an existing business relationship.

In response to these arguments, S & S contends that the established business relationship defense is: (1) not even available because of the absence of a compliant opt-out notice; [FN16] and (2) in any event, is an affirmative defenses for which ZirMed bears the burden of proof and has not produced any evidence whatsoever. (Docket No. 40, at 20.) Specifically, S & S points out that, even assuming an established business relationship existed, for an unsolicited advertisement to be lawful under the TCPA it must contain a compliant opt-out notice:

> FN16. ZirMed argues that the determination of whether the fax advertisement's opt-out notice is compliant is an issue that should be resolved at the merits stage and not at the class certification stage. (Docket No. 43–1, at 11–13.) The Court notes that "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc.,* 133 S.Ct. at 1194–95. The certification analysis "will frequently entail overlap with the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

merits of the plaintiff's underlying claim ... because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. .,* 133 S.Ct. at 1432 (internal quotation marks omitted) (quoting *Dukes,* 131 S.Ct. at 2551–52)).

Whether the opt-out notice is compliant is an issue that has direct bearing on the appropriateness of class certification—specifically the predominance requirement—because it impacts whether individualized inquiries into the established business relationship and permission/consent defenses are necessary. Therefore, the Court can resolve this issue at the class certification stage. In any event, as the Court will note, ZirMed has not presented any evidence on these affirmative defenses.

(b) Restrictions on use of automated telephone equipment

(1) It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—

....

**(C)** to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, **unless**—

**(i)** the unsolicited advertisement is from a sender with an **established business relationship** with the recipient;

**(ii)** the sender obtained the number of the telephone facsimile machine through-

**(I)** the voluntary communication of such number, within the context of such established business relationship, from the recipient of the unsolicited advertisement, or

**(II)** a directory, advertisement, or site on the Internet to which the recipient voluntarily agreed to make available its facsimile number for public distribution,

except that this clause shall not apply in the case of an unsolicited advertisement that is sent based on an established business relationship with the recipient that was in existence before July 9, 2005, if the sender possessed the facsimile machine number of the recipient before such date of enactment; **and**

**\*17 (iii) the unsolicited advertisement contains a notice meeting the requirements under paragraph (2)(D),**

except that the exception under clauses (i) and (ii) shall not apply with respect to an unsolicited advertisement sent to a telephone facsimile machine by a sender to whom a request has been made not to send future unsolicited advertisements to such telephone facsimile machine that complies with the requirements under paragraph (2)(E)

47 U.S.C. § 227(b) (emphasis added). Accordingly, even assuming an established business relationship existed

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

between ZirMed and some potential class members, the existence of that relationship is irrelevant if the opt-out notice does not meet the requirements under 47 U.S.C. 227(b)(2)(D). This is because sending an unsolicited fax advertisement to a recipient with whom an established business relationship exists is still a violation of the TCPA if the opt-out notice is not compliant.

The opt-out notice on the ZirMed fax advertisements states: "To unsubscribe from ZirMed faxes, please visitinfo.zirmed.com/optout." (Docket No. 34–3.) 47 U.S.C. 227(b)(2)(D) delineates the requirements for a compliant opt-out notice:

(2) Regulations; exemptions and other provisions The Commission shall prescribe regulations to implement the requirements of this subsection. In implementing the requirements of this subsection, the Commission—

....

(D) shall provide that **a notice contained in an unsolicited advertisement complies** with the requirements under this subparagraph only if—

(i) the notice is clear and conspicuous and on the first page of the unsolicited advertisement;

(ii) the notice states that the recipient may make a request to the sender of the unsolicited advertisement not to send any future unsolicited advertisements to a telephone facsimile machine or machines and that failure to comply, within the shortest reasonable time, as determined by the Commission, with such a request meeting the requirements under subparagraph (E) is unlawful;

(iii) the notice sets forth the requirements for a request under subparagraph (E);

(iv) the notice includes—

(I) a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender; and

(II) a cost-free mechanism for a recipient to transmit a request pursuant to such notice to the sender of the unsolicited advertisement; the Commission shall by rule require the sender to provide such a mechanism and may, in the discretion of the Commission and subject to such conditions as the Commission may prescribe, exempt certain classes of small business senders, but only if the Commission determines that the costs to such class are unduly burdensome given the revenues generated by such small businesses;

(v) the telephone and facsimile machine numbers and the cost-free mechanism set forth pursuant to clause (iv) permit an individual to make such a request at any time or any day of the week; **and**

***18** (vi) the notice complies with the requirements of subsection (d) of this section.

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

47 U.S.C. 227(b)(2)(D) (emphasis added). The opt-out notice on the ZirMed fax sent in this case does not meet these requirements.

In violation of paragraph (ii), the notice does not state that the recipient may make a request to stop future unsolicited advertisements and that "failure to comply, within the shortest reasonable time ... with such a request is unlawful." In violation of paragraph (iii), it does not set forth the requirements for a request to stop future unsolicited advertisements under 47 U.S .C. 227(b)(2)(E). In violation of paragraph (iv), it arguably does not include "a domestic contact telephone and facsimile machine number for the recipient to transmit such a request to the sender." Additionally, it appears the notice may violate paragraph (v) because it is not clear the telephone and facsimile machine numbers "permit an individual to make such a request at any time on any day of the week." [FN17] The use of the word "and" in paragraph (v) connotes that each paragraph, (i)-(vi), must be satisfied for a notice to be compliant. It is clear that, at the very least, the opt-out notice on the ZirMed fax fails to satisfy several of these paragraphs.

> FN17. The Court also notes the notice is arguably not "clear and conspicuous," as required by paragraph (i), because it is in a type-face smaller than the remainder of the ad copy and at the bottom of the page.

ZirMed's passing citation to *Landsman & Funk, P.C. v. Lorman Bus. Ctr., Inc.,* 2009 WL 602019 (W.D.Wis. Mar.9, 2009), for the notion that only "substantial compliance" is required is not applicable. In that case, the opt-out notice stated that "[f]ailure to comply within a reasonable time with a request to opt-out would be unlawful," which the court found satisfied paragraph (ii). *Id.* at *2, *5–6. The opt-out notice in this case does not state that ZirMed's failure to comply with an opt-out request would be unlawful. Furthermore, unlike the opt-out notice in *Landsman,* it does not convey what an opt-out notice must state in order to comply with the TCPA. *See Bais Yaakov of Spring Valley v. Alloy, Inc.,* 936 F.Supp.2d 272, 288 (S.D.N.Y.2013) ("Unlike *Landsman,* where defendant conveyed the essence of the required information, Defendants here are alleged not to have addressed the prescribed issues *at all.*").

Because the opt-out notice is not compliant, whether an established business relationship existed between some potential class members and ZirMed is irrelevant. Accordingly, it is unnecessary to inquire into whether an established business relationship existed for each proposed class member and it cannot be found that this issue "predominates" over the common issues so as to preclude granting of class certification.[FN18]

> FN18. In any event, the Court notes that ZirMed has the burden of proving this defense and it failed to meet this burden. The Federal Regulations clearly place the burden on the sender, ZirMed:
>
> > To ensure that the EBR exemption is not exploited, the Commission concludes that **an entity that sends a facsimile advertisement on the basis of an EBR should be responsible for demonstrating the existence of the EBR.** The entity sending the fax is in the best position to have records kept in the ordinary course of business showing an EBR, such as purchase agreements, sales slips, applications and inquiry records. (Digitized documents would be acceptable if kept in the ordinary course of business and if they established the existence of the EBR.) The Commission does emphasize that it is not requiring any specific records be kept by facsimile senders. Should a question arise, however, as to the validity of an EBR, **the burden will be on the sender to show that it has a valid EBR with the recipient.**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Preven-
tion Act of 2005, 71 FR 25967, at 25967 (emphasis added). Other courts have also concluded that the
burden is on the sender. *See, e.g., Lampkin v. GGH, Inc.,* 2006 OK Civ.App. 131, at 854–55, 146 P.3d 847
(Okla.Ct.App.2006). ZirMed has produced no evidence to meet this burden and did not respond to Plaintiff
S & S's discovery requests for documents indicating an established business relationship existed between
Defendant and any person to whom a facsimile transmission was sent.

2. Permission/Consent Defense

Regarding the permission/consent defense, ZirMed argues that it purchased the chiropractor list from Eleadlists
only after it "sought assurances ... that the Chiropractor List only included contacts that had provided consent." [FN19]
(Docket No. 36, at 29–30.) Essentially, ZirMed argues that consent presents an issue that is not subject to generalized
proof and, therefore, class certification is not appropriate. As with the established business relationship defense, S & S
argues this defense is: (1) not available because of the absence of a compliant opt-out notice; and (2) in any event, is an
affirmative defense for which ZirMed bears the burden of proof and has not produced any evidence whatsoever.
(Docket No. 40, at 20.)

FN19. ZirMed filed a notice of supplemental authority, (Docket No. 48), bringing to the Court's attention a
recent, non-binding Northern District of Ohio case holding that the commonality requirement was not satis-
fied because there was evidence of the existence of permission and established business relationships.
*Sandusky Wellness Center, LLC v. Wagner Wellness, Inc.,* 2014 U.S. Dist. LEXIS 38475, 2014 WL 1224418
(N.D.Ohio Mar. 24, 2014). The Court notes this case is distinguishable because, as discussed, there is no
evidence of these present.

In any event, the Court would respectfully disagree with that court's analysis. With respect to the estab-
lished business relationship defense/exception, that court did not acknowledge that a plain reading of the
statute provides that an established business relationship alone is not enough to preclude liability—among
other requirements is a compliant opt-out notice. This is established by the presence of "and" in 47 U.S.C.
227(b)(1)(C) within the list of requirements/exceptions after "unless." Regarding the permission defense,
that court did not discuss or acknowledge the federal regulations requiring a compliant opt-out notice, even
in situations where permission or consent is present.

**\*19** Federal Regulations require a compliant opt-out notice on facsimile advertisements that are sent with the
recipient's permission:

(iv) A facsimile advertisement that is sent to a recipient that has provided prior express invitation or permission to
the sender must include an opt-out notice that complies with the requirements in paragraph (a)(4)(iii) of this section.

47 C.F.R. § 64.1200(a)(4)(iv); *see also* 71 FR 25972, 23972 ("entities that send facsimile advertisements to
consumers from whom they obtained permission must include on the advertisements their opt-out notice and contact
information to allow consumers to stop unwanted faxes in the future"); *Landsman,* 2009 WL 602019, at * 2, *4–7
(considering the compliance of an opt-out notice, despite finding that permission for future advertisements exist-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

ed).[FN20] The requirements for a compliant opt-out notice in 47 C.F.R. 64.1200(a)(4)(iii) contain essentially the same requirements as 47 U.S.C. 227(b)(2)(D), which the Court has already found the ZirMed fax did not meet in the analysis of the established business relationship defense.

> FN20. The Court notes that 47 U.S.C. § 227(b)(3)(B) permits a person or entity to bring a private right of action based on a violation of the regulations prescribed under the TCPA.

Notwithstanding these regulations, ZirMed argues, (Docket No. 36, at 33 n. 15), that the FCC had no authority to expand TCPA liability, and the FCC recently "sought comment to clarify this ambiguity and confusion it has caused courts." (*See* Docket Nos. 37–14; 37–15 .) The FCC seeking comment on its regulations requiring "fax advertisements sent to a consumer who has provided prior express invitation or permission to include an opt-out notice" is not legally significant. (Docket No. 37–14.) Additionally, Defendant's passing argument that the FCC was without authority to expand TCPA liability was not supported by any citations and, in any event, the Court disagrees that the FCC is without such authority.

Other courts, including two Courts of Appeals, have found that even advertisements sent with consent/permission must include an opt-out notice that complies with the applicable requirements.[FN21] *See, e.g., Nack v. Walburg,* 715 F.3d 680, 685 (8th Cir.2013); *Ira Holtzman, C.P.A. & Assocs. V. Turza,* 728 F.3d 682, 684 (7th Cir.2013); *Bais Yaakov of Spring Valley v. Alloy, Inc.,* 936 F.Supp.2d 272, 286–87 (S.D.N.Y.2013); *see also Hinman v. M and M Rental Center, Inc.,* 545 F.Supp.2d 802, 807 (N.D.Ill.2008) (stating "[t]he possibility that some of the individuals on the list may have separately consented to the transmissions at issue is an insufficient basis for denying certification"). The Court agrees with S & S that ZirMed's arguments for the alternative, that an opt-out notice isn't required, relies on cases decided before the FCC issued its regulatory guidance in 47 C.F.R. § 64.1200 and 71 FR 25967, or do not appropriately acknowledge the applicability of these regulations.

> FN21. The Court notes the cases cited by the ZirMed from Ohio state courts focused on the placement, in the context of the entire regulatory scheme, of the regulation requiring opt-out notices in advertisements sent with consent/permission in finding that regulation does not apply. While the Court admits the placement of the cited regulation is not ideal and confusing, the language itself clear and this Court would respectfully disagree with those courts' holdings.

Accordingly, whether potential class members provided permission/consent for advertisements from ZirMed is irrelevant because the fax ad that was sent did not contain a compliant opt-out notice.[FN22] As a result, it is irrelevant whether permission/consent existed for each proposed class member and it cannot be found that this issue "predominates" over the common issues, which would preclude class certification.

> FN22. The Court notes that, in any event, similar to the established business relationship defense, the burden is on ZirMed to establish the "permission" defense:
>
> > The Commission is concerned that permission not provided in writing may result in some senders erroneously claiming they had the recipient's permission to send facsimile advertisements. Commenters that discussed this issue agree that **a sender should have the obligation to demonstrate that it complied**

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

> **with the rules, including that it had the recipient's prior express invitation or permission.** Senders who choose to obtain permission orally are expected to take reasonable steps to ensure that such permission can be verified. In the event a complaint is filed, **the burden of proof rests on the sender to demonstrate that permission was given.** The Commission strongly suggests that senders take steps to promptly document that they received such permission. (An example of such documentation could be the recording of the oral authorization. Other methods might include established business practices or contact forms used by the sender's personnel.) Express permission need only be secured once from the consumer in order to send facsimile advertisements to that recipient until the consumer revokes such permission by sending an opt-out request to the sender.

> Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 FR 25967, at 25972 (emphasis added). ZirMed has produced no evidence with which to meet this burden. Notably, ZirMed has not responded to Plaintiff S & S's discovery requests for "[a]ll documents indicating any person gave prior express permission of invitation to receive facsimile transmissions." (Docket No. 40–3, at 6.)

### 3. Who is a Member of the Class

**\*20** Defendant ZirMed's final argument for why predominance doesn't exist is that individual fact finding will be required to identify the subscribers of the relevant fax numbers to which the fax advertisement was sent on November 7th and 8th of 2012. *See generally Compressor,* 292 F.R.D. at 451 (finding that even if the class was modified to include only fax machine owners there would need to be individualized determinations in order to ascertain members of the class because of the evidentiary problem of matching up the phone numbers with fax machine ownership, precluding class certification). The crux of ZirMed's argument is that it would be difficult to match up the actual person/entity that is the subscriber for each phone number from the chiropractor list to which faxes were sent because the list identifies chiropractors associated with the fax numbers—not necessarily the *subscribers* of those fax numbers. (Docket No. 36, at 25.) Essentially, ZirMed argues the names on the successful transmission lists do not necessarily correspond to the subscribers of those numbers. This argument by ZirMed challenges both whether common issues do "predominate" and whether the proposed class is ascertainable.

Relatedly, other courts have found that determining owners of fax machines corresponding with fax machine numbers which advertisements were sent would be feasible through the claims administration process. *See, e.g., City Select Auto Sales, Inc. v. David Randall Associates, Inc.,* 296 F.R.D. 299, 313–14 (D.N.J.2013) (stating "[t]his Court will follow the Northern District of Illinois and hold that the class is ascertainable based on the list of fax numbers who were successfully sent David Randall's advertisement in 2006"); *G.M. Sign, Inc. v. Finish Thompson, Inc.,* 2009 WL 2581324, at \*8 (N.D.Ill. Aug.20, 2009) (finding plaintiff can use the fax numbers on the transmission logs to determine the identity and contact information of class members). Similarly, this Court finds that determining the subscribers of the fax machine numbers to whom the fax advertisements were sent would be feasible through the claims administration process. While ZirMed is apparently correct in arguing that some persons/entities on the chiropractor list are not the subscribers to the corresponding fax machine phone number on that list, determining subscribers would only entail matching the phone number account bill with the numbers to whom the fax advertisements were successfully sent or obtaining an affidavit stating a claimant was the subscriber during November 2012. Furthermore, the list is a good starting point for beginning this inquiry and it is likely that a substantial majority of the persons/entities listed were, in fact, the subscribers to the fax machine phone numbers. Indeed, the difficulty of ascertaining this class

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)

**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

is less than in other class actions. Accordingly, while there will be some limited individualized inquiry necessary for this issue, the Court finds that common issues still "predominate," as is required by Rule 23(b)(3).

VI. FRCP 23(b)(3)—Superiority Requirement

**\*21** Federal Rule of Civil Procedure 23(b)(3) requires that the court find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3). S & S argues the TCPA lends itself to class actions because damage awards are only for $500 and it does not provide for attorney fees, making individual actions rare because the cost of litigation would dwarf any potential recovery. *See Mims v. Arrow Fin. Servs., LLC,* —— U.S. ——, ——, 132 S.Ct. 740, 753, 181 L.Ed.2d 881 (2012) (finding virtually all TCPA claims in federal courts are class actions). "Use of the class method is warranted particularly because class members are not likely to file individual actions—the cost of litigation would dwarf any potential recovery." *Glazer,* 722 F.3d at 861. S & S also points out that persons/entities who receive facsimile advertisements are, in all likelihood, completely unaware of their potential claims. Consequently, in the absence of a class action, these potential claimants are unlikely to bring individual claims. (*See* Docket No. 34–1, at 20.)

ZirMed argues, (Docket No. 36, at 28–29), that "Congress specified individual actions as the preferred means of addressing alleged TCPA violations ... preferably in small claims court." For this proposition, ZirMed relies on the Congressional Record and statements by Senator Hollings that "small claims court or a similar court would allow the consumer to appear before the court without an attorney." 137 Cong. Rec. S16, 205–06 (Statement of Sen. Hollings). Some courts have relied on this legislative history in concluding that a class action would not be superior to individual actions for TCPA claims. *See, e.g., Forman v. Data Transfer, Inc.,* 164 F.R.D. 400, 404 (E.D.Pa.1995).

In S & S's reply, it asserts that ZirMed's argument "demonstrates a near complete lack of understanding of small claims court," (Docket No. 40, at 29), and argues that corporations cannot represent themselves in court, as this generally constitutes the unauthorized practice of law. S & S also reiterates that not a single recipient has brought an individual action against ZirMed and that it is unrealistic to suggest any individual recipient will ever do so. In ZirMed's sur-reply, (Docket 43–1, at 15–16), it established that, notwithstanding S & S's arguments, corporations are permitted to represent themselves in small claims courts in Ohio and Kentucky.

After reviewing the applicable precedent and reviewing the parties' extensive briefing on this issue, the Court believes that the class action is a superior method for adjudicating the claims. While the legislative history arguably indicates a contrary Congressional intent, that history is not controlling given the plain language of the statute does not preclude class actions. Many courts have found that class actions are superior to individual actions in the context of the TCPA and permitted class certification. *See, e.g., Beachwood Hair Clinic, Inc.,* 279 F.R.D. at 446 (finding class action is superior); *G.M. Sign, Inc.,* 2009 WL 2581324, at \*7 (same). Furthermore, the Court believes it is clear that individual actions are unlikely to ever be filed in these matters, supporting the finding that the class action is a superior method for adjudicating the claims. Accordingly, this Court finds that a class action is a superior method for adjudicating the claims.

*Class Certification*

**\*22** Having found that all of the requirements of Federal Rule of Civil Procedure 23 are met, the Court will **GRANT** Plaintiff's Motion for Class Certification. (Docket No. 34.) However, consistent with the Court's conclusions

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 2946421 (W.D.Ky.)
**(Cite as: 2014 WL 2946421 (W.D.Ky.))**

above, the Court will make some amendments to the class definition. The Court's amended class definition is:

> All persons or entities who: (1) were the subscriber to the account associated with a fax number; (2) listed on one of the five Transmission Lists; (3) were successfully sent a copy of the Fax Ad from ZirMed; (4) on November 7th or 8th of 2012.

The amended class definition appropriately accounts for the Court's holding that subscribers to fax account numbers who were *unsuccessfully* sent a fax do not have a claim as a matter of law by removing the "unsuccessfully" language and leaving only "successfully." Additionally, the Court added the language "or entities" after "persons" because many of the recipients are entities rather than persons. *See City Select Auto Sales, Inc.,* 296 F.R.D. at 321 ("The Court will also add 'or entities' to the first clause to make clear that the class includes both 'persons' and 'entities.' This addition follows the TCPA's language, which provides a private right of action to 'a person or entity').

CONCLUSION

For these reasons, and consistent with the Court's conclusions above,

IT IS HEREBY ORDERED that Plaintiff's Motion for Class Certification, (Docket No. 34), is **GRANTED,** with the amendments discussed above. Proposed Intervenor–Plaintiff Sky Shelby, D.C., Inc ., Chiropractic's Motion to Intervene, (Docket No. 47), is **DENIED.**

IT IS SO ORDERED.

W.D.Ky.,2014.
Spine and Sports Chiropractic, Inc. v. ZirMed, Inc.
Slip Copy, 2014 WL 2946421 (W.D.Ky.)

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.